IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| BIOPARQUES DE OCCIDENTE, S.A. DE C.V., AGRICOLA LA PRIMAVERA, S.A. DE C.V., and KALIROY FRESH LLC,<br><br>Plaintiffs,<br><br>and<br><br>CONFEDERACION DE ASOCIACIONES AGRICOLAS DEL ESTADO DE SINALOA, A.C., CONSEJO AGRICOLA DE BAJA CALIFORNIA, A.C., ASOCIACION MEXICANA DE HORTICULTURA PROTEGIDA, A.C., ASOCIACION DE PRODUCTORES DE HORTALIZAS DEL YAQUI Y MAYO, and SISTEMA PRODUCTO TOMATE,<br><br>Consolidated Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>THE FLORIDA TOMATO EXCHANGE,<br><br>Defendant-Intervenor. | Consol. Court No. 19-00204 |

## ORDER

Upon consideration of plaintiffs' and consolidated plaintiffs' motions for judgment on the agency record, defendant's response, defendant-intervenor's response, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' and consolidated plaintiffs' motions for judgment on the agency record are denied; and it is further

ORDERED that the challenged determination, *Fresh Tomatoes from Mexico:  Final Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 57,401 (Dep't of Commerce Oct. 25, 2019), is sustained, and it is further

ORDERED that judgment is entered in favor of the United States.

_____
JUDGE

Date: _____, 2023
        New York, NY

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| BIOPARQUES DE OCCIDENTE, S.A. DE C.V., AGRICOLA LA PRIMAVERA, S.A. DE C.V., and KALIROY FRESH LLC, <br><br> Plaintiffs, <br><br> and <br><br> CONFEDERACION DE ASOCIACIONES AGRICOLAS DEL ESTADO DE SINALOA, A.C., CONSEJO AGRICOLA DE BAJA CALIFORNIA, A.C., ASOCIACION MEXICANA DE HORTICULTURA PROTEGIDA, A.C., ASOCIACION DE PRODUCTORES DE HORTALIZAS DEL YAQUI Y MAYO, and SISTEMA PRODUCTO TOMATE, <br><br> Consolidated Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> THE FLORIDA TOMATO EXCHANGE, <br><br> Defendant-Intervenor. | Consol. Court No. 19-00204 |

RESPONSE OF DEFENDANT UNITED STATES
TO PLAINTIFFS' AND CONSOLIDATED PLAINTIFFS'
RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

Of Counsel:

DOUGLAS G. EDELSCHICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 353-9303

EMMA T. HUNTER
Assistant Chief Counsel
Office of the Chief Counsel for
    Trade Enforcement and Compliance
United States Department of Commerce

June 29, 2023

Attorneys for Defendant

## <u>TABLE OF CONTENTS</u>

**Page:**

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT PURSUANT TO RULE 56.2 ..................................................2

I.  Administrative Determination Under Review ....................................2

II. The Issues Presented For Review ...................................................3

STATEMENT OF FACTS ...................................................................4

I.  History Of The Antidumping Proceeding ........................................4

II. Commerce's Withdrawal From The 2013 Suspension Agreement And
    Resumption Of The Investigation ...................................................6

III. The 2019 Suspension Agreement And Commerce's Continued Investigation .................7

IV. A Brief History Of The Litigation ..................................................8

SUMMARY OF THE ARGUMENT ........................................................9

ARGUMENT .................................................................................10

I.  Standard Of Review ...................................................................10

II. Bioparques Has Waived Numerous Claims By Failing To Argue Them ........................11

III. Commerce's Continuation Of The Investigation Is In Accordance With Law ................12

    A.  Commerce's Continuation Of The Investigation ................................13

    B.  Commerce Lawfully Continued Its Investigation Pursuant To Section
        1673c(g) ...................................................................14

    C.  Commerce Did Not Initiate "An Entirely New Investigation" When It
        Resumed, And Later Continued, Its Previously Suspended Investigation ..........17

IV. Bioparques Failed to Exhaust Its Affected Sales Arguments And Those
    Arguments Otherwise Fail To Account For Ambiguity In The Statute ..........................21

    A.  Bioparques Did Not Exhaust Its Affected Sales Argument Under Section
        1673c(j) ...................................................................21

    B.  Bioparques' Arguments Fail To Account For An Ambiguity In Section
        1673c(j) ...................................................................24

**TABLE OF CONTENTS (continued)**

Page:

V.    Commerce's Determination To Compare Normal Value To Export Price On An
      Annual Basis Rather Than A Monthly Basis Was Supported By Substantial
      Evidence And Is In Accordance With Law .................................................................25

      A.    Legal Framework ..............................................................................................25

      B.    Commerce Reasonably Compared Normal Value To Export Price On An
            Annual Basis Rather Than A Monthly Basis .....................................................27

VI.   Commerce's Use Of The Cohen's *d* Test In Its Differential Pricing Analysis Is
      Accordance With Law and Supported By Substantial Evidence ....................................33

      A.    Legal Framework ..............................................................................................33

      B.    Commerce's Use Of The Cohen's *d* Test Is In Accordance With Law...............34

            1.    Commerce's Use Of The Cohen's *d* Test Reasonably Carries Out
                  The Purpose Of The Statute And Determines Whether U.S. Prices
                  Differ Significantly Among Purchasers, Regions, Or Time Periods ........35

            2.    The *Stupp* Line Of Cases Supports Commerce's Lawful Use Of
                  The Cohen's *d* Test In This Investigation................................................36

      C.    Commerce's Use Of The Cohen's *d* Test Took Into Account The Relevant
            Sales ..................................................................................................................39

      D.    Commerce's Differential Pricing Analysis Established That The Pattern
            Could Not Be Taken Into Account By An Average-To-Average
            Comparison, And Bioparques And CAADES Failed To Exhaust Their
            Challenge To The Sufficiency Of Commerce's Explanation...............................40

      E.    Commerce Reasonably Determined to Make Certain Comparisons Using
            Its Average-to-Transaction Methodology ..........................................................42

VII.  Commerce Properly Included Certain Sales in Its Normal Value Calculation................44

      A.    Legal Framework ..............................................................................................44

      B.    Commerce's Inclusion Of The Identified Sales Was Lawful...............................45

CONCLUSION...................................................................................................................46

## <u>TABLE OF AUTHORITIES</u>

**Cases:**                                                                                                           **Page(s):**

*Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024 (Fed. Cir. 2007)...................................23

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ............................................................................15

*Apex Frozen Foods Private Ltd. v. United States*, 37 F. Supp. 3d 1286 (Ct. Int'l
    Trade 2014) (*Apex I*)..........................................................................................................35

*Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337 (Fed. Cir. 2017)
    (*Apex II*) ..................................................................................................... 33, 35, 40, 41

*Bioparques de Occidente, S.A. de C.V. v. United States*, 470 F. Supp. 3d 1366
    (Ct. Int'l Trade 2020) (*Bioparques I*) ...............................................................................8

*Bioparques De Occidente, S.A. de C.V. v. United States*, 31 F.4th 1336 (Fed.
    Cir. 2022) (*Bioparques II*) ................................................................................ 9, 12, 13

*Boomerang Tube LLC v. United States*, 856 F.3d 908 (Fed. Cir. 2017)....................................22

*Camargo Correa Metais, S.A. v. United States*, 200 F.3d 771 (Fed. Cir. 1999) .........................15

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).............. 11, 23, 25

*Confederación de Asociaciones Agrícolas del Estado de Sinaloa, A.C. v. United
    States*, 459 F. Supp. 3d 1354 (Ct. Int'l Trade 2020) (*CAADES I*) ....................................8

*Confederación de Asociaciones Agricolas del Estado de Sinaloa, A.C. v. United
    States*, 32 F.4th 1130 (Fed. Cir. 2022) (*CAADES II*) ........................................................9

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992)...................................................................15

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003) ......................................23

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) .................................................................11

*Corus Staal BV v. United States*, 502 F.3d 1370 (Fed. Cir. 2007) .............................................22

*Echjay Forgings Private Ltd. v. United States*, 475 F. Supp. 3d 1350 (Ct. Int'l Trade 2020)......12

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996)...................................... 10, 11

*Fuwei Films (Shandong) Co. v. United States*, 791 F. Supp. 2d 1381 (Ct. Int'l Trade 2011) .22-23

*Hor Liang Indus. Corp. v. United States*, 337 F. Supp. 3d 1310 (Ct. Int'l Trade 2018)..............22

*Hymas v. United States*, 810 F.3d 1312 (Fed. Cir. 2016) ...........................................................15

**TABLE OF AUTHORITIES (continued)**

**Cases (continued):**                                                                                  **Page(s):**

*Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309 (Ct. Int'l Trade 2021) .......................32

*Itochu Bldg. Prods. v. United States*, 733 F.3d 1140 (Fed. Cir. 2013) ..................................22, 23

*JBF RAK LLC v. United States*, 790 F.3d 1358 (Fed. Cir. 2015)..........................................11, 35

*Jem D Int'l (Mich.) Inc. USA v. United States*, 470 F. Supp.3d 1374 (Ct. Int'l
     Trade 2020) (*Jem D I*) .....................................................................................................8

*Jem D Int'l (Mich.) Inc. USA v. United States*, No. 2021-1292, 2022 U.S. App.
     LEXIS 10044, 2022 WL 1112813 (Fed. Cir. Apr. 14, 2022) (*Jem D II*)..........................9

*Marmen, Inc. v. United States*, No. 20-00169, 2023 U.S. Ct. Int'l Trade LEXIS 42,
     2023 WL 2567405 (Ct. Int'l Trade March 20, 2023)................................................38, 39

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) ............................11

*Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662 (Fed. Cir 2019) .....................35

*Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375 (Fed. Cir. 2008)....................21, 22

*Norfolk Dredging Co. v. United States*, 375 F.3d 1106 (Fed. Cir. 2004) .....................................15

*NSK Ltd. v. United States*, 170 F. Supp. 2d 1280 (Ct. Int'l Trade 2001)......................................45

*PAM, S.p.A. v. United States*, 582 F.3d 1336 (Fed. Cir. 2009) .....................................................10

*Red Sun Farms v. United States*, 469 F. Supp. 3d 1403 (Ct. Int'l Trade 2020) (*Red Sun I*)....... 8-9

*Red Sun Farms v. United States*, 30 F.4th 1358 (Fed. Cir. 2022) (*Red Sun II*)..............................9

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 11851 (Fed. Cir. 1990) ..............................22, 42

*Russello v United States*, 464 U.S. 16 (1983)...............................................................................41

*Sandvik Steel Co. v. United States*, 164 F.3d 596 (Fed. Cir. 1998) .............................................21

*SeAH Steel Corp. v. United States*, 619 F. Supp. 3d 1309 (Ct. Int'l Trade 2023)..................38, 39

*Shenzhen Xinboda Indus. Co. v. United States*, 456 F. Supp. 3d 1272 (Ct. Int'l Trade 2020).......32

*SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312 (Fed. Cir. 2006) ...........................12

*Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021) ..................................... 34, 35, 36, 41

## TABLE OF AUTHORITIES (continued)

**Cases (continued):**                                                                     **Page(s):**

*Stupp Corp. v. United States*, 619 F. Supp. 3d 1314 (Ct. Int'l Trade 2023) .........................37, 38

*Timken Co. v. United States*, 354 F.3d 1334 (Fed. Cir. 2004) ....................................................11

*Union Steel v. United States*, 713 F.3d 1101 (Fed. Cir. 2013) ...................................................33

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009)....................................................................11

*Vicente Camalu SPR de RI v. United States*, 366 F. Supp. 2d 1373 (Ct. Int'l Trade 2005)...........18

*Williams v. Taylor*, 529 U.S. 420 (2000) ...................................................................................15

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013).............22

**Statutes And Legislative History:**

19 U.S.C. § 1516a.....................................................................................................................10

19 U.S.C. § 1673c.................................................................................................................*passim*

19 U.S.C. § 1675.................................................................................................................24, 33

19 U.S.C. § 1677.................................................................................................................45, 46

19 U.S.C. § 1677b.....................................................................................................................44

19 U.S.C. § 1677f-1..............................................................................................25-27, 33-35, 41-44

28 U.S.C. § 1581.........................................................................................................................9

28 U.S.C. § 2637.......................................................................................................................22

28 U.S.C. § 2639.......................................................................................................................10

Statement of Administrative Action Accompanying Uruguay Round Agreements
    Act, H.R. Doc. 103-316 (1994) ...................................................................................44-45

