UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| BIOPARQUES DE OCCIDENTE, S.A. DE C.V., AGRICOLA LA PRIMAVERA, S.A. DE C.V., AND KALIROY FRESH LLC, <br><br> Plaintiffs, <br><br> and <br><br> CONFEDERACION DE ASOCIACIONES AGRICOLAS DEL ESTADO DE SINALOA, A.C., CONSEJO AGRICOLA DE BAJA CALIFORNIA, A.C., ASOCIACION MEXICANA DE HORTICULTURA PROTEGIDA, A.C., ASOCIACION DE PRODUCTORES DE HORTALIZAS DEL YAQUI Y MAYO, AND SISTEMA PRODUCTO TOMATE, <br><br> Consolidated Plaintiffs <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> THE FLORIDA TOMATO EXCHANGE, <br><br> Defendant-Intervenor. | Consolidated Court No. 19-00204 |

REPLY BRIEF OF PLAINTIFFS BIOPARQUES *ET AL.*

WINTON & CHAPMAN PLLC
1100 13th Street, N.W., Suite 825
Washington, D.C.  20005
(202) 774-5500

Attorneys for Bioparques de Occidente,
    S.A. de C.V., Agricola La Primavera,
    S.A. de C.V, and Kaliroy Fresh LLC

September 13, 2023

Table of Contents

Page

ARGUMENT ..................................................................................................... 1

   A.   Petitioners' Request for Continuation Was Untimely .......................................... 1

   B.   Commerce's Selection of New Respondents and a New Investigation
       Period Was Not Authorized by Statute, which Allows Commerce to
       "Resume" an Investigation after Termination of a Suspension
       Agreement, But Not to Restart an Investigation from the Beginning .................. 3

   C.   Commerce Improperly Based Its Final  Determination on Sales
       Made During a Period  in which a Suspension Agreement Was
       in Force,  in Contravention of the Requirements of the Statute .......................... 6

       1.   The Impact of 19 U.S.C. §1673c(j) Was Expressly
             Argued by the Parties before Commerce ...................................................... 8

       2.   Even if the Impact of 19 U.S.C. §1673c(j) Had Not
             Been Argued before Commerce, It Would Still
             Be Appropriate for the Court to Address the Issue ..................................... 9

       3.   The Language of 19 U.S.C. §1673c(j) Unambiguously
             Requires Commerce to Base Its Determination in
             Any Continued Investigation on Sales that Were
             Not Affected by Any Past Suspension Agreement ..................................... 10

       4.   The Previous Decisions Cited by Defendant-Intervenor
             Are Factually Inapposite and Legally Irrelevant ......................................... 11

   D.   Commerce Improperly Calculated the Dumping
       Margins for the Plaintiffs Using an Average-
       to-Transaction Comparison for Certain U.S. Sales ........................................... 13

       1.   Under Commerce's Longstanding Practice, Average-to-
             Transaction Comparisons Are Never Appropriate in
             Cases Involving Highly-Perishable Agricultural Products ....................... 13

             a.   Plaintiffs Cited to Several Commerce Decisions
                 Involving Highly-Perishable Agricultural Products ........................... 14

             b.   Commerce's 1997 Regulations
                 Did Not Overturn its Practice ............................................................. 15

(i)

Page

2.    The Change in the Statutory Scheme Which
Permits the Use of Average-to-Transaction
Comparisons Does Not Alter Commerce Practice
for Highly-Perishable Agricultural Products ............................................... 16

3.    Commerce's Reliance on the "Cohen's d Test"
as Part of Its "Differential Pricing Analysis"
To Justify the Use of Average-to-Transaction
Comparisons in This Case Was Unlawful .................................................... 17

     a.    Bioparques Arguments Regarding Use of
the Cohen's d Test Are Not Barred by a
Failure to Exhaust Administrative Remedies ...................................... 18

     b.    This Court's Post-Stupp Decisions Are Not Final ............................. 18

     c.    Commerce's Decision Not to Adjust the Time Periods
as Required by the Suspension Agreement When Applying
the Differential Pricing Analysis Was Inadequate ............................. 19

E.   Commerce's Calculation of the Plaintiffs' Margin
Using Investigation-Period Rather than Monthly
Average Normal Values Was Inconsistent with
Commerce's Regulations and Established Practice ............................................. 21

1.    Commerce's Practice of Using Monthly Averages for
High-Inflation Cases Is Distinct from its Practice of
Using Monthly Averages for Highly-Perishable Products ......................... 21

2.    The Cases Cited by Defendants Discuss
Commerce's Methodology for Its Cost Test and
Not Its Methodology for Comparing Sales Prices ..................................... 23

F.   Commerce's Calculation of Normal Value for
Plaintiffs Improperly Included Home-Market Sales
that Were Made at Aberrationally-High Prices .................................................. 23

CONCLUSION ................................................................................................................... 26

Table of Authorities

Page

COURT DECISIONS

*Agro Dutch Indusies v. United States,*
   508 F.3d 1024 (Fed.Cir. 2007) ................................................................ 9

*Asociacion Colombiana de Exportadores de Flores v. United States,*
   704 F.Supp. 1114 (CIT 1989) ................................................................ 15

*Corus Staal v. U.S. Department of Commerce,*
   27 C.I.T. 388 (2003) .............................................................................. 25

*Floral Trade Council v. United States,*
   704 F.Supp. 233 (CIT 1988) ........................................................... 13, 15

*Green v. Bock Laundry Machine Co.,*
   490 U.S. 504 (1989) ............................................................................... 3

*Haggar Co. v. Helvering,*
   308 U.S. 389, 394 (1940) ....................................................................... 3

*HiSteel v. United States,*
   Slip Op. 23-131 (Sept. 12, 2023) ......................................................... 19

*Hormel v. Helvering,*
   312 U.S. 552 (1941) ............................................................................. 18

*Itochu Building Products v. United States,*
   733 F.3d 1140 (Fed.Cir. 2013) ......................................................... 9, 10

*Marmen, Inc. v. United States,*
   627 F. Supp. 3d 1312 (CIT 2023) ........................................................ 19

*Public Citizen v. United States Dept. of Justice,*
   491 U.S. 440 (1989) ............................................................................... 3

*Siemens Gamesa Renewable Energy v. United States,*
   621 F. Supp. 3d 1337 (CIT 2023) ........................................................ 18

*Stupp Corp. v. United States,*
   5 F.4th 1341 (Fed.Cir. 2021) ............................................................... 18

*Stupp Corp. v. United States,*
   619 F.Supp.3d 1314 (CIT 2023) .......................................................... 19

*Zhaoqing Tifo New Fibre Co. v. United States,*
   60 F. Supp. 3d 1328 (CIT 2015) ............................................................ 8

STATUTES

19 U.S.C. § 1677b ................................................................................... 23

19 U.S.C. §1673c .......................................................................... *passim*

(iii)