**Regulations:**

19 C.F.R. § 351.102 .............................................................................................................45, 46

19 C.F.R. § 351.303 ...................................................................................................................14

19 C.F.R. § 351.414 .........................................................................................................26, 27, 33, 34

19 C.F.R. § 353.42 (1996) ..........................................................................................................19

## TABLE OF AUTHORITIES (continued)

**Regulations (continued):**                                            **Page(s):**

19 C.F.R. § 353.56 (1996).................................................................................7

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (Dep't of
Commerce May 19, 1997) (final rules)...................................................29, 43

*Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308 (Dep't of
Commerce Feb. 27, 1996) (proposed rules)............................................29, 43

**Administrative Decisions:**

*64K Dynamic Random Access Memory Components (64K DRAMs) from Japan*, 51 Fed.
Reg. 15,943 (Dep't of Commerce, Apr. 29, 1986) (final AD determination) ................30

*Certain Fresh Cut Flowers from Colombia*, 52 Fed. Reg. 6,842 (Dep't of Commerce
March 5, 1987) (final AD determination)......................................................42

*Certain Fresh Winter Vegetables from Mexico*, 45 Fed. Reg. 20,512 (Dep't of
Commerce March 28, 1980) (final AD determination)......................................42

*Certain Lemon Juice from Brazil*, 87 Fed. Reg. 47,697 (Dep't of Commerce Aug.
4, 2022) (prelim. AD determination) ...........................................................31

*Certain Lemon Juice from Brazil*, 87 Fed. Reg. 78,939 (Dep't of Commerce Dec.
23, 2022) (final AD determination) .............................................................31

*Dynamic Random Access Memory Semiconductors from the Republic of Korea*,
58 Fed. Reg. 15,467 (Dep't Commerce, Mar. 23, 1993) (final AD
determination) (*DRAMs from Korea*) ....................................................29-30

*Erasable Programmable Read Only Memories (EPROMs) from Japan*, 51 Fed.
Reg. 39,680 (Dep't of Commerce, Oct. 30, 1986) (final AD determination)................30

*Fresh and Chilled Atlantic Salmon from Norway*, 56 Fed. Reg. 7,661 (Dep't of
Commerce Feb. 25, 1991) (final AD determination) (*Norwegian Salmon*) ................28-31

*Fresh Tomatoes from Mexico*, 84 Fed. Reg. 57,401 (Dep't of Commerce Oct. 25,
2019) (final AD determination)..............................................................*passim*

*Fresh Tomatoes from Mexico*, 84 Fed. Reg. 49,987 (Dep't of Commerce Sept. 24,
2019) (2019 suspension agreement)............................................7, 13-14, 18

*Fresh Tomatoes from Mexico*, 84 Fed. Reg. 20,858 (Dep't of Commerce May 13,
2019) (termination and resumption of investigation)............................5, 6, 14, 18, 20, 21

**TABLE OF AUTHORITIES (continued)**

**Administrative Decisions (continued):**                                      **Page(s):**

*Fresh Tomatoes from Mexico*, 78 Fed. Reg. 14,967 (Dep't of Commerce March 8,
    2013) (2013 suspension agreement) ................................................................5

*Fresh Tomatoes from Mexico*, 78 Fed. Reg. 14,771 (Dep't of Commerce March 7,
    2013) (termination and resumption of investigation) ........................................5

*Fresh Tomatoes from Mexico*, 73 Fed. Reg. 4,831 (Dep't of Commerce Jan. 28,
    2008) (2008 suspension agreement) ................................................................5

*Fresh Tomatoes from Mexico*, 73 Fed. Reg. 2,887 (Dep't of Commerce Jan. 16,
    2008) (termination and resumption of investigation) ........................................5

*Fresh Tomatoes from Mexico*, 67 Fed. Reg. 77,044 (Dep't of Commerce Dec. 16,
    2002) (2002 suspension agreement) ................................................................5

*Fresh Tomatoes from Mexico*, 67 Fed. Reg. 50,858 (Dep't of Commerce Aug. 6,
    2002) (termination and resumption of investigation) ........................................5

*Fresh Tomatoes from Mexico*, 61 Fed. Reg. 56,618 (Dep't of Commerce Nov. 1,
    1996) (1996 suspension agreement) ................................................................4

*Fresh Tomatoes from Mexico*, 61 Fed. Reg. 56,608 (Dep't of Commerce Nov. 1,
    1996) (preliminary AD determination) ........................................................4, 32

*Fresh Tomatoes from Mexico*, 61 Fed. Reg. 18,377 (Dep't of Commerce Apr. 25,
    1996) (initiation notice) ................................................................................4

*Ripe Olives from Spain*, 83 Fed. Reg. 3,677 (Dep't of Commerce Jan. 26, 2018)
    (prelim. AD determination) ......................................................................31-32

*Ripe Olives from Spain*, 83 Fed. Reg. 28,193 (Dep't of Commerce June 18, 2018)
    (final AD determination) ..............................................................................32

*Static Random Access Memory Semiconductors (SRAMs) from Taiwan*, 63 Fed.
    Reg. 8,909 (Dep't of Commerce, Feb. 23, 1998) (final AD determination) ..................30

**Rules:**

USCIT R. 56.2 ................................................................................................1, 2

**Other Authorities:**

Merriam-Webster's Collegiate Dictionary (11th ed. 2005) ........................................25

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| BIOPARQUES DE OCCIDENTE, S.A. DE C.V., AGRICOLA LA PRIMAVERA, S.A. DE C.V., and KALIROY FRESH LLC, <br><br>       Plaintiffs, <br><br>       and <br><br> CONFEDERACION DE ASOCIACIONES AGRICOLAS DEL ESTADO DE SINALOA, A.C., CONSEJO AGRICOLA DE BAJA CALIFORNIA, A.C., ASOCIACION MEXICANA DE HORTICULTURA PROTEGIDA, A.C., ASOCIACION DE PRODUCTORES DE HORTALIZAS DEL YAQUI Y MAYO, and SISTEMA PRODUCTO TOMATE, <br><br>       Consolidated Plaintiffs, <br><br>       v. <br><br> UNITED STATES, <br><br>       Defendant, <br><br>       and <br><br> THE FLORIDA TOMATO EXCHANGE, <br><br>       Defendant-Intervenor. | Consol. Court No. 19-00204 |

RESPONSE OF DEFENDANT UNITED STATES
TO PLAINTIFFS' AND CONSOLIDATED PLAINTIFFS'
RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade,

defendant, the United States, respectfully submits this response in opposition to the motions for

judgment on the agency record filed by Bioparques and CAADES.[1]  Bioparques Br. in Supp. of

Mot. for J., Dec. 20, 2022, ECF No. 83-1 (Bioparques Br.); CAADES Am. Mot. for J., May 30,

2023, ECF No. 92 (CAADES Br.).  Bioparques challenges various aspects of the final

determination by the United States Department of Commerce (Commerce) in the continued

antidumping duty (AD) investigation of fresh tomatoes from Mexico.  CAADES adopts some, but

not all, of Bioparques' arguments.[2]  Their motions should be denied because Commerce's final

determination is supported by substantial evidence and is in accordance with law.  Accordingly,

we respectfully request that the Court sustain the final determination and enter judgment in favor

of the United States.

STATEMENT PURSUANT TO RULE 56.2

I.    Administrative Determination Under Review

        The challenged administrative determination is *Fresh Tomatoes from Mexico*, 84 Fed.

Reg. 57,401 (Dep't of Commerce Oct. 25, 2019) (final AD determination) (P.R. 516)[3] (Final

---

[1]  In this motion, we refer to the following plaintiffs collectively as "Bioparques:"
(1) Bioparques de Occidente, S.A. de C.V.; (2) Agricola La Primavera, S.A. de C.V.; and
(3) Kaliroy Fresh LLC.  We also refer to the following consolidated plaintiffs collectively as
"CAADES":  (1) Confederacion de Asociaciones Agricolas del Estado de Sinaloa, A.C.;
(2) Consejo Agricola de Baja California, A.C.; (3) Asociacion Mexicana de Horticultura
Protegida, A.C.; (4) Asociacion de Productores de Hortalizas del Yaqui Y Mayo; and (5) Sistema
Producto Tomate.  Finally, we refer to defendant-intervenor Florida Tomato Exchange as "FTE."

[2]  CAADES incorporates by reference and adopts the arguments in sections A, D, E, and
F of Bioparques' brief.  CAADES Br. 2.  CAADES takes no position on the arguments in
sections B and C of Bioparques' brief.  *Id.*  CAADES argues that Commerce must recalculate the
all-others rate if the dumping margin for Bioparques changes as a result of this litigation.  *Id.*  If
Bioparques were to prevail on any arguments that result in a recalculation of its dumping margin
(and it should not), we agree that Commerce would have to recalculate the all-others rate as well.

[3]  In this brief, "P.R." refers to a document in the public section of the agency record.
P.R. Index, Feb. 12, 2020, ECF No. 25-4.  "C.R." refers to a document in the business
proprietary section of the agency record.  C.R. Index, Feb. 12, 2020, ECF No. 25-5.  In July
2020, the Court granted our motion to correct Commerce's certification of the agency record.
Order, July 15, 2020, ECF No. 43; Corrected Certification, May 11, 2020, ECF No. 39-3.

Determination), and the accompanying Issues and Decision Memorandum (IDM) (P.R. 494). The original period of investigation (POI) was March 1, 1995, through February 29, 1996. Due to the unusual procedural posture of this proceeding, in which Commerce terminated a suspension agreement and then continued an investigation more than 23 years after the POI, Commerce calculated Bioparques' dumping margin in the Final Determination based upon more recent information from the period from April 1, 2018, to March 31, 2019.

II.    The Issues Presented For Review

1.    Whether Bioparques has waived counts 1(a), 1(b), 6, 8, and 9 of its complaints by failing to address them in its opening brief.

2.    Whether Commerce had authority to continue the investigation and issue a final determination based on a timely-filed request by FTE in accordance with 19 U.S.C. § 1673c(g).

3.    Whether Commerce's conduct of the continued investigation was in accordance with law.

4.    Whether Bioparques failed to exhaust its challenge to Commerce's reliance upon data from April 2018 to March 2019 (when the 2013 suspension agreement was in effect), and if not, whether Commerce reasonably determined to request and use that recent data to account for the unusual procedural posture of the resumed investigation.

5.    Whether Commerce reasonably determined normal value and export price based on POI averages as opposed to monthly averages.

6.    Whether Commerce reasonably employed its differential pricing analysis in determining how to compare normal value and export price in the investigation.

7.    Whether Commerce reasonably included certain reported sales by Bioparques in its calculation of normal value.

STATEMENT OF FACTS

I.   History Of The Antidumping Proceeding

This action stems from Commerce's currently suspended antidumping duty investigation concerning fresh tomatoes from Mexico.  In April 1996, Commerce initiated an investigation to determine whether imports of fresh tomatoes from Mexico were being, or were likely to be, sold in the United States at less than fair value.  *Fresh Tomatoes from Mexico*, 61 Fed. Reg. 18,377 (Dep't of Commerce Apr. 25, 1996).

On October 28, 1996, Commerce issued its preliminary determination finding that imports of fresh tomatoes from Mexico were being sold at less than fair value in the United States.  *Fresh Tomatoes from Mexico*, 61 Fed. Reg. 56,608, 56,615 (Dep't of Commerce Nov. 1, 1996) (1996 Preliminary Determination).  Commerce also explained that, in accordance with 19 U.S.C. § 1673d(a)(2)(a), and based upon a request from five of the six mandatory respondents, it would postpone its final determination "until the 135th day after the date of the affirmative preliminary determination in the Federal Register."  *Id.* at 56,609.