Page

19 U.S.C. §1677f-1 .................................................................................................... 17, 23

U<span>NDERLINE</span>ADMINISTRATIVE DECISIONS

*Certain Cut-to-Length Carbon-Quality Steel Plate Products from Indonesia*,
    64 Fed. Reg. 73164 (December 29, 1999) ...................................................... 21

*Certain Fresh Cut Flowers from Colombia*,
    52 Fed. Reg. 6482 (March 5, 1987) .......................................................... 13, 22

*Certain Fresh Cut Flowers from Ecuador,*
    52 Fed. Reg. 2128  (Jan 20, 1987) ................................................................. 22

*Certain Fresh Winter Vegetables from Mexico*,
    45 Fed. Reg. 20512 (March 28, 1980) ........................................................... 15

*Certain Lemon Juice from Brazil,*
    87 Fed. Reg. 47697 (Aug. 4, 2022) ............................................................... 22

*Cut Flowers from Colombia,*
    56 Fed. Reg. 50554 (Oct. 7, 1991) ................................................................. 22

*Fresh Tomatoes from Mexico*,
    Investigation No 731-TA-747 (Final), Pub. 5003 (Dec. 2019) ................................. 13, 14

*Fresh Tomatoes from Mexico*,
    Investigation No 731-TA-747 (Preliminary), Pub. 5003 (Dec. 2019) .......................... 14

*Lemon Juice from Brazil and South Africa*,
    Investigation Nos. 731-TA-1578-1579 (Final), Pub. 5403 (Feb. 2023) ....................... 22

*Preliminary Determination: Fresh Tomatoes From Mexico,*
    61 Fed. Reg. 56608 (Nov. 1, 1996) ............................................................. 3, 5

*Ripe Olives from Spain*,
    Investigation Nos. 701-TA-582 and 732-TA-1377 (Final), Pub. 4805 (July 2018) ....... 22

*Sheet Piling from Canada*,
    56 Fed. Reg. 18565 (April 23, 1991) ............................................................. 12

*Static Random Access Memory Semiconductors from Taiwan,*
    63 Fed. Reg. 8909 (Feb. 23, 1998) ............................................................... 22

*Suspension of Antidumping Investigation: Fresh Tomatoes from Mexico*,
    61 Fed. Reg. 56618 (Nov. 1, 1996) ................................................................. 2

*Uranium from Kazakhstan*,
    64 Fed. Reg. 31179 (June 10, 1999) ............................................................. 12

R<span>EGULATIONS</span>

19 C.F.R. §351.209 .......................................................................................... 4

19 C.F.R. §353.42(b) (1996) ............................................................................... 5

Page

ADMINISTRATIVE MATERIALS

*Antidumping Duties; Countervailing Duties*,
   61 Fed. Reg. 7308 (Feb. 27, 1996)............................................................................... 16

OTHERS

MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1993) ........................................ 4

ACADEMIC PUBLICATIONS

Mark Barnett, Stephen Powell "The Role of the United States Trade Laws in Resolving the
   Florida-Mexico Tomato Conflict," 11 Fla. Jrnl. Int'l Law 319 (1997)............................. 8

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| BIOPARQUES DE OCCIDENTE, S.A. DE C.V., AGRICOLA LA PRIMAVERA, S.A. DE C.V., AND KALIROY FRESH LLC,<br><br>     Plaintiffs,<br><br>   and<br><br>CONFEDERACION DE ASOCIACIONES AGRICOLAS DEL ESTADO DE SINALOA, A.C., CONSEJO AGRICOLA DE BAJA CALIFORNIA, A.C., ASOCIACION MEXICANA DE HORTICULTURA PROTEGIDA, A.C., ASOCIACION DE PRODUCTORES DE HORTALIZAS DEL YAQUI Y MAYO, AND SISTEMA PRODUCTO TOMATE,<br><br>     Consolidated Plaintiffs,<br><br>   v.<br><br>UNITED STATES,<br><br>     Defendant,<br><br>   and<br><br>THE FLORIDA TOMATO EXCHANGE,<br><br>     Defendant-Intervenor. | Consolidated Court No. 19-00204 |

PLAINTIFFS' REPLY BRIEF

This brief is submitted on behalf of Plaintiffs Bioparques de Occidente, Agricola La Primavera, and Kaliroy Fresh to reply to the briefs submitted on June 29, 2023, by Defendant and Defendant-Intervenor (collectively, "Defendants") in the above-captioned case.

ARGUMENT

*A.   Petitioners' Request for Continuation Was Untimely*

As explained in our initial brief, the statute provides that Commerce is allowed to "continue" a suspended investigation only if it receives a request for continuation from an

interested party within 20 days after the date of publication of the notice of suspension of the investigation.[1]  This 20-day clock was triggered on November 1, 1996, when Commerce published its notice of suspension of the tomatoes investigation as a result of the 1996 Suspension Agreement.[2]  Accordingly, the 20-day deadline to request the continuation of the investigation expired on November 21, 1996.  Petitioner did not request continuation of the investigation until October 2019, which was 23 years after the statutory deadline under 19 U.S.C. §1673c(g) had expired.[3]  Therefore, Commerce's continuation of the investigation in this proceeding was contrary to the statute and, thus unlawful.

Defendants contend that 19 U.S.C. §1673c(g) resets the deadline for requesting continuation each time a *resumed* investigation is suspended.  As explained in our initial brief, however, that interpretation of subsection (g) cannot be reconciled with subsection (j) of the same statutory provision.  Subsection (j) requires Commerce, in making a final determination in a continued investigation, to disregard sales that were affected by "*any* suspension agreement under subsection (b) or (c) of this section."  As a result, the statute mandates that Commerce use historical data from 1996 (before any of the suspension agreements took effect) in making its final determination in this case.

Reading subsections (g) and (j) together, it is clear that Congress intended subsection (g) to apply only to the *initial* notice of suspension of the original investigation, which in this case was published in 1996.  To allow otherwise would result in an absurd outcome in

---

[1] *See* 19 U.S.C. §1673c(g).

[2] *See Suspension of Antidumping Investigation: Fresh Tomatoes from Mexico*, 61 Fed. Reg. 56618 (Nov. 1, 1996).

[3] *See Fresh Tomatoes from Mexico: Request to Continue Suspended Less Than Fair Value Investigation*, October 11, 2019 (PR-492).

which an interested party can take advantage of the termination and renegotiation of

suspension agreements in an investigation to extend the time limit under subsection (g)

indefinitely.  In addition, it would be absurd to allow interested parties an additional 23

years to request continuation of the investigation, and thus place Commerce in a situation

in which the original respondents and their data may no longer be available or verifiable.