That same day, Commerce also announced that it had signed an agreement with certain Mexican signatories (1996 Suspension Agreement) to suspend the investigation.  *Fresh Tomatoes from Mexico*, 61 Fed. Reg. 56,618, 56,619 (Dep't of Commerce Nov. 1, 1996).  The term, "signatories," throughout the various suspension agreements at issue, has referred to the "signatory producers/exporters of fresh tomatoes from Mexico."  *Id.*

Following the 1996 Suspension Agreement, Commerce and Mexican signatories entered into a series of suspension agreements after certain Mexican signatories announced that they wanted to withdraw from the suspension agreement in effect at that time, consistent with the withdrawal provision negotiated in each agreement.  Specifically, in 2002, 2007, and 2013,

certain Mexican signatories informed Commerce that they wished to withdraw from the relevant agreement.[4]  Each time certain Mexican signatories announced their withdrawal from the suspension agreement in effect at that time, Commerce terminated the suspension agreement and resumed the investigation.[5]  Each time certain Mexican signatories withdrew, the parties were able to negotiate a new agreement, and in 2002, 2008, and 2013, new suspension agreements went into effect.[6]

For Commerce, suspension of the investigation had the effect of resetting the clock for the deadline to complete the investigation, if resumed.  As a result, when Commerce resumed the investigation in 2002, 2008, and 2013, it treated the 1996 Preliminary Determination as if it had been published on the effective date of termination.  *Fresh Tomatoes from Mexico*, 67 Fed. Reg. at 50,859-60; *Fresh Tomatoes from Mexico*, 73 Fed. Reg. at 2,889; *Fresh Tomatoes from Mexico*, 78 Fed. Reg. at 14,772.  In other words, each time Commerce resumed the investigation, the agency indicated that it would issue a final determination within 135 days.  *Id*.

---

[4]  *Fresh Tomatoes from Mexico*, 67 Fed. Reg. 50,858, 50,858-59 (Dep't of Commerce Aug. 6, 2002) (notice of termination of suspension agreement and resumption of antidumping investigation); *Fresh Tomatoes from Mexico*, 73 Fed. Reg. 2,887, 2,888-89 (Dep't of Commerce Jan. 16, 2008) (same); *Fresh Tomatoes from Mexico*, 78 Fed. Reg. 14,771, 14,771 (Dep't of Commerce March 7, 2013) (same); *see also Fresh Tomatoes from Mexico*, 84 Fed. Reg. 20,858, 20,859 n.9 (Dep't of Commerce May 13, 2019) (same, explaining history of proceedings).

[5]  *Fresh Tomatoes from Mexico*, 67 Fed. Reg. at 50,860; *Fresh Tomatoes from Mexico*, 73 Fed. Reg. at 2,889; *Fresh Tomatoes from Mexico*, 78 Fed. Reg. at 14,772.

[6]  *Fresh Tomatoes from Mexico*, 67 Fed. Reg. 77,044, 77,046 (Dep't of Commerce Dec. 16, 2002) (notice of suspension of AD investigation); *Fresh Tomatoes from Mexico*, 73 Fed. Reg. 4,831, 4,833 (Dep't of Commerce Jan. 28, 2008) (same); *Fresh Tomatoes from Mexico*, 78 Fed. Reg. 14,967, 14,968 (Dep't of Commerce March 8, 2013) (same) (2013 Suspension Agreement).

II.    Commerce's Withdrawal From The 2013 Suspension Agreement And Resumption Of
       The Investigation

In March 2019, in accordance with section VI.B of the 2013 Suspension Agreement,

Commerce notified the Mexican signatories that Commerce intended to withdraw from the 2013

Suspension Agreement by May 7, 2019, if the parties were unable to reach a new agreement.

*Fresh Tomatoes from Mexico*, 84 Fed. Reg. 7,872, 7,874 (Dep't of Commerce March 5, 2019).

In May 2019, Commerce published a notice that it was withdrawing from the 2013

Suspension Agreement and resuming the investigation.  *Fresh Tomatoes from Mexico*, 84 Fed.

Reg. 20,858 (Dep't of Commerce May 13, 2019); Final Determination, 84 Fed. Reg. 57,401.

Because of the unusual procedural posture of this proceeding, in which Commerce terminated a

suspension agreement and resumed an investigation more than 23 years after the POI, Commerce

determined to request one year of updated information from April 2018 through March 2019.

*Fresh Tomatoes from Mexico*, 84 Fed. Reg. at 20,860.  Given this unusual procedural posture,

Commerce also determined to reconsider respondent selection.  *Id.*  Commerce selected

Bioparques as a mandatory respondent.  Final Determination, 84 Fed. Reg. at 57,401.

Commerce also explained that, because the statute "does not identify the timing for

completion of the investigation in this particular scenario," the agency was "looking to" 19

U.S.C. § 1673c(i)(1)(B) "for guidance."  *Fresh Tomatoes from Mexico*, 84 Fed. Reg. at 20,860.

Consistent with 19 U.S.C. § 1673c(i)(1)(B), Commerce stated that, "[a]s explained in its 1996

Preliminary Determination, Commerce previously postponed the final determination until the

135th day after the date of the preliminary determination."  *Id.*  Thus, Commerce "intend[ed] to

issue its final determination 135 days after the effective date of withdrawal from and termination

of the 2013 Suspension Agreement, *i.e.*, by September 19, 2019, unless a new suspension

agreement becomes effective prior to or on this date."  *Id.*

In July 2019, Commerce issued a post-preliminary determination.  Post-Preliminary Determination Memo. (July 23, 2019) (P.R. 278) (Post-Preliminary Determination).  In the Post-Preliminary Determination, Commerce applied the statute and regulations in their 1996 iterations, supplementing where necessary with its current and typical practice.  *See*, *e.g.*, Post-Prelim Determination 13 (citing 19 C.F.R. § 353.56 (1996)); *see also* IDM 5.  During its resumed investigation, which was completed within a 135-day timeframe, Commerce issued initial questionnaires and supplemental questionnaires to the three mandatory respondents, and parties submitted timely responses and other required information.  *Id.*

With respect to the differential pricing analysis, in its Post-Preliminary Determination, Commerce determined that 46.88 percent of the value of Bioparques' U.S. sales passed the "Cohen's *d*" test and confirmed the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  Post-Preliminary Determination 8.  Commerce further determined, based on its normal differential pricing analysis, to apply the average-to-transaction (or A-to-T) method to those U.S. sales which passed the Cohen's *d* test, and to apply the average-to-average (or A-to-A) method to those sales which did not pass the Cohen's *d* test, to calculate a weighted-average dumping margin for Bioparques.  *Id.*  With respect to normal value, Commerce applied its typical practice in determining normal value.  *Id.* at 10-13.

III.   The 2019 Suspension Agreement And Commerce's Continued Investigation

In September 2019, Commerce published notice that it was suspending the investigation based on a new suspension agreement between Commerce and Mexican signatories.  *Fresh Tomatoes from Mexico*, 84 Fed. Reg. 49,987 (Dep't of Commerce Sept. 24, 2019) (2019 Suspension Agreement).

In October 2019, Commerce continued the investigation pursuant to 19 U.S.C. § 1673c(g) after receiving requests from FTE and Red Sun Farms to do so.  Final Determination,

84 Fed. Reg. at 57,402.  After considering interested parties' comments on the Post-Preliminary Determination, Commerce issued the Final Determination.  *Id.* at 57,401; *see also* IDM.

Commerce made several changes to its Post-Preliminary Determination that were specific to each mandatory respondent as detailed in the IDM that are not relevant here.  IDM 6-9. Commerce also continued to determine that selecting new mandatory respondents using updated data was reasonable.  IDM 17.  Commerce also continued to apply its differential pricing analysis to Bioparques' U.S. sales and explained that it did not have a reasonable basis to adjust the time periods for that analysis.  IDM 20.  Commerce once again compared export price and normal value using period-wide averages.  IDM 22.  Commerce also determined that Bioparques' higher-priced home market sales were not aberrational.  IDM 26.  Commerce determined a dumping margin for Bioparques of 30.48 percent.  Final Determination, 84 Fed. Reg. at 57,402; *see also* Final Analysis Memo. for Bioparques 1-4 (Oct. 21, 2019) (C.R. 330). Commerce calculated the all-others rate of 20.91 percent based upon a weighted-average of final rates for the mandatory respondents.  Final Determination, 84 Fed. Reg. at 57,402.

IV.    A Brief History Of The Litigation

Four sets of plaintiffs (Bioparques, CAADES, Jem D, and Red Sun Farms) challenged, variously, Commerce's withdrawal from the 2013 Suspension Agreement, Commerce's continuation of the investigation, Commerce's negotiation of and entry into the 2019 Suspension Agreement, and Commerce's Final Determination in the continued investigation.  *Bioparques de Occidente, S.A. de C.V. v. United States*, 470 F. Supp. 3d 1366 (Ct. Int'l Trade 2020) (*Bioparques I*); *Confederación de Asociaciones Agrícolas del Estado de Sinaloa, A.C. v. United States*, 459 F. Supp. 3d 1354 (Ct. Int'l Trade 2020) (*CAADES I*); *Jem D Int'l (Mich.) Inc. USA v. United States*, 470 F. Supp.3d 1374 (Ct. Int'l Trade 2020) (*Jem D I*); *Red Sun Farms v. United*

*States*, 469 F. Supp. 3d 1403 (Ct. Int'l Trade 2020) (*Red Sun I*).  This Court dismissed each of these actions for lack of jurisdiction on ripeness and mootness grounds.  *Id.*  The Federal Circuit affirmed the dismissal of all claims except for those challenging the Final Determination, which it held may be reviewed pursuant to 28 U.S.C. § 1581(c).  *Bioparques De Occidente, S.A. de C.V. v. United States*, 31 F.4th 1336 (Fed. Cir. 2022) (*Bioparques II*); *Confederación de Asociaciones Agricolas del Estado de Sinaloa, A.C. v. United States*, 32 F.4th 1130 (Fed. Cir. 2022) (*CAADES II*); *Jem D Int'l (Mich.) Inc. USA v. United States*, No. 2021-1292, 2022 U.S. App. LEXIS 10044, 2022 WL 1112813 (Fed. Cir. Apr. 14, 2022) (*Jem D II*); *Red Sun Farms v. United States*, 30 F.4th 1358 (Fed. Cir. 2022) (*Red Sun II*).

After the Federal Circuit issued the mandates, Red Sun Farms voluntarily dismissed its case (No. 19-205).  In addition, CAADES took appropriate steps to conform its claims to the Federal Circuit's decisions.  *CAADES* No. 19-203, Joint Status Report at 4-5, Aug. 24, 2022, ECF No. 58.  Bioparques declined to take similar steps to conform its claims to the Federal Circuit's decisions.  Thereafter, we filed a motion to dismiss some, but not all, of Bioparques' claims.  Def. Mot. to Dismiss, Sept. 20, 2022, ECF No. 65.  Granting our motion to dismiss in part, the Court dismissed claim 1(b) in *Bioparques* No. 19-204, claim 1(b) in *Bioparques* No. 19-210, and all claims in *Bioparques* No. 20-35.  Bioparques subsequently presented arguments in sections A through F of its opening brief that correspond to the claims in counts 1(c), 2, 3, 4, 5, and 7 of its complaints in Court Nos. 19-204 and 19-210.

<u>SUMMARY OF THE ARGUMENT</u>

Commerce's Final Determination in its continued investigation of fresh tomatoes from Mexico should be sustained because it is supported by substantial evidence and is in accordance with law.  As an initial matter, Bioparques has abandoned and waived the claims in counts 1(a),

6, 8, and 9 of its complaints by failing to address them in its opening brief.  Bioparques also failed to exhaust several of its arguments before Commerce and its arguments otherwise are without merit.  Specifically, Commerce's continuation of the investigation pursuant to a timely-filed request by FTE was properly conducted pursuant to 19 U.S.C. § 1673c(g).  Moreover, based on the unusual posture of this proceeding which spans more than 23 years, Commerce properly determined to request and use updated data from April 2018 to March 2019.  Commerce also properly employed its differential pricing analysis to determine how to compare normal value and export price in this investigation, and properly found that a mixed-methodology analysis was appropriate based on the record evidence.  Commerce also properly relied on period-wide averages to determine normal value and export price.  Finally, Commerce properly included certain sales reported by Bioparques and CAADES to determine normal value.  Thus, the Court should enter judgment in favor of the Government.

ARGUMENT

I.     Standard Of Review

In reviewing Commerce's determinations, the Court "must sustain 'any determination, finding or conclusion' found by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'"  *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).  A determination by Commerce "is presumed to be correct."  28 U.S.C. § 2639(a)(1).

"Substantial evidence" is "more than a mere scintilla," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009).  Substantial evidence may be "'less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence

does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619-20 (1966)).

When the Court examines Commerce's interpretations of the statute that it administers, the Court employs the two-pronged test established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). First, the Court examines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency and Court must comply with Congress's clear intent. *Id*. at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843; *accord United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009); *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004).