Neither Defendant nor Defendant-Intervenor address the absurdity of their proposed

interpretation of the statute.  However, it is well-established that the Courts should avoid

interpreting a statute in a manner that leads to such an "odd result."[4]

> B.  *Commerce's Selection of New Respondents and a New Investigation Period Was Not Authorized by Statute, which Allows Commerce to "Resume" an Investigation after Termination of a Suspension Agreement, But Not to Restart an Investigation from the Beginning*

Commerce's 1996 investigation of *Mexican Tomatoes* covered sales during the period

from March 1, 1995, to February 29, 1996.  In that investigation, Commerce examined

sales from six mandatory respondents, and published the preliminary dumping margins for

those six respondents on November 1, 1996.[5]  Commerce conducted verification of the

original questionnaire responses by those respondents and received case and rebuttal briefs

addressing the issues in the preliminary determination and verifications in 2002 (after the

suspension agreement signed in 1996 was terminated and the investigation was

---

[4] *See, e.g.*, *Public Citizen v. U.S. Dept. of Justice*, 491 U.S. 440, 454 (1989) (court can look beyond statutory language when plain meaning would "compel an odd result"); *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 527 (1989); *Haggar Co. v. Helvering*, 308 U.S. 389, 394 (1940) ("A literal reading of {statutes} which would lead to absurd results is to be avoided when they can be given a reasonable application consistent with their words and with the legislative purpose.")

[5] *See* 61 Fed. Reg. 56608.

"resumed").  All that was needed to complete the original investigation was for Commerce to issue a final determination based on its analysis of those briefs.

But, after the 2013 Suspension Agreement was terminated, Commerce chose not to complete its unfinished 1996 investigation.  Instead, Commerce decided to select completely new respondents that had not been investigated in Commerce's original investigation, and to request information from those respondents for a new investigation period more than 20 years after the period considered in the original investigation.

The statute and regulations authorize Commerce to "resume" an antidumping investigation that was suspended by a suspension agreement once the agreement is terminated, whether the termination is due to a violation of the agreement or to a decision by Commerce that the agreement no longer meets the requirements of the statute.[6]  As noted in our initial brief, the dictionary defines the term "resume" to mean "to begin again something interrupted" or "to return to or begin (something) again after interruption" or "to pick up again."[7]  In ordinary English, the word "resume" indicates a continuation from the current point, not a complete starting over.

Defendant asserts that Commerce's decision in 2019 to restart the investigation from the beginning with a new investigation period, new respondents, and new questionnaires did not constitute a formal "restart," of the investigation, because Commerce never formally stated that it was terminating its prior investigation and commencing a new one.[8]  But the absence of formality does not change the essential nature of Commerce's actions.

---

[6] *See* 19 U.S.C. §1673c(i)(1)(B); 19 C.F.R. §351.209(b)(2) and (c)(4)(i).

[7] *See* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1993) at 999.

[8] *See* Defendant's Brief at 17.

Commerce had already completed all of the stages of the original investigation, including verification and briefing, before it terminated the 2013 Suspension Agreement. Rather than "resume" *that* investigation (which would have required only that Commerce decide the issues raised in the case and rebuttal briefs that had been submitted), Commerce chose instead to throw out all of the old information and start again from the beginning. That conduct simply does not comport with any notion of "resumption."

For its part, Defendant-Intervenor contends that Commerce's decision to restart the investigation with a new investigation period was consistent with provisions of Commerce's regulations in effect at the time of the original 1996 investigation that permitted Commerce to select an "additional or alternative" period of investigation.[9] But the fact that Commerce had the discretion under its regulations to alter the investigation period at the start of the proceeding is irrelevant to the issue before the Court.[10] Commerce cannot achieve by regulation an outcome that is contrary to the statute. For the same reason, Defendant-Intervenor's citation to past Commerce decisions — which purportedly selected new respondents and a new investigation period in investigations that were

---

[9] *See* Defendant-Intervenor's Brief at 17.

In this regard, the regulations in effect in 1996 provided that the investigation period would normally cover "a period of at least 150 days prior to and 30 days after the first day of the month during which the petition was filed," but permitted Commerce to "examine the merchandise for any additional or alternative period {Commerce} concludes is appropriate." *See* 19 C.F.R. §353.42(b) (1996).

[10] In fact, Commerce did define an extended investigation period *in 1996* when it commenced its investigation. *See* 61 Fed. Reg. at 56610 (defining an extended one-year period from March 1995 to February 1996, despite regulations providing for a six-month investigation period).

resumed after a terminated suspension agreement — are equally irrelevant.[11]  The issue in this case is whether the statutory provision directing  Commerce to "resume" an investigation following termination of a suspension agreement permits Commerce to ignore the record of the original investigation and start afresh.  Neither Commerce's regulations nor its past decisions can authorize Commerce to act beyond the scope of its statutory authority.

> C.   *Commerce Improperly Based Its Final*
>       *Determination on Sales Made During a Period*
>       *in which a Suspension Agreement Was in Force,*
>       *in Contravention of the Requirements of the Statute*

As explained in our initial brief, the statute explicitly provides that, when making final determinations in any investigation that has been "continued" following adoption of a suspension agreement, Commerce and the International Trade Commission ("ITC") *must* disregard the effect of any suspension agreement in a continued investigation after the negotiation of a suspension agreement.  Thus, 19 U.S.C. §1673c(j) states that,

> Determination not to take agreement into account
> In making a final determination under section 1673d of this title, or in conducting a review under section 1675 of this title, in a case in which the administering authority has terminated a suspension of investigation under subsection (i)(1) of this section, or continued an investigation under subsection (g) of this section, the Commission and the administering authority shall consider all of the subject merchandise without regard to the effect of *any* agreement under subsection (b) or (c) of this section.[12]

---

[11] Defendant-Intervenor cites two past proceedings in which Commerce purportedly selected new respondents and a new investigation period in investigations that were resumed after a terminated suspension agreement.  Defendant-Intervenor's Brief at 17. Neither of those cases is apposite.  *See, below,* at 11-12.

[12] (Emphasis added)

Under this provision, Commerce's final determination in a "continued" investigation under 19 U.S.C. §1673c(g) "shall" consider all of the subject merchandise "without regard" to the effect of *any* suspension agreement.  And, any possible uncertainty about the meaning of the phrase "without regard" is clarified by the heading of 19 U.S.C. §1673c(j), which indicates that Commerce's determination is "not to take agreement into account."