Finally, the Court affords Commerce especially great deference "when a statute fails to make clear any Congressionally mandated procedure or methodology for assessment of the statutory tests." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (citation and quotation marks omitted). In that circumstance, "Commerce may perform its duties in the way it believes most suitable." *Id*. Consequently, Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and to apply methodologies to implement the trade statute. *Fujitsu*, 88 F.3d at 1039.

## II.   Bioparques Has Waived Numerous Claims By Failing To Argue Them

Bioparques has waived counts 1(a), 6, 8, and 9 by failing to address them in its opening brief. *See* Am. Compl. ¶ 14, *Bioparques* No. 19-204, Sept. 1, 2022, ECF No. 64; Am. Compl. ¶ 14, *Bioparques* No. 19-210, Sept. 1, 2022, ECF No. 69. Count 1(a) challenged the authority of Commerce to resume or continue the investigation because the "U.S. domestic industry had

withdrawn the petition that led to the investigation and subsequent suspension agreements in 2012." *Id.* With respect to the Final Determination, count 6 challenged whether "Commerce improperly replaced the product-matching methodology used in the original investigation with a new methodology that ignored critical characteristics that are relevant to product value and pricing, such as packing size." *Id.* Count 8 also challenged whether "Commerce improperly disregarded certain 'other income' amounts when calculating the general and administrative ('G&A') expense rates for La Primavera." *Id.* Finally, count 9 challenged whether "Commerce's calculation of the denominator used in the calculation of the G&A and financial expense rates for Bioparques and La Primavera treated packing costs improperly." *Id.* In its opening brief, Bioparques makes no mention of these issues and develops no argument regarding them. Therefore, Bioparques has waived counts 1(a), 6, 8, and 9. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived."); *Echjay Forgings Private Ltd. v. United States*, 475 F. Supp. 3d 1350, 1371 n.7 (Ct. Int'l Trade 2020) (holding that claim not addressed in opening brief had been waived).

III.   <u>Commerce's Continuation Of The Investigation Is In Accordance With Law</u>

Commerce received a request from FTE to continue the investigation within 20 days after Commerce published notice of the 2019 Suspension Agreement, so Commerce continued the investigation pursuant to 19 U.S.C. § 1673c(g). Final Determination, 84 Fed. Reg. at 57,402. As the Federal Circuit observed, this request "to continue the investigation" was "timely." *Bioparques II*, 31 F.4th at 1341. Nevertheless, Bioparques and CAADES argue in this Court that FTE's continuation request was *untimely*, such that Commerce could not lawfully continue the investigation. Bioparques Br. 14-16; *see also* CAADES Br. 2. As demonstrated below, this argument misconstrues the relevant statute and is without merit.

- 12 -

Section 1673c(g) provides:

> Investigation To Be Continued Upon Request –
>
> If the administering authority, with 20 days after the date of publication of the notice of suspension of an investigation, receives a request for the continuation of the investigation from – (1) an exporter or exporters accounting for a significant proportion of exports to the United States of subject merchandise, or (2) an interested party . . . , then the administering authority and the Commission shall continue the investigation.

19 U.S.C. § 1673c(g).  There is no dispute that FTE submitted an October 11, 2019 request to continue the investigation within 20 days after Commerce published the September 24, 2019 suspension notice.  Final Determination, 84 Fed. Reg. at 57,402; *Fresh Tomatoes from Mexico*, 84 Fed. Reg. at 49,987.  Based on a straightforward application of the plain language of section 1673c(g), the Federal Circuit stated that this request "to continue the investigation" was "timely."  *Bioparques II*, 31 F.4th at 1341.

Nevertheless, Bioparques and CAADES argue that "the notice of suspension of an investigation" referenced in 19 U.S.C. § 1673c(g) necessarily means the *first* notice of suspension of an investigation (such as the one Commerce published in 1996), and cannot mean a *subsequent* notice of suspension of a resumed investigation (such as the one Commerce published in 2019), such that FTE's request was 23 years too late and Commerce did not have authority to continue the investigation.  Bioparques Br. 14-16.  But the statute does not use the words "first," or "subsequent," or otherwise specifically refer to situations like this one where there has been a series of agreements that suspended the same investigation.  *See* 19 U.S.C. § 1673c(g).  Accordingly, Bioparques' contorted reading of the statute is without merit.

A.      Commerce's Continuation Of The Investigation

Commerce initiated its investigation in 1995, and later suspended and then resumed it multiple times prior to the most recent suspension in 2019.  2019 Suspension Agreement, 84 Fed.

Reg. at 49,987-88.  At each resumption, including at this most recent resumption, Commerce

indicated that it was treating the most recent termination date as the date on which the preliminary

determination was published:

> The statute does not identify the timing for completion of the
> investigation in this particular scenario.  Therefore, [Commerce is]
> looking to [19 U.S.C. § 1673c(i)(1)(B)], for guidance.  Consistent
> with [section 1673c(i)(1)(B)], Commerce will [resume] the
> investigation as if it had published the affirmative preliminary
> determination under [section 1673b] on the effective date of the
> termination, May 7, 2019.

*Fresh Tomatoes from Mexico*, 84 Fed. Reg. at 20,860.  Commerce stated that, because it had

previously postponed the final determination until the 135th day after the date of the preliminary

determination, it intended to issue its final determination 135 days after termination of the 2013

Suspension Agreement (*i.e.*, September 19, 2019) unless the parties reached a new suspension

agreement.  *Id.*

Commerce and Mexican signatories signed a new suspension agreement on September 19,

2019; therefore, Commerce did not publish a final determination on that date.  2019 Suspension

Agreement, 84 Fed. Reg. at 49,989; *see also* Final Determination, 84 Fed. Reg. at 57,402.  Shortly

thereafter, on October 11, 2019, FTE requested that Commerce continue the investigation

pursuant to 19 U.S.C. § 1673c(g).  Final Determination, 84 Fed. Reg. at 57,402; *see also* Letter

from FTE (Oct. 11, 2019) (P.R. 490).  This request was made within 20 days after the date of

publication of the notice of suspension.  Commerce determined that FTE's submission was

timely, and therefore, continued the investigation pursuant to section 1673c(g).  Final

Determination, 84 Fed. Reg. 57,402; *see also* 19 C.F.R. § 351.303(b).

    B.    <u>Commerce Lawfully Continued Its Investigation Pursuant To Section 1673c(g)</u>

Bioparques and CAADES argue that the FTE's request for continuation was not timely,

such that Commerce unlawfully continued the investigation and reached a final determination.

Bioparques Br. 12-16; *see also* CAADES Br. 2.  They argue that because the initial suspension of investigation occurred on November 1, 1996, any timely request for continuation was due within 20 days of that date (*i.e.*, by November 21, 1996).  Bioparques Br. 14.  Under their theory, FTE's request was 23 years untimely, and therefore, Commerce had no authority to continue the investigation pursuant to 19 U.S.C. § 1673c(g).  This argument is not supported by the statute or by Commerce's actions.

"Statutory interpretation begins with the language of the statute."  *Norfolk Dredging Co. v. United States*, 375 F.3d 1106, 1110 (Fed. Cir. 2004) (citing *Williams v. Taylor*, 529 U.S. 420, 431 (2000)).  "A court derives the plain meaning of the statute from its text and structure."  *Id.* (quoting *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001)).  "If the words are unambiguous, no further inquiry is usually required."  *Camargo Correa Metais, S.A. v. United States*, 200 F.3d 771, 773 (Fed. Cir. 1999) (citation omitted); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there").  In defining the plain meaning of a statute, "courts must avoid 'add[ing] conditions' to the applicability of a statute that do not appear in the provision's text."  *Hymas v. United States*, 810 F.3d 1312, 1324 (Fed. Cir. 2016) (alteration in original, citing *Norfolk Dredging Co.*, 375 F.3d at 1111).

Bioparques and CAADES ask the Court to read new, limiting language into the statute, in contravention of the canons of statutory construction and the plain language of the statute.  As explained above, the statute provides that if a timely request for continuation of the investigation is received from an appropriate party, Commerce "shall" continue the investigation.  19 U.S.C. § 1673c(g).  Contrary to what Bioparques and CAADES read into the statute, there is *no modification* to the timing phrase, "within 20 days after the date of publication of the notice of

suspension of an investigation." *Id.* The statute does not say the "initial" notice of suspension, or the "first" notice of suspension, nor does it have any limitations placed upon at what point in the proceeding the notice in question was published. Instead, the statute plainly provides that, if a timely and proper request for continuation is made within 20 days of the date of publication of the notice of suspension of an investigation, then Commerce shall continue the investigation. *Id.* Commerce published "the notice of suspension" of its investigation on September 24, 2019. *See id.* Commerce received a timely and proper request for continuation within 20 days. Commerce therefore properly continued its investigation as required by law. *See id.*

Moreover, the statute does not modify or restrict the type of investigation referenced in subsection (g) – it provides that the request for continuation must be received within 20 days of "the" notice of suspension of "an" investigation. 19 U.S.C. § 1673c(g). To be sure, there is but one notice published, "the notice of suspension," for any given suspension of "an investigation," but this language does not specifically address whether "an" investigation may include "an" investigation that is resumed following the termination of a suspension agreement. Even if the Court were to determine that an ambiguity exists in the statute, Commerce reasonably interpreted section 1673c(g) as including a resumed investigation. This interpretation not only is reasonable, but it also gives effect to the petition, which "continues to be effective." IDM 11-12. To hold otherwise also would practically eliminate all continued investigations under section 1673c(g) following a resumed investigation under section 1673c(i), and there is no indication that Congress intended such an anomalous result in the statutory scheme.

However, Bioparques and CAADES argue that Congress intended for only the *initial* notice of suspension of the original investigation to be implicated by subsection (g) of section 1673c, asserting that subsection (j) somehow clarifies that interested parties are not permitted to

"place Commerce in a situation in which the original respondents and their data may no longer be available or verifiable." Bioparques Br. 15-16.  This argument has no basis in law.  Subsection (j) addresses how Commerce should consider the effect of a suspension agreement on the subject merchandise; it makes no mention of subsection (g) other than to state that subsection (j) applies when an investigation is continued under subsection (g).[7]  Bioparques and CAADES point to no specific language in subsection (j) that clarifies or addresses subsection (g) in a manner that might suggest a limitation upon which notice of suspension is referenced in subsection (g) when there is more than one such notice.  As a result, Commerce reasonably applied the plain language of subsection (g) when the agency continued the investigation following receipt of a request for continuation within 20 days of publication of the 2019 Suspension Agreement.

C.   Commerce Did Not Initiate "An Entirely New Investigation" When It Resumed, And Later Continued, Its Previously Suspended Investigation

Bioparques makes one more procedural argument concerning the resumed investigation. Bioparques Br. 16-18.  Specifically, Bioparques argues that Commerce's investigation was unlawful because it was an "entirely new investigation" and not a resumption of the original investigation.  *Id.* at 16.  This argument depends upon a false premise – a characterization of Commerce's investigation that resumed in May 2019, as an "entirely new" investigation, merely because Commerce collected updated data given the unusual procedural posture of the proceeding.  However, Bioparques does not and cannot point to a statement on the record by Commerce or any other record evidence that the agency initiated or conducted a "new" investigation, rather than simply resuming and later continuing its original investigation.

---

[7]  We address Bioparques' remaining arguments concerning section 1673c(j) below in argument section IV.

Following termination of the 2013 Suspension Agreement, Commerce expressly confirmed that it had resumed the original investigation that was initiated in 1995, just as it had done in 2002, 2008, and 2013.  Final Determination, 84 Fed. Reg. 57,402; 2019 Suspension Agreement, 84 Fed. Reg. at 49,987-88.  Following the terminations of each prior suspension agreement by Mexican signatories, Commerce resumed the original investigation, the only active segment in the administrative proceeding, which gave rise to Bioparques' and CAADES' ability to renegotiate and sign new suspension agreements several times in the past.  *Fresh Tomatoes from Mexico*, 84 Fed. Reg. at 20,859.  Bioparques and CAADES argue that because Commerce collected updated data in a manner different from prior resumptions, that somehow indicates that the agency initiated and conducted a "new" investigation – but they do not (and cannot) point to any statutory or regulatory support for such a claim.