This understanding of the statutory provision appears to have been accepted in the past by all parties.  For example, as noted in our initial brief, the ITC's past decisions have recognized this statutory limitation on the evidence that can be considered in a resumed investigation.[13]  Similarly, in a 2002 submission in the *Tomatoes* case, Defendant-Intervenor objected to the possible collection of new information in the resumed investigation following termination of the original 1996 Agreement, on the grounds that §1673c(j) *precludes* Commerce from using updated information affected by a suspension agreement.[14]  Furthermore, in a 1997 article, the Chief Counsel for what is now Commerce's Enforcement and Compliance unit and one of his colleagues (who, coincidentally, is now chief judge of this Court) explicitly distinguished between the examination Commerce could undertake (1) if the 1996 Tomatoes Suspension Agreement were terminated and the investigation resumed, or (2) if the petitioners simply withdrew their petition and filed an entirely new petition.  In the former scenario, they explained, 19 U.S.C. §1673c(j) would preclude consideration of prices and other market conditions after

---

[13] *See* Plaintiffs' Initial Brief at 20-21.

[14] *See* Memorandum re Respondent Selection and Period of Investigation, (July 30, 2002). (This document was identified as item 376 of the "Partial" Public Index submitted by Commerce to the Court on February 21, 2020.  *See* Court No. 19-204, ECF No. 32-2.)

*See also* Letter from Shearman & Sterling to Commerce, May 15, 2019, at 3.

the 1996 Agreement took effect.[15]  However, in the latter scenario, where petitioners

withdrew the old case and filed an entirely new petition, 19 U.S.C. §1673c(j) would not

apply.[16]

        1.    *The Impact of 19 U.S.C. §1673c(j) Was Expressly*
               *Argued by the Parties before Commerce*

      Defendants contend that arguments regarding the application of 19 U.S.C. §1673c(j)

are barred by the requirement of exhaustion of administrative remedies.[17]  But that

argument is based on a false premise.  In fact, one of the interested parties (Red Sun) made

an argument specifically about the application of §1673c(j) in its case brief in the resumed

2019 investigation.[18]  In response, Defendant-Intervenor explicitly contended that "nothing

in § 1673c(j) *precludes the use of updated information*…"[19]  Consequently, the application

of §1673c(j) to the resumed 2019 investigation was actually addressed by at least two

interested parties during Commerce's 2019 continued investigation.  As a result, the

exhaustion requirement is satisfied.[20]

---

[15] *See* Mark Barnett, Stephen Powell "The Role of the United States Trade Laws in
Resolving the Florida-Mexico Tomato Conflict," 11 Fla. Jrnl. Int'l Law 319, 342 (1997).

[16] *Id.* at 345 n.175 (1997).

[17] *See* Defendant's Brief at 21.

[18] *See* Red Sun Farm's September 11, 2019, Resubmission of Case Brief to Commerce at 6
(arguing that Commerce does not have the legal authority to continue the antidumping
investigation) (PR-473).

[19] *See* Defendant-Intervenor's September 4, 2019, Rebuttal Brief at 19 (emphasis added)
(PR-456).

[20] *See Zhaoqing Tifo New Fibre Co. v. U.S.*, 60 F. Supp. 3d 1328, 1351 (CIT 2015).

2.   *Even if the Impact of 19 U.S.C. §1673c(j) Had Not*
*Been Argued before Commerce, It Would Still*
*Be Appropriate for the Court to Address the Issue*

Furthermore, as Defendant concedes, the exhaustion requirement does not apply when the issue to be litigated is a "pure question of law."[21]  Defendant asserts that this exception is inapplicable, because it believes the statutory provision at issue is "ambiguous."[22]  But the meaning of the provision — and whether or not it is actually "ambiguous" — is itself a "pure question of law."  Defendant cannot foreclose judicial review of Commerce's interpretation of a statutory provision simply by citing its own preferred interpretation of the provision.  It is for the Court, not Defendant, to say what the statute does or does not mean.[23]

Furthermore, even if the meaning of §1673c(j) were not a "pure question of law," the Court would still have discretion to entertain arguments regarding that provision.  In this regard, it should be noted that the Mexican Associations did address the meaning of that provision at the time that Commerce was deciding whether to select new respondents and a new investigation period.[24]  Despite the arguments presented, Commerce decided to go forward with the selection of new respondents and with new questionnaires requesting information about a period during which the 2013 Agreement had been in effect.  By the time that the briefs were filed in the resumed investigation, Commerce was too far down

---

[21] *See* Defendant's Brief at 22, citing *Itochu Building Products v. U.S.,* 733 F.3d 1140, 1146 (Fed.Cir. 2013).

[22] *Id.* at 23.

[23] *See, e.g., Agro Dutch Indusies v. U.S.,* 508 F.3d 1024, 1029 (Fed.Cir. 2007) (exhaustion not required where "'{s}tatutory construction alone' is sufficient to resolve the merits of the argument….").

[24] *See, e.g.,* Letter from Shearman & Sterling to Commerce, May 15, 2019.

that path to change its course.  Consequently, arguments about the meaning of §1673c(j) in the case briefs would have been futile.  In such circumstances, the exhaustion requirement does not apply.[25]

> 3. *The Language of 19 U.S.C. §1673c(j) Unambiguously Requires Commerce to Base Its Determination in Any Continued Investigation on Sales that Were Not Affected by Any Past Suspension Agreement*

Defendants contend that the language of §1673c(j) is ambiguous, because it could be read to *require*, not forbid, Commerce to consider data that has been distorted by the terms of a Suspension Agreement.[26]  As discussed above, that novel suggestion is contrary to the position espoused by the Defendant-Intervenor, the ITC, and by senior Commerce lawyers in the past.  More importantly, it simply makes no sense.

Under the statute, Suspension Agreements involving market-economy countries are supposed to either eliminate exports to the United States,[27] or the dumping on such exports,[28] or the injury caused by such exports.[29]  Agreements that do not achieve such results are not permitted by the statute.  Consequently, consideration of data during a period covered by any Suspension Agreement should, under the statute, automatically result in a negative determination of dumping or injury.  There would simply be no reason for the statute to call for a resumed investigation after termination of an Agreement, if the

---

[25] *See Itochu Building Products,* 733 F.3d at 1146 ("a party often is permitted to bypass an available avenue of administrative challenge if pursuing that route would clearly be futile, i.e., where it is clear that additional filings with the agency would be ineffectual.").

[26] *See*  Defendant's Brief at 24; Defendant-Intervenor's Brief at 22.

[27] *See* 19 U.S.C. §1673c(b)(1).

[28] *See* 19 U.S.C. §1673c(b)(2).

[29] *See* 19 U.S.C. §1673c(c).

resumed investigation were required to consider the data for sales during the period in which an Agreement was in effect.[30]

In such circumstances, the suggestion by Defendants that the statute could or should be interpreted to *require* consideration of data during a period in which a Suspension Agreement was in effect would conflict with the statutory scheme and lead to absurd results. The Court should not permit that outcome.[31] The statute itself is clear that the analysis in a continued investigation is "not to take agreement into account" and is to be decided "without regard to the effect of any {suspension} agreement." Commerce failed to comply with those requirements and, as a result, its determination cannot be upheld.