As Commerce explained in its IDM, "given that suspension agreements are entered into in order to suspend an otherwise active investigation, it is appropriate that Commerce would continue the suspended investigation upon withdrawal from the suspension agreement."  IDM 14 (citing *Vicente Camalu SPR de RI v. United States*, 366 F. Supp. 2d 1373, 1374 (Ct. Int'l Trade 2005) ("[t]he termination of the 1996 Suspension Agreement [following Mexican producers' and exporters' withdrawal] led perforce to . . . resumption of the agencies' antidumping investigations initiated some six years earlier")).  Commerce resumed the original investigation under the original POI (from March 1995 to February 1996), and determined that because of the unusual procedural posture of the proceeding the agency would request updated data from April 2018 to March 2019.  Final Determination, 84 Fed. Reg. at 57,401.  Commerce did not purport to initiate a "new" investigation nor change the POI of the resumed original investigation.  *Id*.

Bioparques contends that the data collection and respondent selection process that Commerce employed for this unusual proceeding was unlawful because the agency selected new respondents and collected new data from after the original POI. Bioparques Br. 16. This argument is meritless. Although Commerce's regulations identified a period for which Commerce "normally" examines sales ("a period at least 150 days prior to and 30 days after the first day of the month during which the petition was filed or the Secretary initiated the investigation"), the regulations provided that Commerce "may examine the merchandise for *any additional or alternative period it concludes is appropriate*." 19 C.F.R. § 353.42(b)(1) (1996) (emphasis supplied). As Commerce explained, the agency determined to examine sales from an "alternative period" in this proceeding. IDM 15. Commerce lawfully exercised its discretion to collect data from an alternative period (April 2018 to March 2019) given these unusual circumstances where the agency resumed an investigation 23 years after the POI. IDM 15-16.

As Bioparques notes, during the investigation that resumed in May 2019, Commerce engaged in a respondent selection process using updated data, selected new mandatory respondents, solicited information from the respondents, published a Post-Preliminary Determination upon which parties commented, conducted verification, and then continued the investigation to the final determination in October 2019. IDM 17; *see also* Bioparques Br. 17. Yet, Commerce's investigation procedures may occur on a compressed timeline in any proceeding in which the agency selects a new mandatory respondent after the initial respondent selection occurs. None of those actions causes the initiation of a "new" proceeding. Rather, Commerce's actions were within the contours of resuming its investigation and exercising its discretion under the regulations it applied (the 1996 regulations), and likewise did not purport to initiate a "new" proceeding. That Commerce used updated data and selected new respondents is

not an "absurd" result, as asserted by Bioparques, but instead was a reasonable path chosen by Commerce in light of the extremely unusual procedural posture of this proceeding, having spanned 23 years (and counting).  Final Determination, 84 Fed. Reg. at 57,402.

As Commerce has explained, the statute does not explicitly provide for the timing of the resumption of an investigation when one or more parties have withdrawn from and terminated the agreement as provided by the terms of the agreement, and Commerce therefore looked to related provisions for guidance as to how to resume this investigation and followed the same procedure it followed after each prior termination.  *Fresh Tomatoes from Mexico*, 84 Fed. Reg. at 20,860. Bioparques takes issue with the statute's provision of what it terms a period "shorter than even the shortest possible period allowed for the completion of a full investigation" for resumed investigations.  But the language of the statute is plain and unambiguous concerning the timing required for resumed investigations following a termination under section 1673c(i).

As Bioparques further acknowledges, when a suspension agreement is terminated pursuant to section 1673c(i)(1) in an investigation that was not completed, Commerce "shall" resume the investigation as if the preliminary determination was issued on the date of termination.  *See* Bioparques Br. 18.  Indeed, Commerce previously postponed the investigation in the 1996 Preliminary Determination.  *Fresh Tomatoes from Mexico*, 84 Fed. Reg. at 20,860.  Because of the lack of explicit requirements in the statute for this unusual procedural posture (where Commerce terminated the 2013 Suspension Agreement based upon its terms rather than for reasons set forth in section 1673c(i)), Commerce resumed its investigation, and looking to section 1673c(i) for guidance, planned to complete it within 135 days of the termination.  Commerce then conducted the investigation in accordance with section 1673d in reaching its final determination. IDM 1.  There was no "new" investigation and Bioparques points to no record evidence of one.

IV.   Bioparques Failed to Exhaust Its Affected Sales Arguments And Those Arguments
      Otherwise Fail To Account For Ambiguity In The Statute

In its Final Determination, Commerce relied upon sales data from April 2018 through

March 2019.  Final Determination, 84 Fed. Reg. at 57,402.  The 2013 Suspension Agreement was

*in effect* during those 12 months, *Fresh Tomatoes from Mexico*, 84 Fed. Reg. at 20,859-60, but

there was no argument by any interested party that sales during that period were *affected* by the

2013 Suspension Agreement.  Nevertheless, Bioparques argues in this Court – for the first time

ever – that Commerce's reliance upon these sales violated 19 U.S.C. § 1673c(j), which provides

that in making a final determination in a continued investigation, Commerce "shall consider all of

the subject merchandise without regard to the effect of any agreement."  Bioparques Br. 19-23

(quoting 19 U.S.C. § 1673c(j)).  Bioparques' argument *assumes* that the 2013 Suspension

Agreement caused an *effect* on sales from the April 2018 through March 2019 period, but

Bioparques made no argument, presented no analysis, and submitted no record evidence of such

an effect to Commerce.  Bioparques also advances an interpretation of section 1673c(j) that fails

to account for an ambiguity in the statute that was not construed by Commerce expressly in the

first instance.  Bioparques has waived these arguments by failing to exhaust them.

A.   Bioparques Did Not Exhaust Its Affected Sales Argument Under Section 1673c(j)

"'[N]o one is entitled to judicial relief for a supposed or threatened injury until the

prescribed administrative remedy has been exhausted.'"  *Mittal Steel Point Lisas Ltd. v. United

States*, 548 F.3d 1375, 1384 (Fed. Cir. 2008) (quoting *Sandvik Steel Co. v. United States*, 164

F.3d 596, 599 (Fed. Cir. 1998)).  "Simple fairness to those who are engaged in the tasks of

administration, and to litigants, requires as a general rule that courts should not topple over

administrative decisions unless the administrative body not only has erred but has erred *against*

*objection made at the time appropriate under its practice.*"  *Mittal Steel*, 548 F.3d at 1383-84 (emphasis in original, citation omitted).

The exhaustion doctrine is rooted in 28 U.S.C. § 2637(d), which provides that the Court "shall, where appropriate, require the exhaustion of administrative remedies" in civil actions arising from Commerce's antidumping duty determinations.  "[T]his statutory mandate 'indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies.'"  *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (quoting *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)).  Nevertheless, the statute "is not absolute" and has left the door open for courts to fashion limited exceptions.  *Corus Staal*, 502 F.3d at 1379.

The Federal Circuit has recognized limited exceptions when exhaustion would have been "futile" or the matter is a "pure question of law," *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013), and when a party "had no opportunity to raise the issue before the agency," *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1381 (Fed. Cir. 2013), because in the parlance of the statute, "requir[ing] the exhaustion of administrative remedies" in these circumstances would not be "appropriate."  28 U.S.C. § 2637(d).  However, this Court "generally takes a 'strict view' of the requirement that parties exhaust their administrative remedies before . . . Commerce in trade cases."  *Corus Staal*, 502 F.3d at 1379.

A party's obligation to exhaust its administrative remedies applies equally to individual arguments as well as to overall issues.  *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).  This is also true in the context of legal arguments concerning the proper interpretation of an ambiguous statute that Commerce administers.  *Compare Hor Liang Indus. Corp. v. United States*, 337 F. Supp. 3d 1310, 1327-28 (Ct. Int'l Trade 2018) (citing *Fuwei Films*

*(Shandong) Co. v. United States*, 791 F. Supp. 2d 1381, 1384-85 (Ct. Int'l Trade 2011) (holding pure question of law exception did not apply when legal issue implicated *Chevron* step two)), with *Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024, 1032 (Fed. Cir. 2007) (applying pure question of law exception to *Chevron* step one issue).

Bioparques has failed to exhaust its administrative remedies. During the resumed investigation, Bioparques did not argue that Commerce was barred by section 1673c(j) from relying upon sales reported during the April 2018 to March 2019 period because those sales supposedly were *affected* by the 2013 Suspension Agreement. *Compare* Bioparques Br. 19-23 with Bioparques and CAADES Case Br. (Aug. 30, 2019) (P.R. 425); Bioparques and CAADES Rebuttal Br. (Sept. 4, 2019) (P.R. 453). Likewise, in its case and rebuttal briefs before Commerce, Bioparques did not cite to section 1673c(j) even once. Tellingly, in its opening brief, Bioparques does not claim to have exhausted this argument before Commerce.

The limited exceptions to the exhaustion doctrine previously recognized by the Federal Circuit – the pure question of law, futility, and no opportunity to exhaust exceptions – plainly do not apply here. *See Itochu*, 733 F.3d at 1146 (futility); *Agro Dutch*, 508 F.3d at 1029 (pure question of law); *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1003-04 (Fed. Cir. 2003) (no opportunity to exhaust). The question of whether the 2013 Suspension Agreement caused an "effect" on April 2018 to March 2019 sales within the meaning of section 1673c(j) is a fact-intensive question, not a pure question of law, and there is an ambiguity in section 1673c(j) (as demonstrated below) that precludes Bioparques from invoking the pure question of law exception. Likewise, there can be no suggestion that Bioparques lacked an opportunity to submit comments or that raising its arguments regarding allegedly affected sales would have been futile, given that Commerce provided interested parties with an opportunity to comment, and

Commerce addressed the comments that it received.  *See* Post-Preliminary Determination 15

("The purpose of this post-preliminary analysis is to provide the parties with notice of the post-

preliminary analysis and an opportunity to comment on any issues in their case and rebuttal

briefs."); IDM 1-2, 9-48 (addressing comments received).  The exhaustion doctrine bars

Bioparques' affected sales arguments under section 1673c(g).

      B.      <u>Bioparques' Arguments Fail To Account For An Ambiguity In Section 1673c(j)</u>

      Should the Court entertain Bioparques' "affected sales" argument under section 1673c(j)

despite the failure to exhaust, there is an ambiguity in the statute, and Commerce would have to

resolve that ambiguity on remand before the Court reaches the merits of Bioparques' argument.

      Bioparques argues that Commerce could not rely on updated sales data to determine any

dumping margin because section 1673c(j) supposedly requires that Commerce "disregard" such

data.  Bioparques Br. 20.  But the statute is not clear in this regard.  Section 1673c(j) provides:

> (j) Determination not to take agreement into account
>
> In making a final determination under section 1673d of this title, or
> in conducting a review under section 1675 of this title, in a case in
> which the administering authority has terminated a suspension of
> investigation under subsection (i)(1), or continued an investigation
> under subsection (g), the Commission and the administering
> authority shall consider all of the subject merchandise without
> regard to the effect of any agreement under subsection (b) or (c).

19 U.S.C. § 1673c(j).  Commerce does not address section 1673c(j) in its Final Determination.

*See* IDM, *generally*.

      There is an ambiguity in section 1673c(j).  When Congress provided that "the

administering authority shall consider all of the subject merchandise *without regard to the effect*

*of any [suspension] agreement*," this could mean at least two things:  (1) that Commerce *must not*

*consider the effect* that a suspension agreement may have had on sales of subject merchandise, or

(2) as Bioparques argues, that Commerce *must consider the effect* of a suspension agreement *and*

*then exclude* from agency consideration any affected sales of subject merchandise.  Although Commerce did not discuss this ambiguity, we may infer that the agency understood section 1673(j) to mean the former, because Commerce did not consider whether the 2013 Suspension Agreement affected sales of subject merchandise, and Commerce did not exclude from agency consideration any affected sales during the April 2018 to March 2019 timeframe.  This understanding would be reasonable because, whenever a thing must be done "without regard to" a particular factor, that normally means the thing must be done *without considering* the factor at all, such as when hiring must be done without regard to race or gender.  *See* Regard, Merriam-Webster's Collegiate Dictionary (11th ed. 2005) ("regard" means "to pay attention to," to "take into consideration or account," and "to look at").  But, there can be more than one reasonable interpretation of an ambiguous statute, and it is for Commerce as the agency charged with administering the antidumping law to construe that ambiguity in the first instance.  Thus, if the Court deems it necessary to reach the merits of this issue, the Court should remand for Commerce to articulate an interpretation of section 1673c(j) because Commerce's reasonable interpretation of the ambiguous language in section 1673c(j) would be entitled to *Chevron* deference.