4. *The Previous Decisions Cited by Defendant-Intervenor Are Factually Inapposite and Legally Irrelevant*

Defendant-Intervenor contends that Commerce's decision to base its analysis on data during a period covered by a Suspension Agreement is consistent with Commerce's determinations in the investigations on *Uranium from Kazakhstan* and *Sheet Piling from Canada*.[32] Of course, determinations by Commerce cannot overcome statutory language forbidding consideration of such information. And, in fact, the cases cited by Defendant-Intervenor do not support its claims.

---

[30] The Suspension Agreements in the Tomatoes investigation have been adopted under the statutory provision for agreements eliminating the injurious effect of the dumping. Importantly, the ITC's final injury determination in the "continued" investigation of Mexican Tomatoes that is the subject of this appeal, the ITC acknowledged that 19 U.S.C. §1673c(j) requires it to consider data that has not been tainted by the suspension agreement. *See* Plaintiffs' Initial Brief at 20, n.38.

[31] *See* note 4, above.

[32] Defendant-Intervenor's Brief at 17.

In *Uranium from Kazakhstan*, Commerce *did not* choose a new respondent or select a new investigation period.  The respondent stated in its response to a supplemental questionnaire issued by Commerce following the termination of the suspension agreement that it was not able to access data *from the original period of investigation*.  Instead, the respondent submitted data from a later period.  In response, Commerce determined that Kazakhstan failed to provide complete, accurate and timely responses and therefore applied adverse facts available.  Significantly, Commerce did not at any point in that case rely on data for a period other than the original investigation period.[33]

In *Sheet Piling from Canada,* Commerce resumed an investigation after it determined (eight years after the Agreement took effect) that the sole respondent had violated the Agreement by failing to eliminate its sales less than fair value.  In the resumed investigation, Commerce requested updated information from the sole respondent.  The domestic interested party objected, contending that Commerce should base its decision on data from the earlier review that had led to Commerce's finding that the respondent was dumping in violation of the Agreement.  Significantly, none of the parties contended that the information from the original investigation period should have been used, or that §1673c(j) precluded consideration of any post-Agreement data.[34]  Obviously, Commerce's failure to address an argument that was never raised in the proceeding does not establish that §1673c(j) permits consideration of post-Agreement data.

---

[33] *See Uranium from Kazakhstan*, 64 Fed. Reg. 31179, 31181 (June 10, 1999).

[34] In its final determination, Commerce continued to rely on updated information, but only because it found that both the information from the prior review and the updated information were equally affected by the suspension agreement.  *See Sheet Piling from Canada*, 56 Fed. Reg. 18565, 18568 (April 23, 1991).

      D.    *Commerce Improperly Calculated the Dumping*
            *Margins for the Plaintiffs Using an Average-*
            *to-Transaction Comparison for Certain U.S. Sales*

         1.    *Under Commerce's Longstanding Practice, Average-to-*
              *Transaction Comparisons Are Never Appropriate in*
              *Cases Involving Highly-Perishable Agricultural Products*

As explained in our initial brief, Commerce's long-standing practice is to calculate dumping margins using an average-to-average comparison in cases that involve highly-perishable agriculture products.  Commerce has stated that using an average-to-average rather than an average-to-transaction comparison is a "more fair and more representative measure of fair value" in cases that involve perishable product, because the price of perishable products fluctuates significantly over a short period of time and sellers lose their price-setting ability as the products reach the "end-of-life."[35]  Accordingly, Commerce has stated that the average-to-average comparison is a "reasonable means of avoiding penalizing producers for normal selling practices necessitated by the rapid deterioration of the merchandise."[36]

There is no dispute by Commerce or any of the parties to this appeal that fresh tomatoes are highly-perishable agricultural products.  In fact, the ITC's final determination in the resumed injury investigation found that fresh tomatoes are "very perishable"[37] and "...are marketed as soon as possible after packing, reflecting the time limits on their

---

[35] *Certain Fresh Cut Flowers from Colombia*, 52 Fed. Reg. 6482, 6843 (March 5, 1987).

[36] *Floral Trade Council v. United States,* 704 F.Supp. 233, 238-39 (CIT 1988) (footnote omitted).  *See also Asociacion Colombiana de Exportadores de Flores v. U.S.,* 704 F.Supp. 1114, 1115 (CIT 1989) ("The court has approved ITA's adoption of this averaging methodology as to related flower investigations. There are no facts of record here which would alter that conclusion.").

[37] *Fresh Tomatoes from Mexico*, Investigation No 731-TA-747 (Final), Pub. 5003 (Dec. 2019) at 13.

storage and commercial acceptability."[38]  The ITC also found that prices of fresh tomatoes

in both the U.S. and Mexican markets "…tended to vary a great deal month to month..."[39]

In these circumstances, Commerce's past decisions require a comparison of average prices

of tomatoes.  Commerce's use of the average-to-transaction comparison methodology in its

resumed investigation was, therefore, inconsistent with agency practice.

a.   *Plaintiffs Cited to Several Commerce Decisions
     Involving Highly-Perishable Agricultural Products*

Defendant contends that our initial brief cited only one Commerce determination

involving highly-perishable agricultural products:  *Salmon from Norway.*  According to

Defendant, the facts that led Commerce to compare average prices in *Norwegian Salmon*

are distinguishable from this case.[40]  Defendant is mistaken.

In fact, our initial brief cited multiple cases that involved highly-perishable

agricultural products including *Fresh Winter Vegetables from Mexico*, *Fresh Cut Flowers

from Colombia*, and *Fresh Cut Flowers from Ecuador*.[41]  Furthermore, none of those cases

required the specific price pattern identified in the *Salmon from Norway* decision in order

to apply the average-to-average comparison methodology.  Instead, those cases held that,

simply because the high perishability of the merchandise limited the length of time the

product could capture full market price, use of the average-to-average comparison

---

[38] *Id*. at 29.  *See also Fresh Tomatoes from Mexico*, Investigation No 731-TA-747
(Preliminary), Pub. 5003 (Dec. 2019) at II-4 at note 28 (explaining that fresh tomatoes
"must be consumed within about 3 weeks after harvesting").

[39] *Fresh Tomatoes from Mexico*, Investigation No 731-TA-747 (Final), at V-19.

[40] *See* Defendant's Brief at 28, 30-31.

[41] *See* Plaintiffs' Initial Brief at 23-27.

methodology was warranted.[42]  Based on that reasoning, Commerce has previously

determined that prices of fresh tomatoes from Mexico should be compared based on

average prices.[43]  Such a result is plainly appropriate in this case as well.