V.    Commerce's Determination To Compare Normal Value To Export Price On An Annual
       Basis Rather Than A Monthly Basis Was Supported By Substantial Evidence And Is In
       Accordance With Law

      A.    Legal Framework

      In an investigation, Commerce generally determines whether subject merchandise is sold for less than fair value by comparing the weighted average of the normal values to the weighted average of the export prices (the average-to-average method), or by comparing the normal values of individual transactions to the export prices of individual transactions (the transaction-to-transaction method).  19 U.S.C. § 1677f-1(d)(1)(A).  Under certain circumstances however, Commerce may determine whether subject merchandise is being sold for less than fair value by

comparing the weighted average of the normal values to the export prices of individual transactions (the average-to-transaction method). *Id.* § 1677f-1(d)(1)(B). Regardless of the methodology being used, the statute does not specify the period over which Commerce should make such comparisons in an investigation. *See id.*

Commerce's regulations also do not establish the period over which the agency should make comparisons when using the *average-to-transaction* or *transaction-to-transaction* methods in an *investigation*. *See* 19 C.F.R. § 351.414. But, when Commerce uses the *average-to-average* comparison method in an *investigation*, the regulations provide that (1) the agency "ordinarily" will calculate average export prices and normal values for "the entire period of investigation," but (2) when normal values or export prices "differ significantly" over the entire period of investigation, the agency "may calculate weighed averages for such shorter period as [Commerce] deems appropriate." *Id.* § 351.414(d)(3). Although the regulation provides Commerce with discretion to calculate weighted averages for "such shorter period" as the agency deems appropriate when using the *average-to-average* comparison method in an *investigation*, such grouping into shorter periods is not required. *Id.*

Further, when using the *average-to-average* comparison method in an *administrative review*, the regulations provide that Commerce "normally will calculate weighted averages on a monthly basis and compare the weighted-average monthly export price . . . to the weighted-average normal value for the contemporaneous month." 19 C.F.R. § 351.414(d)(3). Finally, when using the *average-to-transaction* comparison method in an *administrative review*, Commerce "will limit the averaging of such prices to sales incurred during the contemporaneous month." *Id.* § 351.414(e). However, these regulatory provisions do not apply in an *investigation*. *See id.* §§ 351.414(d)(3), 351.414(e).

B.   Commerce Reasonably Compared Normal Value To Export Price On An Annual
     Basis Rather Than A Monthly Basis

Commerce determined that a mixed comparison methodology was appropriate, using an

average-to-average methodology for certain Bioparques' sales (that did not pass the Cohen's *d*

test) and an average-to-transaction methodology for other sales (that did pass the Cohen's *d* test)

based on Commerce's differential pricing analysis.  Post-Preliminary Determination 8, *unchanged*

*in* IDM 20, 22; *see also* Post-Prelim. Analysis Memo. for Bioparques 3, *unchanged in* Final

Analysis Memo. for Bioparques.  Bioparques and CAADES argue that Commerce should have

compared normal value to export price on a monthly basis because of the highly perishable nature

of tomatoes.  Bioparques Br. 36-43; *see also* CAADES Br. 2.  They argue that comparisons on a

monthly basis are required by Commerce's regulations and past precedent, focusing the majority

of its legal argument on "pre-Uruguay Round" administrative cases.  *Id.*

As demonstrated above, neither the statute nor Commerce's regulations *require* a

comparison of monthly averages in an investigation.  Indeed, the statute does not address this

issue, and Commerce's regulations provide that in an investigation, Commerce "ordinarily" will

make comparisons on an annual basis.  *See* 19 U.S.C. § 1677f-1(1)(A); 19 C.F.R. § 351.414(d)(3).

Bioparques and CAADES rely upon section 351.414(d)(3), which provides:  "when normal

values, export prices, or constructed export prices differ significantly *over the course of the*

*period of investigation*, the Secretary may calculate weighted averages for such shorter period as

the Secretary deems appropriate."  19 C.F.R. § 351.414(d)(3) (emphasis supplied); *see also*

Bioparques Br. 7, 37.  But Commerce found no compelling reason on this record to deviate from

its standard methodology because there was no evidence of high inflation during the period

examined, Bioparques and CAADES did not argue that the high perishability of tomatoes and the

short time that tomatoes spend in inventory are different in different months, and Bioparques and

CAADES did not provide a sufficient factual basis to justify comparing export prices and normal values on a monthly basis. IDM 22. Under these circumstances, Commerce acted in accordance with law and within its discretion when it made comparisons on an *annual* basis rather than a *monthly* basis consistent with typical agency practice.

Nevertheless, Bioparques and CAADES assert that because of the "highly perishable" nature of fresh tomatoes, Commerce should have used monthly average prices for the normal value and export price comparisons. They argue that record evidence demonstrates that prices for sales in both Mexico (the home market) and in the United States "varied significantly" from month to month over the April 2018 to March 2019 period because of this perishable nature, and that in such circumstances, the use of monthly averages for both normal value and export price was "required by Commerce's regulations." Bioparques Br. 39-41. They further argue that prior determinations by Commerce also mandate the use of monthly averages, relying on cases that predate Commerce's Final Determination here by more than 25 years. They argue based on these cases (from 1998 or earlier) that Commerce has a practice of using a shorter averaging period where "the time of the sale is closely connected to the prices charged."

Neither the statute nor Commerce's regulations actually *require* the use of monthly averages for either normal value or export price in the case of an investigation, whether using average-to-average or another comparison type. The administrative cases cited by Bioparques are also distinguishable and thus of little probative value on a number of bases. First, four of the five administrative determinations do not concern "highly perishable products" and are thus of limited relevance, given the importance Bioparques places on the nature of the product. Only *Norwegian Salmon* involves a perishable product.

Second, the age of *Norwegian Salmon* (and most other determinations) cited by Bioparques is significant because they predate 1997 when the agency expressly declined to adopt a rule along the lines of what Bioparques claims to exist:

> In general, we believe it is appropriate to average prices across the period of investigation, though we recognize that there are circumstances in which other averaging periods are more appropriate.  Accordingly, the proposed rule is designed to ensure that the time periods over which price averages and comparisons are made comports with the circumstances of the case, while maintaining a preference for period-wide averaging.  *Where perishable products are concerned, the Department has not fashioned a rule with respect to a particular type of product* because such an approach may limit the agency's ability to address, for example, price trends unrelated to the perishable nature of the product.

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,373 (Dep't of Commerce May 19, 1997) (final rules) (emphasis supplied); *see also Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,349 (Dep't of Commerce Feb. 27, 1996) (proposed rules) ("in cases involving highly perishable agricultural products . . . the Department does not consider it appropriate to create a regulatory preference for averaging over the market cycle," and instead "the Department believes it is more appropriate to decide these issues on a case-by-case basis").

Third, while true that Commerce used monthly average prices for normal value in a number of determinations, the pricing history in each case was significantly different than in the case of fresh tomatoes from Mexico.  For example, in *DRAMs from Korea*, Commerce observed "a consistent downward trend in both U.S. and [third market] prices over the POI" and that "a significant number of the third-country sales were made at monthly average prices that vary from the POI average prices" for one respondent, such that the agency used monthly weighted average prices for normal value.  *Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 58 Fed. Reg. 15,467, 15,476 (Dep't Commerce, Mar. 23, 1993) (final AD determination)

(*DRAMs from Korea*).  In *EPROMs from Japan* and *64K DRAMs from Japan*, Commerce

observed "sharp declines in monthly prices" such that it calculated a monthly normal value for

each product for each month of the POI (where the normal value was not determined using

constructed value).  *Erasable Programmable Read Only Memories (EPROMs) from Japan*, 51

Fed. Reg. 39,680, 39,682 (Dep't of Commerce, Oct. 30, 1986) (final AD determination); *64K*

*Dynamic Random Access Memory Components (64K DRAMs) from Japan*, 51 Fed. Reg. 15,943,

15,944 (Dep't of Commerce, Apr. 29, 1986) (final AD determination).  Finally, in *SRAMS from*

*Taiwan*, Commerce observed that "demand for SRAMs decreased dramatically" resulting in

"significant decrease in the price of SRAMs that occurred throughout the POI," leading

Commerce to use its discretion to calculate *quarterly*, not monthly, average normal values.

*Static Random Access Memory Semiconductors (SRAMs) from Taiwan*, 63 Fed. Reg. 8,909, 8926

(Dep't of Commerce, Feb. 23, 1998) (final AD determination).  None of the circumstances

described above fit the fact pattern of the Mexican or U.S. tomato market price data reported by

respondents.  There was no "significant decrease" or "consistent downward trend" in prices

across the averaging period; indeed, as Bioparques demonstrates in its chart in its brief and as is

reflected in the record evidence, the price of tomatoes fluctuated predictably throughout the year

owing to the "peak" season, and prices both increased and decreased, albeit not significantly,

during the specific period examined.  IDM 22; Bioparques Br. 39-41.  These determinations thus

provide little support for Bioparques' argument.

Fourth, in the only other perishable goods product case cited, *Norwegian Salmon*,

Commerce explained that there was considerable price volatility:

> We noted two discernible trends.  First, there was a significant
> increase from month to month in [foreign market values] from
> September through December, with another notable increase in
> January, 1990, continuing into February.  Second, there was a

steady *decrease* in U.S. price from September to December, with a
large, pronounced increase in U.S. price in January, 1990 and
continuing in February.

*Fresh and Chilled Atlantic Salmon from Norway*, 56 Fed. Reg. 7,661 (Dep't of Commerce Feb.

25, 1991) (final AD determination) (*Norwegian Salmon*), and accompanying IDM at Exporter-

Wide Comment 3 (emphasis in original).  In other words, the price of Norwegian salmon

increased in the home market while decreasing in the U.S. market for four months, and the price

increased in both markets for two months.  *Id.*  This same price volatility does not exist in the

Mexican tomato market; Bioparques itself acknowledges that the price for tomatoes predictably

"peaks" during certain months each year in both the U.S. and Mexican markets – a sharp contrast

to the data from the *Norwegian Salmon* case which demonstrated significant price volatility

between the two markets.  Further, in *Norwegian Salmon*, Commerce *declined* to average U.S.

prices on a monthly basis notwithstanding the price volatility observed.  *Id.  Norwegian Salmon*

also predated 1997 when Commerce declined to adopt any bright line rules or regulatory

preferences for highly perishable agricultural goods.

   Bioparques argues further that Commerce did not provide citations for the IDM's

statement that the agency has used period-wide averages in other investigations involving

agricultural products.  Be that as it may, Commerce has used period-wide averages in other

investigations involving agricultural products.  *E.g.*, *Certain Lemon Juice from Brazil*, 87 Fed.

Reg. 47,697 (Dep't of Commerce Aug. 4, 2022) (prelim. AD determination), and accompanying

Preliminary Decision Memo. (PDM) at 14 ("We examined the cost data and determined that our

quarterly cost methodology is not warranted for [respondents] Citrus Juice or LDC, and therefore,

we are applying our standard methodology of using period-wide average costs based on Citrus

Juice's and LDC's reported data."), *unchanged in* 87 Fed. Reg. 78,939 (Dep't of Commerce Dec.

23, 2022) (final AD determination); *Ripe Olives from Spain*, 83 Fed. Reg. 3,677 (Dep't of

Commerce Jan. 26, 2018) (prelim. AD determination), and accompanying PDM at 17 ("We examined the respondents' cost data and determined that our quarterly cost methodology is not warranted and, therefore, we applied our standard methodology of using annual costs based on the reported data."), *unchanged in* 83 Fed. Reg. 28,193 (Dep't of Commerce June 18, 2018) (final AD determination).  Moreover, regardless of Commerce's treatment of agricultural product price data in other investigations, based on the record evidence in this investigation, Commerce reasonably determined that there was no reason to deviate from its preferred practice of using period-wide averages.  *See Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309, 1327 (Ct. Int'l Trade 2021) (*citing Shenzhen Xinboda Indus. Co. v. United States*, 456 F. Supp. 3d 1272, 1285 n.22 (Ct. Int'l Trade 2020) ("[e]ach administrative review is a separate segment of an antidumping proceeding and each with its own, unique administrative record")).

Finally, Commerce explained in the IDM a specific reason why it had exercised its discretion to compare export prices and normal values on a monthly basis in the 1996 Preliminary Determination:  "Mexico experienced significant inflation during the POI, as measured by the wholesale price index published in International Financial Statistics and the consumer price index from the Bank of Mexico," so "to avoid the distortions caused by the effects of significant inflation on prices and on the weighted-averages of those prices, [the agency] calculated [export prices], [constructed export prices], and [normal values] on a monthly average basis, rather than on a POI average basis."  IDM 22 (citing 1996 Preliminary Determination, 61 Fed. Reg. at 56,611).  In contrast, record evidence demonstrates that Mexico did not suffer from high inflation during the April 2018 to March 2019 period of sales reported.  IDM 22 (citing Bioparques' Section D Response (July 10, 2019) (P.R. 187, C.R. 75)).