> b.  *Commerce's 1997 Regulations*
> *Did Not Overturn its Practice*

Defendants also argue that Commerce no longer has a practice of using the average-

to-average comparison for highly-perishable agricultural products.  In support of that

assertion, Defendants cite to language in the *Preamble* to Commerce's proposed 1997

regulations, which stated that "in cases involving highly perishable agricultural products...

the Department does not consider it appropriate to create a regulatory preference for

averaging over the market cycle," and instead "the Department believes it is more

appropriate to decide these issues on a case-by-case basis."[44]

But Defendants' description of the *Preamble* to the proposed 1997 regulations is

incomplete and misleading.  Commerce's full explanation in the *Preamble* was as follows:

> We also have not adopted a suggestion that the regulations
> provide that in cases involving highly perishable agricultural products,
> the preferred approach will be to use the average-to-average method,
> with averages being calculated over the market cycle. *In the past, the*

---

[42] *See e.g., Floral Trade Council*, 704 F.Supp. 238-39 (footnote omitted) (explaining that "{a}s in *Winter Vegetables*, perishability and resulting price fluctuation is one of the reasons for employing a non-traditional methodology such as sampling or averaging."). *See also Asociacion Colombiana de Exportadores de Flores v. United States,* 704 F.Supp. 1114, 1115 (CIT 1989) ("The court has approved ITA's adoption of this averaging methodology as to related flower investigations. There are no facts of record here which would alter that conclusion.").

[43] *See Certain Fresh Winter Vegetables from Mexico*, 45 Fed. Reg. 20512, 20513-14 (March 28, 1980) (explaining that "'certain fresh winter vegetables' means fresh cucumbers, eggplant, peppers, squash, and tomatoes (except cherry tomatoes)" and deciding to compare average daily U.S. and comparison-market prices).

[44] *Id*.

*Department has used the average-to-average method in cases involving perishable agricultural products, and believes that the administrative and judicial precedents arising out of these cases would continue to be valid under the new statute and these regulations.* However, at this time, the Department does not believe it has sufficient experience with these types of cases to warrant the creation of a regulatory preference in favor of the average-to-average method in all cases of this type. Likewise, the Department does not consider it appropriate to create a regulatory preference for averaging over the market cycle. At this point, the Department believes it is more appropriate to decide these issues on a case-by-case basis.[45]

It is clear from Commerce's full explanation that Commerce did not intend its 1997 regulations to overturn its established practice.  To the contrary, Commerce explicitly stated that the pre-1997 decisions, which used average-to-average comparisons over shorter averaging periods (including monthly averages) for highly-perishable products constituted precedents that "would continue to be valid under the new statute and these regulations."

2.    *The Change in the Statutory Scheme Which Permits the Use of Average-to-Transaction Comparisons Does Not Alter Commerce Practice for Highly-Perishable Agricultural Products*

Defendants also claims that Commerce was not required to use the average-to-average comparison in this case because the statute permits Commerce to use the average-to-transaction methodology.[46]  Defendants' argument misses the mark.

The statute only permits the use of the average-to-transaction methodology when certain conditions are met.  Specifically, the amended statute provides that Commerce may only use the average-to-transaction methodology if:

---

[45] *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7308, 7349 (Feb. 27, 1996) (emphasis added, citation omitted).

[46] *See* Defendant's Brief at 43 and Defendant-Intervenor's Brief at 27.

(i)   there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, *and*

(ii)  *the administering authority explains why such differences cannot be taken into account using {the average-to-average} method*....[47]

Since Commerce has previously stated that the average-to-average methodology is needed to avoid distortions for cases involving highly-perishable products, and that the use of monthly-average prices fully addresses the risk of "masked" dumping, Commerce has failed to explain why "patterns" of price differences cannot be taken into account by the average-to-average methodology in this case.[48]

3.   *Commerce's Reliance on the "Cohen's d Test" as Part of Its "Differential Pricing Analysis" To Justify the Use of Average-to-Transaction Comparisons in This Case Was Unlawful*

As explained in our initial brief, Commerce's reliance on its "Cohen's *d* Test" as part of its "Differential Pricing Analysis" was inconsistent with the decision by the Court of Appeals for the Federal Circuit in the *Stupp* case.  In response, Defendant contends that this argument should be barred by Plaintiffs' alleged failure to exhaust its administrative remedies on this issue.  In addition, Defendant also asserts that subsequent decisions by this Court affirming Commerce's redetermination on remand in *Stupp* render Plaintiffs' arguments moot.  Finally, Defendant-Intervenor contends that Plaintiffs actually endorsed the use of Cohen's *d* analysis in the underlying investigation.  However, none of these arguments withstands scrutiny.

---

[47] 19 U.S.C. §1677f-1(d)(1)(B) (emphasis added).

[48] *See* Plaintiffs' Initial Brief at 26-27 (citing *Cut Flowers from Colombia*, 56 Fed. Reg. 50554, 50555 (Oct. 7, 1991)).

     *a.*    *Bioparques Arguments Regarding Use of*
           *the Cohen's d Test Are Not Barred by a*
           *Failure to Exhaust Administrative Remedies*

Defendants contend that the Court should reject Bioparques' arguments concerning

the mathematical defects in Commerce's use of the Cohen's *d* test because Bioparques

failed to raise those issues before Commerce in the underlying proceeding.  In this case,

however, there has been an intervening judicial interpretation of existing law — the

decision in *Stupp* — which if applied might have materially altered Commerce's

determination.  The case briefs in the underlying investigation were filed with Commerce

on August 30, 2019.[49]  *Stupp* was decided by the CAFC just shy of *two years later*, on

July 15, 2021.[50]  It is well-settled that the "exhaustion" doctrine is not required where there

have been "judicial interpretations of existing law after decision below and pending

appeal—interpretations which if applied might have materially altered the result."[51]

     *b.*    *This Court's Post-Stupp Decisions Are Not Final*

Defendants also argues that the CAFC's decision in *Stupp* does not preclude

Commerce's continued use of the Cohen's *d* test because Commerce's use of that test has

subsequently been sustained by this Court in the *Stupp* remand and other recent cases.[52]

However, the simple answer is that this Court's decision in the *Stupp* remand is now

---

[49] *See e.g.*, Mexican Respondents' Joint Case Brief (August 30, 2019) (PR-425, CR-302);
and Red Sun Farm's Case Brief (August 30, 2019) (PR-426, CR-303).

[50] *Stupp Corp. v. U.S.*, 5 F.4th 1341, 1353 (Fed.Cir. 2021).

[51] *See, e.g., Hormel v. Helvering*, 312 U.S. 552, 558-59 (1941); *Siemens Gamesa
Renewable Energy v. United States*, 621 F. Supp. 3d 1337, 1348 (CIT 2023).