In conclusion, Bioparques and CAADES have failed to establish that Commerce abused

its discretion or violated any law or regulation when the agency used an annual average rather

than a monthly average when comparing export price to normal value.  IDM 22.

VI.   Commerce's Use Of The Cohen's *d* Test In Its Differential Pricing Analysis Is
      Accordance With Law and Supported By Substantial Evidence

A.   Legal Framework

In an antidumping proceeding, the statute generally directs Commerce to determine

whether subject merchandise is sold at less than fair value in the United States by comparing the

export price and normal value.  19 U.S.C. § 1675(a)(2)(A).  To perform this comparison,

Commerce may use one or more of three methodologies:

> (1) Average-to-transaction (A-T), in which Commerce compares
> the weighted average of the normal values to the export prices (or
> constructed export prices) of individual transactions.
>
> (2) Average-to-average (A-A), in which Commerce compares the
> weighted average of the normal values to the weighted average of
> the export prices (or constructed export prices).
>
> (3) Transaction-to-transaction (T-T), in which Commerce
> compares the normal value of an individual transaction to the
> export price (or constructed export price) of an individual
> transaction.

*Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337, 1340-41 (Fed. Cir. 2017) (*Apex*

*II*) (citing *Union Steel v. United States*, 713 F.3d 1101, 1103 (Fed. Cir. 2013)).

In general, antidumping duties are calculated using the average-to-average method by

"comparing the weighted average of the normal values to the weighted average of the export

prices (and constructed export prices) for comparable merchandise."  19 U.S.C. § 1677f-

1(d)(1)(A)(i); *see also* 19 C.F.R. § 351.414(c)(1) ("the Secretary will use the average-to-average

method unless the Secretary determines another method is appropriate in a particular case.").

Commerce also "will use the transaction-to-transaction method only in unusual situations, such

as when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom-made."  19 C.F.R. § 351.414(c)(2).  The statute also provides that the average-to-transaction method can be used when "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time," and Commerce explains why such differences cannot be taken into account using the average-to-average method.  19 U.S.C. § 1677f-1(d)(1)(B).

Commerce uses a differential pricing analysis to determine whether the average-to-transaction method should be used.  Post-Prelim Memo. 6.  In the first stage of the analysis, Commerce applies the Cohen's *d* test to determine the whether the respondent's pricing behavior differed significantly among purchasers, regions, or time periods.  *Id.* at 6-7.  The ratio test assesses the extent of the price differences for all sales as measured by the Cohen's *d* test.  *Id.* at 7-8.  Then, in the second stage of the analysis, Commerce examines whether using only the average-to-average method can appropriately account for such differences.  *Id.* at 8.  Even if some of a respondent's sales pass the Cohen's *d* test, if the ratio test shows less than 33 percent of total sales pass the Cohen's *d* test or that the average-to-average method can appropriately account for such differences, Commerce will use the average-to-average method.  *Id.*

B.   Commerce's Use Of The Cohen's *d* Test Is In Accordance With Law

Commerce's use of the Cohen's *d* test is in accordance with law because it reasonably carries out the purpose of 19 U.S.C. § 1677f-1(d)(1)(B).  Bioparques and CAADES purport to rely on *Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021), but their arguments are neither supported by the record, nor by *Stupp* and its progeny.

1.　Commerce's Use Of The Cohen's *d* Test Reasonably Carries Out The Purpose Of The Statute And Determines Whether U.S. Prices Differ Significantly Among Purchasers, Regions, Or Time Periods

Commerce's differential pricing analysis is a gap-filling exercise intended to carry out the purpose of 19 U.S.C. § 1677f-1(d)(1)(B). *See Apex Frozen Foods Private Ltd. v. United States*, 37 F. Supp. 3d 1286, 1302 (Ct. Int'l Trade 2014) (*Apex I*). Commerce's approach must reasonably interpret and implement the statute. *Stupp*, 5 F.4th at 1353 ("Our precedents make clear that the relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness, not substantial evidence") (citations omitted); *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 667 (Fed. Cir 2019) ("In carrying out its statutorily assigned tasks, Commerce has discretion to make reasonable choices within statutory constraints"); *Apex Frozen Foods*, 862 F.3d at 1346 (holding Commerce's "meaningful difference" test to be "reasonable"); *JBF RAK*, 790 F.3d at 1363, 1367 (holding that Commerce's interpretation of 19 U.S.C. § 1677f-1(d)(1)(B)(i) was reasonable and that "[b]ecause Congress did not provide for a direct methodology, Commerce properly 'fill[ed] th[at] gap'").

Commerce uses the Cohen's *d* test to determine whether the reported prices in the U.S. market differ significantly among purchasers, regions, or time periods. Post-Prelim Memo. 7. As applied by Commerce, the Cohen's *d* test compares the product-specific prices of "test groups" of a respondent's sales to a "comparison group" by region, purchaser, and time period. *Stupp*, 5 F.4th at 1346. For each category, Commerce segregates sales into subsets, with one subset becoming the test group, and the remaining subsets being combined as the comparison group. *Id*. Commerce then calculates the means and standard deviations of the test and comparison groups. *Id*. Commerce calculates a Cohen's *d* coefficient by dividing the difference in the groups' means by the groups' standard deviation. *Id*. Each subset is thus tested against the remaining subsets across each category and assigned a d coefficient by solving Cohen's ratio.

If the *d* value of a test group is equal to or greater than the "large threshold," or 0.8, the

observations within that group are said to have "passed" the Cohen's *d* test.  *Id.* at 1347.

Commerce uses the differential pricing analysis to examine all U.S. sales, and because of

that, where the sale prices in the test group and in the comparison group each represent the *full*

*population* of prices to each of those groups for the comparable merchandise, it renders

inapposite concerns regarding the statistical significance of differences whether based on sample

size or sample distribution.  Thus, Commerce's use of the Cohen's *d* test is in accordance with

law and a reasonable interpretation of the statute.

> 2. The *Stupp* Line Of Cases Supports Commerce's Lawful Use Of The
> Cohen's *d* Test In This Investigation

In *Stupp*, the Federal Circuit held that "Commerce's ratio test reasonably implements the

statutory requirement that Commerce determine whether there is a pattern of export prices

differing significantly."  *Stupp*, 5 F.4th at 1355 (internal quotations omitted).  The Federal

Circuit observed that "there is no statutory language telling Commerce how to detect patterns of

significantly differing export prices, much less how to aggregate and quantify pricing

comparisons across product groups in order to select a statutorily defined comparison method[,]"

and "Commerce therefore has discretion to determine a reasonable methodology to implement

the statutory directive."  *Id.* at 1354.  The Federal Circuit affirmed Commerce's general approach

as reasonable in *Stupp*.  *Id.*

However, the Federal Circuit remanded the underlying redetermination "to give

Commerce an opportunity to explain whether the limits on the use of the Cohen's *d* test

prescribed by Professor Cohen and other authorities were satisfied in this case or whether those

limits need not be observed when Commerce uses the Cohen's *d* test in less-than-fair-value

adjudications."  5 F.4th at 1360.  "In that regard, [the Federal Circuit] invite[d] Commerce to

clarify its argument that having the *entire* universe of data rather than a sample makes it permissible to disregard the otherwise-applicable limitations on the use of the Cohen's *d* test." *Id*. (emphasis added).  The Federal Circuit did *not* hold Commerce's use of the Cohen's *d* test unlawful and instead gave Commerce an opportunity to address a concern that Commerce's failure to satisfy the statistical criteria assumed by Cohen's *d* test could "undermine the usefulness of the interpretive cutoffs," resulting in artificially inflated dumping margins.  *Id.* at 1357.

Bioparques and CAADES argue that the final determination must be remanded because the same concerns raised in *Stupp* are present here.  Bioparques Br. 29-33; *see also* CAADES Br. 2.  They argue that the comparisons made in this investigation have "very few observations, contain sales with little or no variance in price, and do not have substantially equal variances or substantially equal number of data points," thus arguing that the same concerns that were present in *Stupp* should invalidate the results of Commerce's differential pricing analysis here. Bioparques and CAADES point to the number of data points in two specific comparisons, asserting that because in these two comparisons, there were significantly fewer number of data points in the "test group" than in the "base group," Bioparques Br. 32, the data comparisons do not "have the mathematical characteristics relied on by Professor Cohen."  However, as explained below, recent caselaw confirms that Commerce's application of the Cohen's *d* test is reasonable, leaving Bioparques and CAADES without a compelling argument.

On remand in the *Stupp* litigation, this Court sustained Commerce's redetermination. *Stupp Corp. v. United States*, 619 F. Supp. 3d 1314 (Ct. Int'l Trade 2023), *appeal pending*, No. 2023-1663 (Fed. Cir.).  In the redetermination, Commerce explained that its Cohen's *d* analysis does not operate in a vacuum and must be considered in context with the ratio test and the

meaningful difference test. *Id.* at 1321. Commerce further explained that the "cutoffs [employed] are tied to real-world criteria, that small fluctuations in price will not lead to 'false positives' in Cohen's test, and that the use of the 0.8 threshold results in reasonably infrequent application of alternative methodologies." *Id.* (citing Commerce's Remand Redetermination). As this Court held, Commerce specifically addressed the concern regarding the use of the test when it evaluates data which fails to meet statistical assumptions of normality, size, and variance (the same concerns raised here by Bioparques and CAADES). *Id.* at 1326-27. As the Court elaborated, "Congress delegated to Commerce the authority to determine where a price difference is significant . . . [and] . . . also made clear that the definition of a 'significant price difference' would depend on the product at issue." *Id.* at 1327. Following a discussion of Commerce's response to the Federal Circuit's other concerns, the Court concluded that Commerce has adequately explained how its methodology is reasonable. *Id.* at 1327-28.

In addition, in *SeAH Steel* and *Marmen*, which also involved Commerce's differential pricing methodology, this Court recently held that "Commerce's use of a population, rather than a sample, in the application of the Cohen's *d* test sufficiently negates the questionable assumptions about thresholds that were raised in *Stupp*." *SeAH Steel Corp. v. United States*, 619 F. Supp. 3d 1309, 1313 (Ct. Int'l Trade 2023); *Marmen, Inc. v. United States*, No. 20-00169, 2023 U.S. Ct. Int'l Trade LEXIS 42, at *21-22, 2023 WL 2567405 (Ct. Int'l Trade March 20, 2023) ("Based on Commerce's explanation, this Court concludes that Commerce's application of the Cohen's *d* test to determine whether there was a significant pattern of differences was reasonable because Commerce applied the Cohen's *d* test to a population rather than a sample."), *appeal pending*, No. 2023-1877 (Fed. Cir.).

In this investigation, as in the administrative determinations underlying the *Stupp*, *SeAH Steel*, and *Marmen* cases, Commerce relied upon an entire population dataset (*i.e.*, all export sales).  Post-Preliminary Determination 8; Post-Prelim. Analysis Memo. for Bioparques 3.  Therefore, having used the same Cohen's *d* methodology in the *Stupp*, *SeAH*, and *Marmen* cases, and having applied the same differential pricing methodology here, Commerce's determination that there exists a pattern of prices differ significantly among purchasers, regions, or time periods should be sustained.  *See* Post-Preliminary Determination 5-9, *unchanged in* IDM 20.

      C.      <u>Commerce's Use Of The Cohen's *d* Test Took Into Account The Relevant Sales</u>

Bioparques and CAADES argue that Commerce failed to provide an explanation regarding how its use of the differential pricing analysis was reasonable when its analysis did not control for the 2013 Suspension Agreement, which "required different prices over different time periods," such that any "pattern" determined by the differential pricing analysis necessarily "cannot distinguish between changes in price over time periods that resulted from the terms of the Agreement versus changes that resulted from other factors."  Bioparques Br. 33-34.  This argument proceeds from a faulty premise.