[52] *See* Defendant's Brief at 38-39, Defendant-Intervenors' Brief at 32-33.

pending on appeal before the CAFC.[53]  The flaws in the justifications offered by Commerce after *Stupp* have been addressed at length in that appeal.  In the interests of brevity, we will not repeat them here.[54]

> c. *Commerce's Decision Not to Adjust the Time Periods as Required by the Suspension Agreement When Applying the Differential Pricing Analysis Was Inadequate*

Defendants also contend that Commerce properly rejected the Mexican Association's request to adjust the time periods considered by Commerce's Differential Pricing Analysis to reflect the effect of Suspension Agreement on prices.[55]  In this regard, they assert that the reference prices in the agreement served only as a price floor, and that the U.S. prices of some types of tomatoes did not follow the pattern set by the agreement.

However, as explained in our initial brief, it does not matter that exporters *could* set prices for tomatoes in the United States above the floor price because Commerce must determine whether there is a "pattern" in the U.S. prices that differ over time periods. Furthermore, Commerce must explain how application of its differential pricing analysis to find a "pattern" in the U.S. price for tomatoes over time period was reasonable when its analysis did not control for the floor prices required by the 2013 Suspension Agreement.[56] Commerce simply failed to provide an adequate explanation.

---

[53] *See Stupp Corp. v. U.S.*, 619 F.Supp.3d 1314 (CIT 2023), *appeal pending*, No. 2023-1663 (Fed. Cir.).  *See also Marmen, Inc. v. U.S.*, 627 F. Supp. 3d 1312 (CIT 2023), *appeal pending*, No. 2023-1877 (Fed.Cir.).

[54] We note that Judge Katzmann has, in a very recent decision, stayed consideration of arguments concerning Commerce's use of the Cohen's *d* test pending the outcome of the CAFC appeal in *Stupp*.  *See HiSteel v. United States,* Slip Op. 23-131 at 16 (Sept. 12, 2023).

[55] *See* Defendant's Brief at 39; Defendant-Intervenor's Brief at 33-35.

[56] *See* Plaintiffs' Initial Brief at 34-35.

In addition, Defendant-Intervenor asserts that the 2013 Agreement could not have affected the results of the Cohen's *d* test because the results of the test differed among all three Mexican respondents.[57] But there is no evidence that the three respondents examined by Commerce made sales in the same relative volumes in the same time periods. The evidence is clear that different producers in different regions of Mexico produce tomatoes at different times.[58] Consequently, there is no reason to expect the results of an analysis by time period to be the same for all Mexican growers.

More generally, as explained in our initial brief, the results of the Cohen's *d* test are meaningless when the assumptions underlying that test are not satisfied.[59] The evidence in this case demonstrates that the assumptions required for the use of the Cohen's *d* test were not satisfied for any of the respondents analyzed by Commerce.[60] In such circumstances, a comparison of "meaningless" result for different respondents cannot establish that Commerce's analysis of price differences by time period was "meaningful."

[57] *See* Defendant-Intervenor's Brief at 35.

[58] *See e.g.,* Exhibit D-3 of Bioparques Group's July 10, 2019, Response to Section D of Commerce's Questionnaire (PR-178, CR-75); NASE's July 10, 2019 Response to Section D of Commerce's Questionnaire at 3-4, and Exhibit D-1 (PR-183, CR-103); CEUTA's July 10, 2019 Response to Section D of Commerce's Questionnaire at 3-4, and Exhibit D-1 (PR-190, CR-121).

[59] *See* Plaintiffs' Initial Brief at 30-31.

[60] An analysis of the inconsistency of Plaintiffs' U.S. sales data with the assumptions of the Cohen's *d* test were set forth in our initial brief. *See id.* A similar analysis can be prepared for the other respondents examined by Commerce.

- 20 -

E.   *Commerce's Calculation of the Plaintiffs' Margin
     Using Investigation-Period Rather than Monthly
     Average Normal Values Was Inconsistent with
     Commerce's Regulations and Established Practice*

1.   *Commerce's Practice of Using Monthly Averages for
     High-Inflation Cases Is Distinct from its Practice of
     Using Monthly Averages for Highly-Perishable Products*

As explained in our initial brief, Commerce's past decisions confirm that, when an
average-to-transaction methodology is used in an investigation, an averaging period of less
than the full investigation period will be used when "the time of sale is closely connected
to the prices charged."[61]  Defendants argue that Commerce's failure to follow that
precedent in this case is supported by substantial evidence, because Commerce did not find
evidence of high inflation in Mexico during the restarted investigation period.[62]  For its
part, Defendant-Intervenor also asserts that, after 1997, Commerce only uses the average-
to-average comparison over shorter periods for perishable products when there is high-
inflation.[63]  But these arguments are without merit.

It is certainly true that Commerce has a long-standing practice of comparing monthly-
average prices when the comparison market experienced high inflation during the
investigation period.[64]  But, that practice is separate and distinct from Commerce's practice

---

[61] *See* Plaintiffs' Initial Brief at 38.

[62] *See* Defendant's Brief at 32 and Defendant-Intervenor's Brief at 38.

[63] *See* Defendant-Intervenor's Brief at 38.

[64] *See e.g.*, *Certain Cut-to-Length Carbon-Quality Steel Plate Products from Indonesia*, 64
Fed. Reg. 73164, 73170 (December 29, 1999) ("*{a}s a matter of practice*, when the
Department uses its high inflation methodology, we index the costs reported in each POI
month, even if inflation was absent during certain portions of the period for which the
costs were reported (*i.e.*, the POI), and *make sales comparisons on a monthly average
basis, rather than on a POI average basis*, in order to minimize the effects of inflation on
our analysis." (emphasis added)).

of comparing monthly average prices (1) for products whose "when normal values, export prices, or constructed export prices have moved significantly over the POI,"[65] or (2) for highly-perishable products.[66]  As a result, Commerce's explanation that it did not compare monthly average prices because Mexico did not experience high inflation during the resumed investigation period has no bearing on whether it was permitted to depart from its practice of comparing monthly-average prices when normal values have "moved significantly" or when the investigation involved highly-perishable products.

   Furthermore, contrary to Defendant-Intervenor's assertion, there is no evidence to support the assertion that Commerce has changed its practice with respect to the comparison methodology for highly-perishable products.  First, none of the cases cited by Defendant-Intervenor involve highly-perishable agricultural products.[67]  Second, Commerce did not state in any of the cases cited by Defendant-Intervenor that it was changing its practice regarding highly-perishable products.[68]  And third, when Commerce

---

[65] *See, e.g., Static Random Access Memory Semiconductors from Taiwan,* 63 Fed. Reg. 8909, 8926 (Feb. 23, 1998).

[66] *See* Plaintiffs' Initial Brief at 25-26, citing, *inter alia, Certain Fresh Cut Flowers from Ecuador,* 52 Fed. Reg. 2128, 2128-29 (Jan 20, 1987); *Certain Fresh Cut Flowers from Colombia,* 52 Fed. Reg. at 6843; *Cut Flowers from Colombia,* 56 Fed. Reg. 50554, 50555 (Oct. 7, 1991).