As Commerce determined, the reference prices in the 2013 Suspension Agreement functioned as price floors, not "required prices."  IDM 20.  Commerce explained that it had analyzed the gross unit prices reported by Bioparques and had found that there were export sales at prices *above* the reference prices set by the 2013 Suspension Agreement, thus indicating that the reference prices functioned as price floors.  *Id.*  Further, Commerce compared export sales with reference prices set by the 2013 Suspension Agreement in terms of season (winter and summer pricing), and determined that the export prices *did not follow* the pattern of price decrease set by the 2013 Suspension Agreement.  *Id.*  This record evidence supports Commerce's finding that it was unnecessary to adjust time periods for the differential pricing analysis on the

basis of the time periods for reference prices in the 2013 Suspension Agreement.  *Id.*

Commerce's reasonable explanation is supported by substantial evidence and is in accordance

with law.

> D.    Commerce's Differential Pricing Analysis Established That The Pattern Could Not Be Taken Into Account By An Average-To-Average Comparison, And Bioparques And CAADES Failed To Exhaust Their Challenge To The Sufficiency Of Commerce's Explanation

Bioparques and CAADES also argue that Commerce failed to establish that the pattern

found to exist could not be "taken into account" by an average-to-average comparison.

Bioparques Br. 35-36.  As an initial matter, this argument was not raised before Commerce, so

the agency has not had an opportunity to address it in the first instance.  Nevertheless, Commerce

did provide a reasonable explanation supported by substantial evidence as to why the pattern

determined by its differential pricing analysis could not be taken into account by an average-to-

average comparison.  The Federal Circuit has affirmed Commerce's meaningful difference test,

which is the test by which Commerce determines whether the pattern can be taken into account

by an average-to-average comparison, and Commerce applied that same test here.  *See Apex*

*Frozen Foods*, 862 F.3d at 1346 (holding Commerce's "meaningful difference" test to be

"reasonable").

Commerce explained in its Post-Preliminary Determination that the average-to-average

comparison could not account for the pattern of differing prices (across purchasers, regions, or

time periods) because there is a twenty-five percent relative change between:  (1) the weighted-

average dumping margin calculated using the average-to-average method; and (2) the weighted-

average dumping margin calculated using an alternative comparison method based on applying

(i) the average-to-transaction method to those export sales which passed the Cohen's *d* test, and

(ii) the average-to-average method to those export sales which did not pass the Cohen's *d* test. Post-Preliminary Determination 8.

As explained above, the statute does not specify how Commerce may determine that a pattern exists and whether prices differ significantly, let alone require a particular sequence in Commerce's analysis or use of statistical techniques.  19 U.S.C. § 1677f-1(d)(1)(B).  If Congress intended to impose a requirement for Commerce to conduct a statistical analysis, it would have done so expressly.  *Russello v United States*, 464 U.S. 16, 23 (1983) ("'[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion").  As the Federal Circuit held in *Apex II* and repeated in *Stupp*, Commerce's chosen methodology reasonably achieves the overarching statutory aim of addressing targeted or masked dumping.  *Stupp,* 5 F.4th at 1355-56.  Commerce's use of the twenty-five percent threshold in its meaningful difference test (to establish that the pattern cannot be accounted for by an average-to-average comparison) is a reasonable interpretation of the statute and is owed judicial deference.  Bioparques and CAADES disagree with this explanation but that does not make it legally insufficient.

Bioparques and CAADES made no argument before Commerce that *even more* explanation was necessary on the meaningful difference issue.  In their joint case brief, Bioparques and CAADES made a conclusory argument that there was no pattern of prices that differed significantly and that any difference was a consequence of the reference prices set by the 2013 Suspension Agreement.  Bioparques and CAADES Case Br. 4.  Commerce fully addressed that argument.  IDM 20.  But Bioparques and CAADES did not make an argument that Commerce's explanation of why the pattern cannot be accounted for by an average-to-average

comparison was insufficient in any way.  *See generally*, Bioparques and CAADES Case Br.

Bioparques and CAADES therefore failed to exhaust administrative remedies with respect to the

sufficiency of Commerce's explanation.  *See*, *e.g.*, *Rhone Poulenc*, 899 F.2d at 1191.

Commerce's interpretation of section 1677f-1(d)(1)(B) is lawful, reasonable, and

supported by substantial evidence.  Bioparques and CAADES may disagree with the outcome,

but they fail to point to any statutory or record-based rationale undermining Commerce's

determination here.  As such, this Court should sustain Commerce's differential pricing analysis.

> E.      Commerce Reasonably Determined To Make Certain Comparisons Using Its
>          Average-To-Transaction Methodology

Commerce determined that a mixed comparison methodology was appropriate, using its

average-to-average methodology for certain of Bioparques' sales, and its average-to-transaction

methodology for other sales, based on the differential pricing analysis.  Post-Preliminary

Determination 8, *unchanged in* IDM 20, 22; *see also* Post-Prelim. Analysis Memo. for

Bioparques 3, *unchanged* in Final Analysis Memo. for Bioparques.

Bioparques and CAADES argue that Commerce previously decided that average-to-

transaction comparisons are "never appropriate in cases involving highly-perishable agricultural

products."  Bioparques Br. 23-29; *see also* CAADES Br. 2.  They argue that because in a prior

1980 negative determination, *Certain Fresh Winter Vegetables from Mexico*, Commerce found

that the subject merchandise (which did include tomatoes at the time) was not being sold at less-

than-fair-value, based on normal value to export price comparisons on a daily basis, this meant

that Commerce had set a practice for how to make comparisons in every "highly perishable

agricultural product" case going forward.  Bioparques Br. 23-29.  In its brief, Bioparques cites to

only two administrative proceedings from the 1980s, *Certain Fresh Winter Vegetables from

Mexico* and *Certain Fresh Cut Flowers from Colombia*, but Bioparques does not engage with the

statutory and regulatory framework that does not require Commerce to use monthly averages for comparisons of normal value to export price in investigations.  *See* Bioparques Br. 24-26.

Bioparques and CAADES ignore the plain language of the statute in arguing that average-to-transaction comparisons are not permitted for "highly perishable" products.  The statute, amended in 1995 and thus applicable to this final determination, permits Commerce to compare the weighted-average of the normal values to the export prices for individual transactions (in other words, apply the average-to-transaction methodology) if a set of conditions are met.  *See* 19 U.S.C. § 1677f-1(d)(1)(B); Post-Preliminary Determination 6, *unchanged in* IDM.  There is no statutory carve-out for "highly perishable" products, nor do Commerce's regulations provide for such a carve-out.  Thus, it cannot be the case that using the average-to-transaction methodology is "never" permitted for "highly perishable" products.

Further, the administrative determinations cited by Bioparques, which pre-date 1997, do not establish a practice by which Commerce is bound.  To the contrary, Commerce expressly declined to adopt any such practice in 1997 because the agency did "not believe it ha[d] sufficient experience with these types of cases to warrant the creation of a regulatory preference," and instead "believe[d] it is more appropriate to decide these issues on a case-by-case basis." *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. at 7,349 (proposed rules), *unchanged in Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. at 27,373 (final rules).  In short, Bioparques and CAADES argue that Commerce has violated a purported practice that does not actually exist.

If Commerce can demonstrate that the conditions required by section 1677f-1(d)(1)(B) are met, then it is permitted under the statute to use the average-to-transaction methodology.  That is precisely what happened in Commerce's analysis of Bioparques' reported sales.  As Commerce

explained in applying its differential pricing analysis, it determined the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods. Post-Preliminary Determination 8; IDM 20. The agency further explained that the average-to-average methodology cannot account for such differences because there is a twenty-five percent relative change between the dumping margin calculated using the average-to-average methodology and the dumping margin calculated using a combination of average-to-average and average-to-transaction methodologies. Post-Preliminary Determination 8, *unchanged in* IDM. Therefore, Commerce satisfied the conditions precedent in section 1677f-1(d)(1)(B) and reasonably applied its mixed methodology to Bioparques' sales, including the average-to-transaction methodology in certain instances. Post-Preliminary Determination 8, *unchanged in* IDM.

VII.   Commerce Properly Included Certain Sales In Its Normal Value Calculation

Bioparques and CAADES argue that Commerce's calculation of normal value included certain home-market sales that were made at "aberrationally high" prices, were outside the normal course of trade, and should not have been included in the normal value calculation. Bioparques Br. 43-48. As demonstrated below, the record evidence does not support this argument.

A.   Legal Framework

Normal value is "the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and *in the ordinary course of trade* and, to the extent practicable, at the same level of trade as the export price or constructed export price." 19 U.S.C. § 1677b(a)(1)(B)(i) (emphasis added). Commerce must exclude home market sales that fall outside the ordinary course of trade. *See id.* The statute's purpose is to "avoid basing normal value on sales which are extraordinary for the market in question, particularly when the use of such sales would lead to irrational or unrepresentative results." Statement of Administrative Action Accompanying Uruguay Round Agreements Act,

H.R. Doc. 103-316, at 834 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4171 (1994) (SAA).

The "ordinary course of trade" is defined as "conditions and practices which, for a reasonable

time prior to the exportation of subject merchandise, have been normal in the trade under

consideration with respect to merchandise of the same class or kind."  19 U.S.C. § 1677(15).

Sales may be outside the ordinary course of trade if they "have characteristics that are

extraordinary for the market in question."  19 C.F.R. § 351.102(b)(35); *see also NSK Ltd. v.*

*United States*, 170 F. Supp. 2d 1280, 1296 (Ct. Int'l Trade 2001).  This is a question of fact and

focuses on the totality of the circumstances surrounding the home market sales, including any

aberrational prices, abnormally high profits, unusual terms of sale, or unusual product

specifications.  19 C.F.R. § 351.102(b)(35); SAA at 834.

 B. Commerce's Inclusion Of The Identified Sales Was Lawful

 Bioparques and CAADES argue that the inclusion of certain sales was unlawful because

they were made at aberrational prices that were not representative of the market in question and

were outside the ordinary course of trade.  Bioparques Br. 43; *see also* CAADES Br. 2.

Specifically, Bioparques identifies certain sales as "high-priced home-market sales . . . especially

during the month of November," asserting that spikes in pricing can occur during the off-season

of May to December.  Bioparques Br. 44-45.  Bioparques asserts that the "extremely high" prices

during November demonstrate that some of the sales prices during that month "must have been

extraordinary for the Mexican market," and that such sales generated "massive" profits.  *Id*. at 45.

Bioparques further asserts that because of the 2013 Suspension Agreement, the Mexican market

"necessarily" was distorted, and that "average prices in Mexico are generally much lower than in

the United States and often fall below cost."  *Id*. at 46.  However, Bioparques continues, during

the off-season, Mexican customers may need to "pay exorbitant prices" to persuade growers to

sell, resulting in price spikes.  *Id.* at 46-47.

What this story fails to show are any "characteristics that are extraordinary for the market in question," such that the resulting prices are aberrational. 19 C.F.R. § 351.102(b)(35). Indeed, in recounting how the Mexican market operates "normally" from year to year, with high and low seasons for supply and seemingly typical price surges during low season each year, Bioparques and CAADES undermine their own argument that any such price spikes are "uncharacteristic" or "aberrational" in nature or outside the ordinary course of trade, as Commerce found. IDM 26. In other words, Bioparques and CAADES fail to argue that the prices identified fall outside of the expected "spikes" typically seen in the Mexican market, year after year, due to the high and low supply seasons of tomatoes. *See id.* To the contrary, the price fluctuations appear to be within the "ordinary course of trade" because they are reflective of the "conditions and practices which, for a reasonable time prior to the exportation of subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15). As such, they cannot demonstrate that Commerce's determination to include the identified sales in the normal value calculation was unsupported by substantial evidence or otherwise not in accordance with law, and this Court should therefore sustain Commerce's inclusion of these sales in the normal value calculation.

<u>CONCLUSION</u>

For these reasons, the United States respectfully requests that the Court sustain the Final Determination and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

                                         s/ Franklin E. White, Jr.
                                        FRANKLIN E. WHITE, JR.
                                        Assistant Director

                                         s/ Douglas G. Edelschick
Of Counsel:                             DOUGLAS G. EDELSCHICK
                                        Senior Trial Counsel
EMMA T. HUNTER                          Commercial Litigation Branch
Assistant Chief Counsel                 Civil Division
Office of the Chief Counsel for         United States Department of Justice
    Trade Enforcement and Compliance   P.O. Box 480, Ben Franklin Station
United States Department of Commerce    Washington, DC 20044
                                        Tel: (202) 353-9303

June 29, 2023                           Attorneys for Defendant

CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains 13,976 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

s/ Douglas G. Edelschick