[67] *See Lemon Juice from Brazil and South Africa*, Investigation Nos. 731-TA-1578-1579 (Final), Pub. 5403 (Feb. 2023), 47 at note 17 ("Juice producers freeze lemon juice to *store it up to two years*…") (emphasis added)); *Ripe Olives from Spain*, Investigation Nos. 701-TA-582 and 732-TA-1377 (Final), Pub. 4805 (July 2018),  I-13 to 14 at note 44 ("Raw olive fruit stored in bins for up to two years are referred to as "put down fruit" by U.S. processors. The fruit stored in brine can be *held up to two years* before they must be processed. When this put down fruit is taken out of storage {it} starts the 7-day processing into a ripe olive....") (emphasis added).

[68] *See Certain Lemon Juice from Brazil,* 87 Fed. Reg. 47697 (Aug. 4, 2022) and accompanying Preliminary Decision Memorandum and *Ripe Olives from Spain*, 83 Fed. Reg. 3677 (Jan. 26, 2018), and accompanying Preliminary Decision Memorandum.

adopted its revised regulations in 1997, Commerce explicitly stated that its practice regarding highly perishable products would still apply to cases going forward.[69]

        2.    *The Cases Cited by Defendants Discuss*
             *Commerce's Methodology for Its Cost Test and*
             *Not Its Methodology for Comparing Sales Prices*

Finally, Defendants argue that Commerce has used investigation-period-average prices instead of monthly-average prices in previous cases involving certain agricultural products.[70]  However, all the cases cited by Defendants (which involved products that were not highly perishable) addressed only the period to be used to determine the average *cost* for purposes of the sales-below-cost test under 19 U.S.C. § 1677b(b).[71]  By contrast, the issue in this case is what the appropriate averaging period should be to compare sales *prices* between markets pursuant to 19 U.S.C. §1677f-1.  As a result, none of the cases cited by Defendants support the assertion that Commerce has a new practice of using period-average *sales prices* for highly-perishable agricultural products.

        F.    *Commerce's Calculation of Normal Value for*
            *Plaintiffs Improperly Included Home-Market Sales*
            *that Were Made at Aberrationally-High Prices*

As explained in our initial brief, Commerce's calculation of the dumping margins for Plaintiffs was distorted by the inclusion of extremely high-priced home-market sales, especially during the month of November.  Commerce's final determination took the position that, in the absence of evidence that there were other unusual aspects to the sales, the mere fact that the prices were unusually high did not justify the exclusion of the sales

---

[69] *See* above at 15-16.

[70] *See* Defendant's Brief at 31-32 and Defendant-Intervenor's Brief at 39.

[71] *See id*. (both citing Commerce's explanations in *Lemon Juice from Brazil* and *Ripe Olives from Spain* that discuss why Commerce did not use quarterly costs).

as outside the "ordinary course of trade."[72]  Defendants' briefs defend Commerce's

determination based on the same argument.[73]

However, Defendants' arguments ignore the fact that prices for home-market sales

were necessarily distorted by the operation of the Suspension Agreement.  The reference

prices and quality standards for U.S. sales established by the 2013 Agreement necessarily

meant that the Mexican market would be subject to extraordinary swings in supply that

would not have existed in the absence of the Agreement.[74]  In other words, the Suspension

Agreement itself contributed to the distortions that made the high-priced Mexican sales

unusual.

Furthermore, as noted in our initial brief, prices in Mexico were severely distorted by

the weather, especially by hurricanes that disrupted the growing season.  For example,

Hurricane Michael slammed into Florida as a Category 5 hurricane on October 10, 2018,

devastating the tomato crop.  About two weeks later, on October 28, Hurricane Willa,

struck the primary tomato-growing regions in the Mexican state of Sinaloa, in one of the

rare hurricanes to strike the major-tomato growing areas of Sinaloa.  With hurricanes

devastating both Florida and Sinaloa just before the start of their peak harvesting season, it

is hardly surprising that prices for tomatoes spiked to aberrational levels in November

2018.[75]

---

[72] *See* Final I&D Memorandum at cmt. 7 (PR-496).

[73] *See* Defendant's Brief at 46; Defendant-Intervenor's Brief at 41.

[74] *See* Plaintiffs' Initial Brief at 46-47.

[75] *See id*. at 47.

Defendant-Intervenor asserts that the impact of these hurricanes should be disregarded, because the resulting distortions affected both U.S. and Mexican prices.[76]  But the statute does not permit Commerce to include home-market sales that are "outside the ordinary course of trade" in its analysis just because U.S. sales may also have been made at unusual prices.[77]  Furthermore, Defendant-Intervenor's suggestion assertion that high-priced U.S. sales will cancel out high-priced home-market sales ignores the unbalanced nature of Commerce's dumping calculations.  For example, under the average-to-transaction comparison used by Commerce in this case, each individual U.S. sale throughout the period was compared to a single average of all above-cost sales in Mexico during the entire period.  This meant that the high-priced Mexican sales in November were compared not only to prices for individual U.S. sales in the same month (when, according to Defendant-Intervenor, U.S. prices would also have been high), but also to prices for U.S. sales in other months when prices were at ordinary levels.  The distortion was exacerbated by the fact that most of Plaintiffs' sales in Mexico outside of November were below cost (in large measure due to distortions caused by the Suspension Agreement).  As a result, the extremely high-priced sales in Mexico November had a disproportionate impact on the dumping margins.  The "ordinary course of trade" provision was intended to prevent precisely that result.

---

[76] *See* Defendant-Intervenor's Brief at 41.

[77] This Court has previously held that Commerce has the discretion to include all *U.S.* sales in its analysis, even *U.S.* sales that are outside the "ordinary course of trade."  *See, e.g., Corus Staal v. U.S. Department of Commerce*, 27 C.I.T. 388, 404 (2003).

<u>Conclusion</u>

For the foregoing reasons, we respectfully request that the Court grant Plaintiffs'

motion for judgment on the agency record, and remand this matter to Commerce for

disposition in a manner consistent with the judgment of this Court.

Respectfully submitted,

<u>/s/Jeffrey M. Winton</u>

Jeffrey M. Winton
Amrietha Nellan
Vi N. Mai
Jooyoun Jeong
Ruby Rodriguez

Winton & Chapman PLLC
1900 L Street, N.W., Suite 611
Washington, D.C.  20036
(202) 774-5500

Attorneys for Bioparques de Occidente,
    S.A. de C.V., Agricola La Primavera,
    S.A. de C.V, and Kaliroy Fresh LLC

September 13, 2023

Certificate of Compliance


Pursuant to the Court's "Standard Chambers Procedures," I, Jeffrey M. Winton, hereby certify that the word count function of the word-processing system used to prepare the foregoing brief indicates that the brief contains 6,964 words including headings, footnotes, and quotations, but not including the cover, caption, table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block.


/s/Jeffrey M. Winton


September 13, 2023