A-201-820
Remand Slip Op. 24-45
~~Business Proprietary Document~~
**Public Version**
E&C/OI:  AH/DV/TS

**_Bioparques de Occidente, S.A. de C.V., et al. v. United States_,
698 F. Supp. 3d 1265 (CIT 2024)
Fresh Tomatoes from Mexico**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of remand redetermination in accordance with the opinion and remand order of the United States Court of International Trade (CIT or Court) in _Bioparques de Occidente, S.A. de C.V., et al. v. United States_, 698 F. Supp. 3d 1265 (CIT 2024) (_Remand Order_).  The litigation involves challenges to our _Final Determination_ in the antidumping duty investigation of fresh tomatoes from Mexico.[1]  Commerce individually examined, and determined weighted-average dumping margins for Bioparques de Occidente, S.A. de C.V. (Bioparques)/Agricola La Primavera, S.A. de C.V. (Agricola); Ceuta Produce, S.A. de C.V./Rancho La Memoria, S. de R.L. de C.V.; and Negocio Agricola San Enrique, S.A. de C.V in the _Final Determination_.

In the _Remand Order_, the Court concluded that "Commerce's Final Determination must resume its investigation flowing from the affirmative preliminary determination issued on November 1, 1996, including focusing its analysis on the evidence submitted regarding the original period of investigation of March 1, 1995 through February 29, 1996, and reviewing the original six mandatory respondents" in order to comply with the language of section 734(i)(1)(B) of the Tariff Act of 1930, as amended (the Act).[2]  The Court thus held that Commerce's final

---

[1] _See Fresh Tomatoes from Mexico:  Final Determination of Sales at Less Than Fair Value_, 84 FR 57401 (October 25, 2019) (_Final Determination_), and accompanying Issues and Decision Memorandum (IDM).
[2] _See Remand Order_, 698 F. Supp. 3d at 1276.

determination was "not in accordance with law" and remanded the matter to Commerce for further consideration.[3]

Consistent with the Court's *Remand Order*, and under respectful protest, Commerce has reconsidered the selection of respondents and consideration of recent data used in the continued investigation.[4] We evaluated the 1995-1996 data from the seven respondents individually examined in 1996 and in 2002 during the investigation and determined dumping margins using the 1995-1996 data.

## II.    BACKGROUND

On November 1, 1996, Commerce published the preliminary determination of the antidumping duty investigation of fresh tomatoes from Mexico.[5] Also, effective November 1, 1996, Commerce and certain producers and exporters of fresh tomatoes from Mexico signed an agreement to suspend the investigation.[6]

On May 31, 2002, Mexican tomato growers accounting for a large percentage of all fresh tomatoes imported into the United States from Mexico provided written notice to Commerce of their withdrawal from the agreement suspending the antidumping duty investigation on fresh tomatoes from Mexico. On June 27, 2002, Commerce published a *Federal Register* notice notifying the public of its intent to terminate the suspension agreement, intent to terminate the five-year sunset review, intent to resume the antidumping duty investigation, and request for comments on the use of updated information.[7] In particular, Commerce acknowledged the "unusual nature of this proceeding," as well as the significant lapse of time since initiation of the

---

[3] *Id.* at 1276-77.
[4] *See Viraj Grp., Ltd. v. United States*, 343 F.3d 1371, 1376 (Fed. Cir. 2003).
[5] *See Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination:  Fresh Tomatoes from Mexico*, 61 FR 56608 (November 1, 1996) (*Preliminary Determination*).
[6] *See Suspension of Antidumping Investigation:  Fresh Tomatoes from Mexico*, 61 FR 56618 (November 1, 1996) (*Suspension Agreement 1996*).
[7] *See Fresh Tomatoes from Mexico*, 67 FR 43278 (June 27, 2002).

investigation (over six years), and explained that it was considering selecting new respondents and collecting updated information for the period April 1, 2001, through March 31, 2002.[8]  On July 30, 2002, Commerce terminated the suspension agreement, the sunset review of the suspended investigation, and resumed the investigation because Mexican tomato growers/exporters accounting for a significant percentage of all fresh tomatoes imported into the United States from Mexico withdrew from the agreement, meaning that the suspension agreement did not cover substantially all imports of fresh tomatoes from Mexico and thus no longer met the statutory requirement to continue with the suspension agreement.[9]  Noting that neither the Act nor the regulations speak to what data to use in a resumed investigation, and noting its mixed practice of using original or updated information in resumed investigations, Commerce determined to use the information from the original period of investigation. Commerce reached this decision based on its limited resources and time constraints, and its finding that the preliminary determination was still viable and representative of the industry notwithstanding that some mandatory respondents were no longer in business or had stopped exporting, and that more than five years had elapsed since the preliminary determination.[10]

During the 2002 resumed investigation, Commerce verified mandatory respondents that remained in business at the time, released verification reports, invited comments for the final determination, and accepted case and rebuttal briefs.  Additionally, Commerce and Mexican tomato growers/exporters initialed a proposed agreement to suspend the resumed antidumping

---

[8] *Id.* at 43279 ("Given the unusual nature of this proceeding (*e.g.*, based on our analysis of U.S. Customs data, three of the originally investigated companies have not exported tomatoes to the United States in the last two years) and the significant lapse of time since initiation of the investigation (*i.e.,* over six years), the Department is considering selecting new respondents and collecting updated information for use in completing the investigation of sales at LTFV.  In the event we collect updated information, the period of investigation will be from April 1, 2001, through March 31, 2002.  This period reflects the most recently completed four fiscal quarters before the Mexican tomato growers accounting for a large percentage of all fresh tomatoes imported into the United States from Mexico provided written notice to the Department of their withdrawal from the suspension agreement.").
[9] *See Fresh Tomatoes from Mexico*, 67 FR 50858 (July 30, 2002) (*Suspension Agreement Termination 2002*).
[10] *See* Memorandum, "Resumed Antidumping Investigation on Fresh Tomatoes from Mexico; Respondent Selection and Period of Investigation," dated July 30, 2002, at 3.

duty investigation on imports of fresh tomatoes from Mexico on November 8, 2002, and interested parties submitted comments on the proposed agreement on November 22, 2002.[11] Before the final determination of the 2002 resumed investigation, Commerce and growers and exporters accounting for substantially all imports of fresh tomatoes from Mexico signed a new agreement to suspend the investigation, effective December 16, 2002.[12]

On November 26, 2007, Mexican tomato growers/exporters accounting for a significant percentage of all fresh tomatoes imported into the United States from Mexico provided written notice to Commerce of their withdrawal from the 2002 Suspension Agreement, effective 90 days from the date of their withdrawal letter, or earlier, at Commerce's discretion.[13]  On November 28, 2007, Commerce and Mexican tomato growers/exporters initialed a new proposed agreement to suspend the antidumping duty investigation on imports of fresh tomatoes from Mexico. Commerce released the initialed agreement to interested parties on December 3, 2007, and afforded them an opportunity to comment on the initialed agreement and several interested parties filed comments in support of the initialed agreement.[14]  On January 16, 2008, Commerce terminated the suspension agreement, the sunset review of the suspended investigation, and resumed the antidumping duty investigation.[15]  This was because withdrawal by the Mexican tomato growers/exporters meant that the suspension agreement did not cover substantially all imports of fresh tomatoes from Mexico and thus no longer met the statutory requirement to continue with the suspension agreement.  On January 22, 2008, Commerce signed a new

---

[11] *See Suspension of Antidumping Investigation:  Fresh Tomatoes from Mexico*, 67 FR 77044, 77045 (December 16, 2002) (*Suspension Agreement 2002*).
[12] *Id.*
[13] *See Fresh Tomatoes from Mexico: Notice of Termination of Suspension Agreement, Termination of Five-Year Sunset Review, and Resumption of Antidumping Investigation*,73 FR 2887, 2888 (January 16, 2008) (*Suspension Agreement Termination 2008*).
[14] *See Suspension of Antidumping Investigation: Fresh Tomatoes from Mexico*,73 FR 4831, 4832 (January 28, 2008) (*Suspension Agreement 2008*).
[15] *See Suspension Agreement Termination 2008*, 73 FR at 2888.

4

suspension agreement with producers and exporters accounting for substantially all imports of fresh tomatoes from Mexico.[16]

On February 2, 2013, Commerce and Mexican tomato growers/exporters accounting for a significant percentage of all fresh tomatoes imported into the United States from Mexico initialed a proposed suspension agreement.[17]  On February 28, 2013, Mexican tomato growers/exporters accounting for a significant percentage of all fresh tomatoes imported into the United States from Mexico provided written notice to Commerce of their withdrawal from the 2008 Suspension Agreement, effective 90 days from the date of their withdrawal letter or earlier, at Commerce discretion.  Commerce accepted the Mexican tomato growers/exporters withdrawal from the 2008 Suspension Agreement, effective March 1, 2013, and terminated the suspension agreement, the sunset review of the suspended investigation, and resumed the antidumping duty investigation.[18]  This was because withdrawal by the Mexican tomato growers/exporters meant that the suspension agreement did not cover substantially all imports of fresh tomatoes from Mexico and thus no longer met the statutory requirement to continue with the suspension agreement.  On March 4, 2013, Commerce signed a new suspension agreement with producers and exporters accounting for substantially all imports of fresh tomatoes from Mexico.[19]

---

[16] *See Suspension Agreement 2008*, 73 FR at 4831.

[17] *See Fresh Tomatoes from Mexico: Termination of Suspension Agreement, Termination of Five-Year Sunset Review, and Resumption of Antidumping Investigation*, 78 FR 14771 (March 7, 2013) (*Suspension Agreement Termination 2013*).  Based on this proposed agreement, and the anticipation that the Mexican tomato growers/exporters would withdraw from the 2008 Agreement in order to enter into a new agreement if an acceptable agreement was reached, Commerce published a notice of intent to terminate the suspension agreement and resume the antidumping investigation, and intent to terminate the sunset review on February 8, 2013.  *See, Fresh Tomatoes from Mexico:  Intent to Terminate Suspension Agreement and Resume Antidumping Investigation and Intent to Terminate Sunset Review*, 78 FR 9366 (February 8, 2013).

[18] *See Suspension Agreement Termination 2013*.

[19] *See Fresh Tomatoes from Mexico: Suspension of Antidumping Investigation*, 78 FR 14967 (March 8, 2013) (*Suspension Agreement 2013*).

On January 9, 2018, Commerce issued a letter that formally opened consultations with the Mexican tomato growers/exporters to negotiate possible revisions to the 2013 Agreement.[20] Commerce continued to negotiate with representatives of the Mexican growers/exporters and, in parallel, has continually consulted with representatives of the domestic industry between January 2018 and May 2019.[21] On February 6, 2019, in accordance with Section VI.B of the 2013 Agreement, Commerce notified Mexican signatories that Commerce intended to withdraw from the 2013 Agreement.[22] Commerce continued to hold consultations with representatives of the Mexican growers/exporters and the domestic industry to discuss a possible new suspension agreement following that notification.[23] Because a new signed agreement had not been signed, effective May 13, 2019, Commerce terminated the 2013 suspension agreement in accordance with section VI.B, not section 734(i) of the Act,[24] consistent with its February 6, 2019 notice. Section VI.B of the 2013 suspension agreement provides that Commerce may withdraw from this suspension agreement "upon ninety days written notice to the other party."[25] If a suspension agreement is terminated in accordance with section 734(i)(1) of the Act and the investigation is not completed, the statute directs Commerce to "resume the investigation as if its affirmative preliminary determination were made on the date of" the termination of the suspension agreement.[26] However, the statute does not specify how to resume the investigation in the event

---

[20] *See Fresh Tomatoes from Mexico: Termination of Suspension Agreement, Rescission of Administrative Review, and Continuation of the Antidumping Duty Investigation*, 84 FR 20858, 20860 (May 12, 2019) (*Suspension Agreement Termination and Continuation of Investigation 2019*).

[21] *See Fresh Tomatoes from Mexico: Intent To Terminate Suspension Agreement, Rescind the Sunset and Administrative Reviews, and Resume the Antidumping Duty Investigation*, 84 FR 7872 (March 5, 2019).

[22] The 2013 Suspension Agreement, in section VI.B, provided: "The signatories or the Department may withdraw from this Agreement upon ninety days written notice to the other party." *See Confederacion de Asociaciones Agricolas del Estado de Sinaloa, A.C. v. United States*, 32 F.4th 1130 (Fed. Cir. 2022) (*Confederacion*) (affirming Commerce's reliance on section VI.B to terminate the 2013 suspension agreement).

[23] *See Suspension Agreement Termination and Continuation of Investigation 2019*, 84 FR at 20860.

[24] *See Suspension Agreement Termination and Continuation of Investigation 2019*.

[25] *See Suspension Agreement 2013*.

[26] *See* section 734(i) of the Act ("If the administering authority determines that an agreement accepted under subsection (b) or (c) is being, or has been, violated, or no longer meets the requirements of such subsection (other

the suspension agreement is terminated in accordance with a non-statutory provision, such as Commerce's termination of the 2013 suspension agreement.[27]  The 2013 suspension agreement does not specify how to resume the investigation either if and when it is terminated in accordance with section VI.B.[28]  Therefore, we did not find that section 734(i) of the Act requires that Commerce "resume the investigation as if its affirmative preliminary determination were made on the date of" the termination of the suspension agreement.

Because termination of the suspension agreement was the result of Commerce's withdrawal, it notified parties that it was continuing the antidumping duty investigation on fresh tomatoes from Mexico.[29]  Regarding the period of investigation, Commerce explained that the original period was March 1, 1995, through February 29, 1996, but that "{d}ue to the unusual procedural posture of this proceeding, in which we are terminating a suspension agreement and continuing an investigation that covers a period of investigation that dates back more than 23 years," it would request information corresponding to the most recent four full quarters, *i.e.*, April 1, 2018 through March 31, 2019.[30]  On May 24, 2019, Commerce selected new respondents for individual examination.[31]  On July 23, 2019, Commerce issued a post-

---

than the requirement, under subsection (c)(1), of elimination of injury) and subsection (d), then, on the date of publication of its determination, it shall—
(A) suspend liquidation under section 733(d)(2) of unliquidated entries of the merchandise made on the later of—
(i) the date which is 90 days before the date of publication of the notice of suspension of liquidation, or
(ii) the date on which the merchandise, the sale or export to the United States of which was in violation of the agreement, or under an agreement which no longer meets the requirements of subsections (b) and (d) or (c) and (d), was first entered, or withdrawn from warehouse, for consumption,
(B) if the investigation was not completed, resume the investigation as if its affirmative preliminary determination were made on the date of its determination under this paragraph, ….").
[27] *See Final Determination* IDM at Comment 1 ("Section VI.B. does not specify how to proceed in the event of withdrawal under that provision, nor does the statute.  Hence, as it routinely does in other contexts, Commerce looked to section 734(i)(1)(B) of the Act for guidance.")
[28] *See Suspension Agreement Termination and Continuation of Investigation 2019*, 84 FR at 20860.
[29] *Id.,* 84 FR at 20858.
[30] *Id.*, 84 FR at 20860-61.  In an antidumping duty investigation, Commerce will "normally examine merchandise sold during the four most recently completed fiscal quarters…as of the month preceding the month the petition was filed," however, Commerce "…may examine merchandise sold during any additional or alternate period that the Secretary concludes is appropriate.  *See* 19 CFR 351.204(b)(1).
[31] *See* Memorandum, "Respondent Selection," dated May 24, 2019 (Respondent Selection Memorandum).

preliminary decision, in which it relied on the data from these new respondents covering the period April 1, 2018 through March 31, 2019.[32]  The U.S. Court of Appeals for the Federal Circuit (Federal Circuit) affirmed Commerce's reliance on section VI.B to terminate the 2013 suspension agreement.[33]

On August 20, 2019, Commerce and a representative of CAADES *et al.* initialed a draft agreement to suspend the antidumping duty investigation on fresh tomatoes from Mexico. Commerce notified the Florida Tomatoes Exchange and the other parties, released the initialed draft agreement to the interested parties, and invited interested parties to provide written comments on the draft suspension agreement by no later than the close of business on September 9, 2019.  In addition, Commerce consulted with the Florida Tomato Exchange (FTE) concerning its intention to suspend the antidumping duty investigation on fresh tomatoes from Mexico, notified the U.S. International Trade Commission of the proposed agreement, and released draft statutory memoranda explaining how the agreement would be carried out and enforced, and how the agreement will meet the applicable statutory requirements.  Commerce received comments from numerous parties by the September 9, 2019, deadline.  On September 19, 2019, Commerce and producers and exporters accounting for substantially all imports of fresh tomatoes from Mexico signed a new agreement to suspend the investigation.[34]

In October 2019, in accordance with section 734(g) of the Act, the U.S. domestic tomato growers requested that Commerce continue the suspended investigation.  In response to these requests, Commerce continued and completed the investigation and, on October 25, 2019, published the *Final Determination*.[35]

---

[32] *See* Memorandum, "Post-Preliminary Decision Memorandum in the Less-Than-Fair-Value Investigation of Fresh Tomatoes from Mexico," dated July 23, 2019.
[33] *See Confederacion*, 32 F.4th at 1136, 1140-41.
[34] *See Fresh Tomatoes from Mexico:  Suspension of Antidumping Duty Investigation*, 84 FR 49987, 49988-89 (September 24, 2019) (*2019 Agreement*).
[35] *See Final Determination*.

Various parties sought judicial review of the *Final Determination.* On April 17, 2024, the CIT issued the *Remand Order.* On June 27, 2024, Commerce issued a request for information to allow parties to submit new factual information and comments regarding the operating status and ownership of all seven original mandatory respondents, changes to the tomatoes industry in Mexico from the 1995-1996 period, and changes to the tomatoes industry in the U.S. from the 1995-1996 period. Commerce received comments from: NS Brands, Ltd. and Naturesweet Invernaderos S. de R.L. de C.V. / NatureSweet Comercializadora, S. de R.L. de C.V. (collectively, NatureSweet); Asociación Mexicana de Horticultura Protegida, A.C., Asociación de Productores de Hortalizas del Yaqui y Mayo, Confederación de Asociaciones Agrícolas del Estado de Sinaloa, A.C., Consejo Agrícola de Baja California, A.C., and Sistema Producto Tomate (collectively, Mexican Signatories); the Fresh Produce Association of the Americas (FPAA); Mastronardi Produce – USA, Inc., Mastronardi International, Ltd., and Mastronardi Produce, Ltd. (collectively, Mastronardi); and the FTE, and rebuttal comments from the FTE.[36]

## III.   REMAND ORDER

In the *Remand Order*, the Court held that Commerce's selection of new mandatory respondents in the 2019 resumed investigation and individually examining their data covering the period April 1, 2018, through March 31,2019 was not in accordance with law.[37] Citing section 734(i)(1)(B) of the Act, the Court held that Commerce "must resume its investigation flowing from the affirmative preliminary determination issued on November 1, 1996, including

---

[36] *See* NatureSweet's Letter "Response to Request for Information," dated July 18, 2024 (NatureSweet Response); the Mexican Signatories' Letter, "Response to the Department's June 27, 2024 Request for Information," dated July 18, 2024 (Mexican Signatories Response); FPAA's Letter, "FPAA Comments to RFI Pursuant to CIT Remand Order," dated July 18, 2024 (FPAA Response); Mastronardi's Letter, "Mastronardi's Comments in Response to Request for Information," dated July 18, 2024 (Mastronardi Response); the FTE's Letter, "FTE Response to Request for Information," dated July 18, 2024 (FTE Response); and FTE's Letter, "FTE Rebuttal Factual Information Comments," dated July 29, 2024 (FTE Rebuttal).
[37] *See Remand Order*, 698 F. Supp. 3d at 1275-76.

focusing its analysis on the evidence submitted regarding the original period of investigation of March 1, 1995 through February 29, 1996, and reviewing the original six mandatory respondents…"[38]  The Court thus held that Commerce's final determination was "not in accordance with law" and remanded the matter to Commerce for further consideration.

## IV.    FINAL RESULTS OF REDETERMINATION

Consistent with the Court's *Remand Order* and under respectful protest, Commerce evaluated the 1995-1996 data from the seven respondents individually examined in 1996 and in 2002 during the investigation.  These seven respondents are:  San Vicente Camalu (Camalu); Ernesto Fernando Echavarria Salazar Grupo Solidaio (Echavarria); Arturu Lomeli Villalobas S.A. de C.V. (Lomeli); Eco-Cultivos S.A. de C.V. (Eco-Cultivos); Ranchos Los Pinos S. de R.L. de C.V. (Los Pinos); Administradora Horticola del Tamazula (Tamazula); and Agricola Yory, S. de P.R. de R.I. (Yory).

In conducting an analysis of the 1996 respondents and data, pursuant to the Court's *Remand Order*, Commerce determined that it required clarification and additional information from interested parties.  Thus, on June 27, 2024, Commerce reopened the record and issued a letter to the parties, requesting information on the operating status and ownership of all seven original mandatory respondents, changes to the tomatoes industry in Mexico from the 1995-1996 period, and changes to the tomatoes industry in the U.S. from the 1995-1996 period.[39]

### 1.  Information Regarding Current Operation of Original Seven Mandatory Respondents

For the *Preliminary Determination*, we selected the seven largest exporters of fresh tomatoes from Mexico for individual examination in accordance with section 777A(c)(2)(B) of

---

[38] *Id* at 25.  For the *Preliminary Determination*, Commerce originally selected six mandatory respondents.  *See Preliminary Determination*, 61 FR at 56608-09.  Although Commerce found Arturo Lomeli Villalobas S.A. de C.V. and Eco Cultivos, S.A. de C.V. affiliated, it calculated separate dumping margins for these two companies, resulting in preliminary dumping margins for seven respondents.  *See Preliminary Determination*, 61 FR at 56608-09, 56615.
[39] *See* Commerce's Letter, "Request for Information," dated June 27, 2024.

the Act.[40]  More than 20 years have passed since these respondents were selected for individual

examination.[41]  Commerce has limited information about the current operating status of these

producers.  First, the U.S. Customs and Border Protection (CBP) data examined in 2019 when

we continued the investigation demonstrates that many of these respondents are not among the

largest exporters.  Second, when the 1996 suspension agreement was terminated, and the

investigation resumed in 2002, Commerce learned that two of the seven original mandatory

respondents (Eco-Cultivos and Lomeli) ceased operation,[42] and two other original mandatory

respondents (Los Pinos and Yory) failed verifications.[43]

Due to the significant passage of time, for this remand Commerce determined it would be

appropriate to seek updated information on the operating status and ownership of the original

mandatory respondents.  Commerce received comments and information on the operating status

and ownership of six (Eco-Cultivos, Yory, Echavarria, Los Pinos, Tamazula, and Camalu) out of

seven original respondents.  A summary of these comments is provided below.

NatureSweet, a U.S. and foreign producer of fresh tomatoes, submits that Eco-Cultivos is

no longer operational[44] and Desert Glory Ltd. is the predecessor of NatureSweet.[45]  According to

information available to NatureSweet, Desert Glory was purchased by an investment firm in

1998 and rebranded to NatureSweet.  In 1999, NatureSweet purchased greenhouse assets from

Eco-Cultivos (an original respondent) and did not acquire the rights to use Eco-Cultivos' brand.

NatureSweet cites to a November 4, 2002 letter from Eco-Cultivos which states that the

---

[40] *See Preliminary Determination*, 61 FR at 56608-09.
[41] *See* Commerce's Letter "CBP Data Release," dated May 8, 2019, and attached CBP data, covering the period April 1, 2018, through March 31, 2019.
[42] *See* Memoranda, "Document Placement on the Record," dated June 27, 2024 at 7; and "Document Placement on the Record," dated June 27, 2024, at Attachment and Attachment 2.
[43] *See* Memoranda, "Home-Market and U.S. Sales Verification of Agricola Yory, S. de P.R. de R.I., and Meyer Tomatoes," dated November 12, 2002; and "Home-Market and U.S. Sales Verification of Ranchos Los Pinos, S. de R.L. de C.V.", dated November 12, 2002.
[44] *See* NatureSweet Response at 5-6 and Exhibit 4.
[45] *Id.* at 4-5 and Exhibit 3.

company is dormant to support its assertion that Eco-Cultivos is no longer operating in the tomato industry.[46]

The Mexican Signatories assert that three additional original respondents Yory, Echavarria, and Los Pinos are no longer operational.[47] The Mexican Signatories state that Yory no longer exists and that two current signatories[48] acquired certain of Yory's assets including agricultural machinery, packing facilities, and administrative offices.[49]

With regard to Echavarria, the Mexican Signatories indicate that in 1997, current signatory Exportadora Agricola Sacramento S.A. de C.V. (Sacramento), who was not an original mandatory respondent in the investigation, acquired all of Echavarria's assets, and provided a limited statement about Sacramento's current ownership.[50]  Further, the Mexican Signatories noted that as of 2013 there is no longer overlap in ownership between Sacramento and Negocio Agricola San Enrique S.A. de C.V.[51]

The Mexican Signatories state that original respondent Los Pinos is no longer operational, having merged with Productora Agricola Industrial Del Noroeste, S.A. de C.V. (Agricola), a current signatory, with Agricola the surviving entity of the merger and current exporter.[52]  The Mexican Signatories additionally confirmed that Camalu continues to export and has the same ownership structure.

---

[46] *Id.* at 5 and Exhibit 4.
[47] *See* Mexican Signatories Response at 4-6.
[48] The two signatories are Agroexportadora Petatlan S.A. de C.V. and Agricola del Rancho S.A. de C.V.
[49] *See* Mexican Signatories Response at 4.  The Mexican Signatories additionally noted that two of the seven former owners of Yory are involved with the two signatories that acquired its assets, with one holding a small minority ownership interest and the other leasing land to both signatories.
[50] *Id.* at 5.
[51] In 2019, Commerce determined that Sacramento and San Enrique were affiliated.  *See* Memorandum, "Affiliation of Negocio Agricola San Enrique S.A. de C.V. and Exportadora Agricola Sacramento S.A. de C.V.," dated October 21, 2019.
[52] *See* Mexican Signatories Response at 6.

The Mexican Signatories state that they had no additional information regarding Tamazula's operating status and ownership.  No other parties submitted information regarding the current operating status or ownership of Lomeli or Tamazula.

The information obtained by Commerce in 2002 indicates that two companies (Eco-Cultivos and Lomeli) ceased operations, and the information submitted recently by parties indicates that only Camalu remains in existence and/or is operational, while four mandatory respondents (Eco-Cultivos, Yory, Echavarria, and Los Pinos) are no longer in existence/operational under their original name and ownership structure.  Despite this information, Commerce still has no further information about the operating status of two of the seven original mandatory respondents (Lomeli and Tamazula).  While parties indicated the sale of the assets of three of the seven respondents (Yory, Echavarria, and Eco-Cultivos) and the merger of another (Los Pinos), and provided some information on the current names and ownership of these companies, this information is limited and largely not supported with documentation.  Consequently, we find that the information available is not sufficient to evaluate the changed circumstances of Yory, Echavarria, Eco-Cultivos, Lomeli, Los Pinos, and Tamazula or to make determinations regarding their current operating names and status.

Thus, consistent with the Court's *Remand Order*, and under respectful protest, we find it appropriate to determine dumping margins for all seven original mandatory respondents for purposes of these final results of redetermination.  Specifically, we are calculating individual margins for Camalu, Echavarria, and Tamazula, and consistent with our practice, we are determining margins based on adverse facts available for Yory, Los Pinos, Eco-Cultivos, and Lomeli, for the reasons explained below.

## 2.  Determination of Dumping Margins

### i.  <u>Calculated Margins</u>

Commerce is calculating dumping margins for certain respondents using the 1995-1996 data and taking into account comments received after the *Preliminary Determination* (which used said data).[53]  Additionally, due to the passage of time and changes to Commerce's practice regarding the use of zeroing and differential pricing, Commerce has adjusted its original calculations from the *Preliminary Determination* for Camalu, Echavarria, and Tamazula, the three companies receiving calculated margins, as discussed below.

For these final results of redetermination, we made the following changes from the *Preliminary Determination.*  Details of these changes are explained in the final remand analysis memoranda.[54]

Camalu

- We used Camalu's reported U.S. credit expenses, U.S. inventory carrying costs, and packing costs;
- We used Camalu's revised U.S. domestic brokerage and handling expenses;
- We did not separately deduct non-sale quantities from the pounds-sold denominator; and
- We included non-deductible expenses to the calculation of the general and administrative expenses (G&A) ratio.

Echavarria

- We included the foreign-exchange losses attributable to short-term debt incurred during January 1995 in the financial expense ratio calculation for the fiscal year 1995;
- We included profit-sharing expense in the calculation of cost of production (COP) and constructed value (CV); and
- We included foreign exchange losses, unreconciled costs, and loss on damaged materials in the G&A ratio calculation.

---

[53] *See* Camalu's Letter, Case Brief, dated November 20, 2002; Petitioner's Letter, Case Brief, dated November 20, 2002; CAADES' Letter, Pre-hearing comments, dated November 20, 2002; Desert Glory's Letter, Case Brief, dated Nobember 20, 2002; Petitioner's Letter, Corrections to Case Brief, dated November 22, 2002; Petitioner's Letter, Rebuttal Brief, dated November 25, 2002; Los Pinos' Letter, Rebuttal Brief, dated Nobember 25, 2002; Camalu's Letter, Rebuttal Brief, dated November 25, 2002; Desert Glory's Letter, Rebuttal Brief, dated November 25, 2002. The petitioners are the Florida Tomato Growers Exchange; the Florida Tomato Exchange; the Tomato Committee of the Florida Fruit and Vegetable Association; the South Carolina Tomato Association; the Gadsden County Tomato Growers Association; and an Ad Hoc Group of Florida, California, Georgia, Pennsylvania, South Carolina, and Virginia Tomato Growers.  *See Initiation of Antidumping Duty Investigation: Fresh Tomatoes from Mexico*, 61 FR 18377 (April 25, 1996) (*Initiation Notice*).
[54] *See* Memoranda, "Draft Remand Analysis Memorandum for Ernesto Fernando Echavarria Salazar Grupo Solidario," "Draft Remand Analysis Memorandum for Administradora Del Tamazula, S. de R.L.," and "Draft Remand Analysis Memorandum for San Vicente Camalu," dated concurrently with these Draft Results of Redetermination Pursuant to Court Remand (collectively, Draft Remand Analysis Memoranda).

<u>Tamazula</u>

- We applied partial AFA to Tamazula's home market inventory carrying costs, interest expense, and indirect selling expenses;
- We calculated the date of receipt of payment for home market sales by adding the average credit days to the shipment date; and
- We included the 1995 experimental costs in the 1995 G&A expense.

### ii.  **Margins Determined Based on Adverse Facts Available**

We determine that, in accordance with section 776(a)(2)(D) of the Act, the use of facts otherwise available is appropriate for determining the dumping margins of Yory, Los Pinos, Eco-Cultivos, and Lomeli.  We also determine that, in accordance with section 776(b) of the Act, an adverse inference is appropriate in selecting from among the facts otherwise available to determine the dumping margins for Yory, Los Pinos, Eco-Cultivos, and Lomeli.  Despite its attempts to verify the information that was submitted by these companies and is necessary to the determination, Commerce could not verify such information in whole, or in part, as required under section 782(i) of the Act.  Details of Commerce's attempts to verify such information and these four companies' verification failures are explained in Appendix I.

*Use of Facts Otherwise Available*

Section 776(a)(2) of the Act provides that if, in the course of a proceeding, an interested party (A) withholds information that has been requested by Commerce, (B) fails to provide such information in a timely manner or in the form or manner requested, (C) significantly impedes a proceeding under the antidumping statute, or (D) provides such information but the information cannot be verified as provided in section 782(i) of the Act, Commerce shall, subject to section 782(d), use the facts otherwise available in reaching the applicable determination.

Furthermore, section 782(e)(2) of the Act authorizes Commerce to decline to consider information, that is submitted by an interested party and is necessary to the determination, when such information cannot be verified.  Section 782(e)(4) of the Act also permits Commerce to

decline to consider information if the interested party has not demonstrated that it acted to the best of its ability in providing such information and meeting the requirements established by the administering authority with respect to the information.

Although Yory, Los Pinos, Eco-Cultivos, Lomeli, Echavarria, and Tamazula provided information necessary for us to calculate a weighted-average dumping margin, that information could not be verified, in whole or in part, as required by section 782(i) of the Act.[55]

Specifically, we could not verify the data concerning Yory's reported home-market and U.S. sales, and thus cannot be certain that such data is not incomplete. Incomplete home-market and U.S. sales data is normally sufficient to render a respondent's entire response inadequate for the purpose of calculating a dumping margin. Additionally, we find that its reported per-unit costs are unreliable and unverifiable. The unreliability of Yory's cost data renders its home-market sales data unusable without undue difficulty. Accordingly, we find that there is no reasonable basis for determining normal value for Yory in this investigation. Therefore, Commerce is not able to make appropriate price-to-price comparison in determining the accurate dumping margin.

Regarding Los Pinos, because we could not verify the total quantity associated with Los Pinos's reported home-market sales and the total quantity and value figures associated with Los Pinos's reported U.S. sales, we cannot be certain that the company reported complete information on its sales. Incomplete home-market and U.S. sales data is normally sufficient to render a respondent's response inadequate for the purpose of calculating a dumping margin. Therefore, the inability to ascertain the completeness of home-market and U.S. sales data, supports the use of facts otherwise available.

---

[55] *See* Appendix I.

Commerce was unable to complete verification of Eco-Cultivos and Lomeli. Commerce was unable to locate Lomeli. Eco-Cultivos informed Commerce that the company was inoperative and did not retain any records associated with the information submitted to Commerce in connection with the original investigation. Eco Cultivos did not provide an answer to whether documents existed that would make the verification of the submitted information possible.

Regarding Echavarria, Commerce was unable to verify or recreate transaction specific expenses reported by Echavarria for its U.S. and home market sales, or certain home market price adjustments. Echavarria was additionally unable to provide supporting documentation for expenses reported on the growers' reports generated prior to October 1, 1995. The inability of Commerce to verify these expenses supports the use of facts otherwise available.

With respect to Tamazula, Commerce was unable to verify credit expenses, indirect selling expenses, and inventory carrying costs reported in the home-market, nor inventory carrying costs reported in the U.S. market. The inability of Commerce to verify these expenses supports the use of facts otherwise available.

Because we were not able to verify information, in whole or in part, necessary to the determination, as explained above, we find that the use facts otherwise available, in accordance with section 776(a)(2)(D), is appropriate for this redetermination.

*Adverse Inference*

Section 776(b) of the Act provides that, if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce, in reaching the applicable determination in this proceeding, may use an inference in selecting from among the facts otherwise available. In its verification outlines, Commerce requests of the respondent specific information (*e.g.*, source documentation,

reconciliation worksheets) to verify the integrity and accuracy of the information that is submitted by these companies and that is necessary to the determination. With respect to companies discussed herein, the main common difficulty encountered by Commerce at verifications the lack of availability of and access to the original information. The other difficulty stemmed from companies' unpreparedness to meet the specific requirements that were elaborated in the verification outlines.

In the *Preliminary Determination*, Commerce stated that "as provided in section 782(i) of the Act, we will verify all information determined to be acceptable for use in making our final determination." Interested parties were also on notice that Commerce would resume the investigation if the 1996 suspension agreement were terminated.[56] Interested parties were also on notice in May 2002 of Commerce's intent to terminate the suspension agreement, and were on notice of the resumption of the investigation in August 2002.[57] Taken together, the responding companies were on notice that this investigation may resume in the future which, in turn, would require Commerce to verify all information pertinent to the final determination. Accordingly, we do not find the responding companies' justification for unavailability of, and inaccessibility to, the original information to have merit.

Moreover, no respondent raised concerns about the potential verification difficulties Commerce may encounter in its attempts to verify the original data. In our August 12, 2002, supplemental questionnaire we asked CAADES to "comment on the availability of and access to the information submitted by the original respondents and used by {Commerce} for the November 1, 1996, preliminary determination of sales at less than fair value." We also requested that CAADES indicate whether business entities that succeeded the responding companies in the

---

[56] See *Suspension Agreement 1996*, 61 at 56620 (Appendix I.—Suspension Agreement Fresh, Tomatoes From Mexico, Section VI).
[57] See *Suspension Agreement Termination 2002* and *Preliminary Determination*.

original investigation have access to the former companies' records pertinent to this investigation.[58]  In its September 12, 2002, response to our supplemental questionnaire Los Pinos stated that "all {of} the information presented in the original investigation, is available in the company{'s} files for any consultation by request."[59]  In its August 30, 2002, response to our supplemental questionnaire, CAADES stated that, with respect to Echavarria, "all the information submitted is available at request.  The new company has complete access to former company records."[60]  In the same letter, with respect to Tamazula, the counsel stated that "all the information submitted by Administradora Horticola del Tamazula, is available at request."[61]

The verification outlines we provided to the responding companies described the types of information and supporting documentation we seek to obtain at verification.[62]  The letter transmitting the verification outline warns the respondent of the imminent outcome that arises from the party's inability to comply with a request for such information.  With respect to certain responding companies, the verification outlines were provided to them in advance, thus allowing more preparation time.  With respect to most companies discussed herein, at verification Commerce spent a considerable amount of time explaining certain verification procedures along with suggesting various approaches to satisfy these tasks.  At verification, we also provided these companies with additional time, given the time constraints at verification, to prepare the information we had requested in the outline.

---

[58] *See* Commerce's Letter, "CAADES Supplemental Questionnaire," dated August 12, 2002.
[59] *See* CAADES' Letter, "CAADES Information re Los Pinos," dated September 12, 2002.
[60] *See* CAADES' Letter, "CAADES Supplemental Questionnaire Response," dated August 30, 2002.
[61] *Id.*
[62] *See* Commerce's Letters, Sales Verification Agenda Outline for Los Pinos, dated September 20, 2002; Sales Verification Agenda Outline for Yory, dated September 26, 2002; Sales Verification Agenda Outline for Camalu, dated October 4, 2002; Sales Verification Agenda Outline for Echavarria, dated October 8, 2002; Cost Verification Agenda Outline for Yory, dated October 10, 2002; Cost Verification Agenda Outline for Camalu, dated October 11, 2002; Sales Verification Agenda Outline for Tamazula, dated October 14, 2002; Cost Verification Agenda Outline for Echavarria, dated October 16, 2002; Cost Verification Agenda Outline for Tamazula, dated October 17, 2002; and Cost Verification Agenda Outline for Los Pinos, dated October 18, 2002.

For these reasons discussed, we find that Yory, Los Pinos, Eco-Cultivos, Lomeli, Echavarria, and Tamazula have failed to cooperate by not acting to the best of their ability to provide information that can be verified.  Therefore, in accordance with section 776(b) of the Act, in reaching this final redetermination, Commerce finds it appropriate to use an adverse inference in selecting from among the facts otherwise available.

*Use of AFA in Determining Margins*

In accordance with section 782(e)(2) of the Act, we have declined to consider information, in its entirety, submitted by Yory, Los Pinos, Eco-Cultivos, and Lomeli because their information could not be verified.  Similarly, for Echavarria and Tamazula we have declined to consider information submitted with respect to certain claimed adjustments that we could not verify.

In applying adverse facts available to determine the dumping margin for Yory, Los Pinos, Eco-Cultivos, and Lomeli, we find that the use of 273.43 percent, the highest margin alleged in the petition,[63] is appropriate because we are able to corroborate this petition rate with individual margins calculated for Camalu, Echavarria, and Tamazula.[64]  In selecting a rate based on AFA, Commerce selects a rate that is sufficiently adverse to ensure that the uncooperative party does not obtain a more favorable result by failing to cooperate than if it had fully cooperated.[65]  In an investigation, Commerce's practice is to select, as an AFA rate, the higher of:  (1) the highest dumping margin alleged in the petition; or (2) the highest calculated rate of any respondent in the investigation.[66]

---

[63] *See Initiation Notice*, 61 FR at 18378; *see also* Petitioners' Letter, "Petition Requesting the Imposition of Antidumping Duties on Imports of Fresh Tomatoes from Mexico," dated March 29, 1996.  *See* Appendix I for our rationales for use of this margin as total adverse facts available.

[64] *See* Draft Remand Analysis Memoranda and their calculation outputs for the individual margins that corroborate this petition rate.

[65] *See* Statement of Administrative Action accompanying the Uruguay Round Agreements, H.R. Doc. No. 103, 316, vol 1 (1994) at 870.

[66] *See, e.g.*, *Welded Stainless Pressure Pipe from Thailand:  Final Determination of Sales at Less Than Fair Value*, 79 FR 31093 (May 30, 2014), and accompanying IDM at Comment 3.

We find that the following applications of partial adverse facts available are appropriate in calculating weighted-average dumping margins for Echevarria and Tamazula:

- For Echavarria we find that use of the highest reported expense amounts for those expense categories that we could not verify pertaining to U.S sales and the lowest reported expense amounts for those expense categories that we could not verify pertaining to home-market sales is appropriate. We have not set home-market expenses to zero because we verified that Echavarria incurred some costs for these expenses. For VALCRD2H price adjustments, as adverse facts available, we set the adjustment to zero because we were not able to verify whether Echavarria actually incurred these price adjustments.
- For Tamazula we find that reliance on the highest reported expense amounts for those expense categories that we could not verify pertaining to U.S sales and the lowest reported expense amounts for those expense categories that we could not verify pertaining to home-market sales is appropriate.

### iii.    **Elimination of Zeroing**

At the time of the 1995-1996 investigation and in the 2002 resumed investigation, Commerce's antidumping duty margin calculation methodology included a practice of "zeroing" wherein Commerce did not consider negative individual margins when calculating an exporter's weighted-average antidumping duty margin, instead setting the negative individual margins to zero percent when a particular exporter's individual sales transaction was not dumped. In 2005, a panel of the World Trade Organization (WTO) Dispute Settlement Body found that the United States did not act consistently with its obligations under Article 2.4.2 of the WTO Antidumping Duty Agreement when it employed the zeroing methodology in average-to-average comparisons in certain challenged antidumping duty investigations.[67] In response, Commerce implemented a modification to provide offsets for non-dumped comparisons when using monthly average-to average comparisons, effective for all antidumping duty investigations as of January 16, 2007.[68] Commerce did not change its practice of zeroing in other types of comparisons, including

---

[67] *See* Panel Report, United States – Laws, Regulations and Methodology for Calculating Dumping Margins (Zeroing), WT/DS294/R (October 31, 2005)
[68] *See Antidumping Proceedings:  Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final Modification*, 71 FR 77722 (December 27, 2006).

average-to-transaction comparisons in investigations.  Commerce's decision to cease zeroing in average-to-average comparisons in antidumping duty investigations, while recognizing that Commerce continued to use zeroing when making average-to-transaction comparisons in certain investigations and administrative reviews, was upheld by the Federal Circuit.[69]  Commerce implemented the same WTO-consistent modification for average-to-transaction comparisons in antidumping duty reviews effective April 16, 2012.[70]

In the *Preliminary Determination* for Camalu, Echavarria, and Tamazula, Commerce calculated margins using the average-to-average comparison method.  Accordingly, for these final results of redetermination calculations, Commerce has eliminated zeroing, consistent with current methodology.

### iv.    **Differential Pricing**

*Determination of the Comparison Method*

At the time of the 1995-1996 investigation, Commerce's calculation methodology did not include a differential pricing analysis.  In current investigations and administrative reviews, Commerce has applied a "differential pricing" analysis for determining whether application of the average-to-transaction method is appropriate in a particular situation consistent with 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act.[71]  Commerce finds that the differential pricing analysis is instructive for purposes of examining whether to apply an alternative comparison method.

---

[69] *See U.S. Steel v. United States*, 621 F. 3d. 1351 (Fed. Cir. 2010).
[70] *See Antidumping Proceedings:  Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 FR 8101 (February 14, 2012).
[71] Pursuant to 19 CFR 351.414(c)(1), Commerce calculates a weighted-average dumping margin by comparing weighted-average NVs to weighted-average EPs or constructed export prices (CEP), *i.e.*, the average-to-average method, unless the Secretary determines that another method is appropriate in a particular situation.  In less-than-fair-value investigations, Commerce examines whether to compare weighted-average NVs with the EPs or CEPs of individual sales, *i.e.*, the average-to-transaction method, as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act.

The differential pricing analysis used by Commerce examines whether there exists a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or time periods. The analysis evaluates all export sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists. If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the average-to-average method to calculate the weighted-average dumping margin. The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise. Purchasers are based on the reported {consolidated customer codes}. Regions are defined using the reported destination code (*i.e.*, {ZIP code}) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau. Time periods are defined by the quarter within the period of investigation based upon the reported date of sale. For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between export price (or constructed export price) and NV for the individual dumping margins.

In the first stage of the differential pricing analysis, the "Cohen's *d* test" is applied. The Cohen's *d* coefficient is a generally recognized statistical measure of the extent of the difference between the mean (*i.e.*, weighted-average price) of a test group and the mean (*i.e.*, weighted-average price) of a comparison group. First, for comparable merchandise, the Cohen's *d* coefficient is calculated when the test and comparison groups of data for a particular purchaser, region, or time period each have at least two observations, and when the sales quantity for the comparison group accounts for at least five percent of the total sales quantity of the comparable merchandise. Then, the Cohen's *d* coefficient is used to evaluate the extent to which the prices

23

to the particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise.  The extent of these differences can be quantified by one of three fixed thresholds defined by the Cohen's $d$ test:  small, medium, or large (0.2, 0.5, and 0.8, respectively).  Of these thresholds, the large threshold provides the strongest indication that there is a significant difference between the mean of the test and comparison groups, while the small threshold provides the weakest indication that such a difference exists.  For this analysis, the difference is considered significant, and the sales in the test group are found to pass the Cohen's d test, if the calculated Cohen's $d$ coefficient is equal to or exceeds the large (*i.e.*, 0.8) threshold.

Next, the "ratio test" assesses the extent of the significant price differences for all sales as measured by the Cohen's $d$ test.  If the value of sales to purchasers, regions, and time periods that pass the Cohen's d test account for 66 percent or more of the value of total sales, then the identified pattern of prices that differ significantly supports the consideration of the application of the average-to-transaction method to all sales as an alternative to the average-to-average method.  If the value of sales to purchasers, regions, and time periods that pass the Cohen's $d$ test accounts for more than 33 percent and less than 66 percent of the value of total sales, then the results support consideration of the application of an average-to-transaction method to those sales identified as passing the Cohen's $d$ test as an alternative to the average-to-average method, and application of the average-to-average method to those sales identified as not passing the Cohen's d test.  If 33 percent or less of the value of total sales passes the Cohen's $d$ test, then the results of the Cohen's $d$ test do not support consideration of an alternative to the average-to-average method.

If both tests in the first stage (*i.e.*, the Cohen's $d$ test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that an alternative comparison method should be considered, then in the second stage of the differential pricing analysis,

Commerce examines whether using only the average-to-average method can appropriately account for such differences. In considering this question, Commerce tests whether using an alternative comparison method, based on the results of the Cohen's *d* and ratio tests described above, yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the average-to-average method only. If the difference between the two calculations is meaningful, then this demonstrates that the average-to-average method cannot account for differences such as those observed in this analysis, and, therefore, an alternative comparison method would be appropriate. A difference in the weighted-average dumping margins is considered meaningful if: (1) there is a 25 percent relative change in the weighted-average dumping margins between the average-to-average method and the appropriate alternative method where both rates are above the de minimis threshold; or (2) the resulting weighted-average dumping margins between the average-to-average method and the appropriate alternative method move across the *de minimis* threshold.

*Results of the Differential Pricing Analysis*

For Camalu, based on the results of the differential pricing analysis, Commerce finds that 37.37 percent of the value of U.S. sales pass the Cohen's *d* test and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods. Further, Commerce determines that the average-to-average method cannot account for such differences because the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the average-to-average method and when calculated using an alternative comparison method based on applying the average-to-transaction method to those U.S. sales which passed the Cohen's *d* test and the average-to-average method to those sales which did not pass the Cohen's d test. Thus, for these final results of redetermination, Commerce is applying the average-to-transaction method to those U.S. sales which passed the Cohen's *d* test and the

average-to-average method to those sales which did not pass the Cohen's *d* test to calculate the weighted-average dumping margin for Camalu.

For Echavarria, based on the results of the differential pricing analysis, Commerce finds that 43.10 percent of the value of U.S. sales pass the Cohen's *d* test and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods. Further, Commerce determines that the average-to-average method cannot account for such differences because there is a 25 percent relative change between the weighted-average dumping margin calculated using the average-to-average method and the weighted-average dumping margin calculated using an alternative comparison method based on applying the average-to-transaction method to those U.S. sales which passed the Cohen's *d* test and the average-to-average method to those sales which did not pass the Cohen's *d* test. Thus, for these final results of redetermination, Commerce is applying the average-to-transaction method to those U.S. sales which passed the Cohen's *d* test and the average-to-average method to those sales which did not pass the Cohen's *d* test to calculate the weighted-average dumping margin for Echavarria.

For Tamazula, based on the results of the differential pricing analysis, Commerce finds that 14.47 percent of the value of U.S. sales pass the Cohen's *d* test and does not confirm the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods. Thus, the results of the Cohen's *d* and ratio tests do not support consideration of an alternative to the average-to-average method. Accordingly, for these final results of redetermination, Commerce determines to apply the average-to-average method for all U.S. sales to calculate the weighted-average dumping margin for Tamazula.

### v. Calculation of All-Others Rate

Section 735(c)(5)(A) of the Act provides that the estimated weighted-average dumping margin for all other producers and exporters not individually investigated shall be equal to the

weighted average of the rates applied to individually investigated exporters and producers, excluding rates that are zero, *de minimis*, or determined entirely under section 776 of the Act, *i.e.*, facts otherwise available.

Commerce calculated estimated weighted-average dumping margins for Camalu, Echavarria, and Tamazula that are not zero, *de minimis*, or based entirely on facts otherwise available. For these final results of redetermination, Commerce calculated the all-others rate using a weighted average of the estimated weighted-average dumping margins calculated for these three individually examined respondents in accordance with section 735(c)(5)(A) of the Act.

### 3. Tomato Types Matched in the Dumping Margin Calculation

The U.S. market for fresh tomatoes has undergone significant changes since the initiation of the investigation, changes which call into question whether the resulting margin calculations are compatible with Commerce's statutory obligation to calculate accurate dumping margins. Upon the termination of the 2013 suspension agreement and resumption of the investigation in 2019, we found it appropriate to request information corresponding to the most recent four full quarters given the significant passage of time.[72] The CBP data we obtained following continuation of the investigation provided a more current view of imports of fresh tomatoes from Mexico.[73] Specifically, the CBP data showed [                    ] specialty tomatoes compared to the 1995-1996 sales data.[74] The 1995-1996 sales data [              ] reported round tomatoes.[75] The preliminary USITC report, presenting data collected from U.S. producers,

---

[72] *See Suspension Agreement Termination and Continuation of Investigation 2019*, 84 FR at 20860 ("We have exercised this discretion here, due to the unusual procedural posture of this proceeding, in which we terminated a suspension agreement and continued an investigation that covers a period of investigation that dates back more than 23 years. In light of these unusual circumstances, we determined it was appropriate to request information corresponding to the most recent four full quarters, i.e., April 1, 2018, through March 31, 2019.").
[73] *See* Appendix II; *see also* Commerce's Letter "CBP Data Release," dated May 8, 2019, and attached CBP data.
[74] *See* Appendix II.
[75] *See* Appendix III for business proprietary details of the 1995-1996 sales data.

packers, and importers in 1995, found that the majority of Mexican imports of fresh tomatoes at this time were round tomatoes.[76]  Because significant changes to the tomatoes industry could adversely impact whether Commerce's model matching methodology accurately reflects the market for fresh tomatoes, during the course of this remand Commerce requested information from parties regarding the status of the tomatoes industry in order to evaluate whether there were any issues in using the 1995-1996 data in light of the current tomato types imported into the U.S. market.[77]

Five parties cited significant increase and changes to U.S. market demand for fresh tomatoes.  The FPAA noted the increase in U.S. demand for roma tomatoes, which replaced round beefsteak as the top variety preferred in the United States in 2020.[78]  The absolute size of the U.S. market for fresh tomatoes has increased since the original investigation,[79] and notably demand has grown for specialty variety of tomatoes and availability outside of the traditional growing season.[80]  NatureSweet and Mastronardi further argued that specialty greenhouse grown tomatoes do not compete in the same market as field grown round and roma tomatoes.[81]  Additionally, an economic analysis of the fresh tomato market prepared by an agricultural economics expert found that specialty tomatoes are clustered in a separate pricing group when compared to roma and round tomatoes, indicating that these groups are not substitutable and therefore do not compete in the same market.[82]  Mastronardi noted that the specialty tomato

---

[76] *See Fresh Tomatoes from Mexico*, USITC Inv. No. 731-TA-747 (Preliminary), USITC Pub. No. 2967 at I-2 (May 1996).

[77] *See* Commerce's Letter, "Request for Information," dated June 27, 2024.  Commerce received factual information regarding changes to the tomatoes industry in Mexico from NatureSweet; the Mexican Signatories; the FPAA, an association representing U.S. importers of subject merchandise; and Mastronardi, a U.S. producer and importer of Mexican tomatoes.

[78] *See* FPAA Response at 11.

[79] *See* Mastronardi response at 7; FPAA Response at 10.

[80] *See* NatureSweet Response at 14, 16; Mexican Signatories Response at 10-11; Mastronardi Response at 8; FPAA Response at 10-11.

[81] *See* NatureSweet Response at 18.

[82] *Id.* at 18-19 and Exhibit 13.

market did not materially exist at the time of the original investigation; although cherry tomatoes existed in 1995, most grape, cocktail, and other varieties of specialty tomatoes were developed in the 2000s and 2010s.[83]

Further, factual information submitted by interested parties further describes significant changes in growing techniques and market demands since the 1995-1996 period.   Mexican growers have shifted to greenhouse or other protected agriculture styles[84] while the varieties offered have grown to meet demand for specialty tomatoes.[85]  Specialty tomatoes command higher prices and are primarily greenhouse grown.  U.S. Department of Agriculture (USDA) data indicates that over the last two decades, nearly all import growth has stemmed from greenhouse tomatoes, with 66 percent of Mexican production now in greenhouses.[86]  This shift to specialty tomatoes responds to U.S. demand for tomatoes of higher quality and available year-round, both characteristics of greenhouse grown specialty tomatoes.[87]  While Mexican production shifted heavily toward protected agriculture styles, the U.S. production stayed focused on open field tomato production.[88]

Information obtained from interested parties in this remand segment indicates substantial changes to the tomatoes industry from the original period of investigation and that the sales and cost data obtained for the original period may not be representative of today's tomatoes industry and market.  In the absence of using data from a more recent period to calculate dumping margins for use in the investigation, we do not currently see a way to address this potential issue.

---

[83] *See* Mastronardi Response at 8.
[84] *See* NatureSweet Response at 8-10, Mexican Signatories Response at 8-9, and Mastronardi Response at 12-13.
[85] *See* NatureSweet Response at 16-17, Mexican Signatories Response at 11-12, and Mastronardi Response at 13-14.
[86] *See* NatureSweet Response at 12, citing Manuel Mandujano, Tomatoes and Products Annual, USDA Foreign Agricultural Service Report at Exhibit 7 (June 4, 2024).
[87] *See* NatureSweet Response at 16-17, Mexican Signatories Response at 11, and Mastronardi Response at 13-14.
[88] *See* NatureSweet Response at 15 (NatureSweet reported that the vast majority of fresh tomatoes grown in the United States are field grown, particularly in Florida and California, with the U.S. domestic industry supplying only 12 percent of the domestic greenhouse tomato supply according to USDA data), Mexican Signatories Response at 10, 12, and Mastronardi Response at 6; FPAA Response at 2.

Accordingly, consistent the Court's *Remand Order*, we have used the 1995-1996 data reported by the original respondents.

In the *Preliminary Determination*, we matched tomatoes sold in the home market and to the United States with identical tomato types.[89]  If there is no identical tomato type match, we compared U.S. sales to a normal value based on constructed value.[90]  It is our practice to ensure that product characteristics, and thus matching, reflects the product and market of the period of investigation or review.[91]  If any part of the product matching does not reflect the current product and market, we make modifications, usually in the form of changing the reporting requirements for product characteristics, to reflect current conditions.[92]  We did not find that the product matching of tomatoes by tomato type is outdated, and as established in the 1995-1996

---

[89] *See Preliminary Determination*, 61 FR at 56611 ("… the weighted-average prices were calculated and compared by product type.").

[90] *Id.* ("Where there were no sales of identical merchandise (tomatoes of the same tomato type (*e.g.*, round, roma, *etc.*)) in the home market to compare to U.S. sales in the same month, we compared U.S. sales to a normal value based on constructed value.  We did not compare sales of similar merchandise ….")

[91] *See, e.g.*, *Certain Cold-Rolled Carbon Steel Flat Products from Germany; Final Results of Antidumping Duty Administrative Review*, 60 FR 65264, 65271 (December 19, 1995) ("To make {product matching} determinations, the Department devises a hierarchy of commercially meaningful characteristics suitable to each class or kind of merchandise.").

[92] *See, e.g.*, *Structural Steel Beams from Korea; Notice of Final Results of Antidumping Duty Administrative Review*, 70 FR 6837 (February 9, 2005), and accompanying IDM at Comment 1 ("… the model match strength characteristics, as modified early in this proceeding, *more accurately reflect the market realities* of the subject structural steel beams than did the preceding model match characteristics. ….  the Department is not precluded from reconsidering the applicability of the model match characteristics in subsequent segments of the proceeding when additional information is developed regarding the products and *marketing considerations pertinent to those products*. ….  Based on a careful analysis of *the commercial realities* of the structural beam market, the Department determined that the strength grouping of the pre-existing model match should be consolidated as described by petitioners' proposal because the pre-existing model match eliminated the matching of comparable products which should have been regarded as identical.  This made possible more accurate matching. ….  {E}nsuring appropriate comparisons is critical to the statutory directive to calculate a dumping margin and the Department must maintain the flexibility to modify the model match as required."); *Notice of Final Results of the Twelfth Administrative Review of the Antidumping Duty Order on Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 72 FR 13086 (March 20, 2007), and accompanying IDM at Comment 1 ("Specifically, the Department's decision to make the modification to the model-match criteria in Structural Steel Beams from Korea was based on:  1) a careful analysis of *the commercial realities of the market*, …."); and *Light-Walled Rectangular Pipe and Tube from Mexico:  Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 FR 17815 (March 12, 2024), and accompanying IDM at Comment 2 ("Commerce's practice is not to alter the physical characteristics developed at a prior segment of the proceeding unless a party provides compelling and convincing evidence demonstrating that:  (1) the current physical characteristics are not reflective of the subject merchandise; (2) there have been *industry-wide changes to the product* that merit a modification; or (3) there is some other compelling reason to warrant a change."  (Emphases added.)).

investigation we continue to use tomato type, which can be round, plum or roma, saladette, cherry, or other, as the first matching characteristic. However, we found that the types of tomatoes reported in the 1995-1996 sales data and matched in the margin calculations for the *Preliminary Determination* in 1996 differ from the commercial and market conditions at the time Commerce continued the investigation in 2019, *i.e.*, a saw significant growth in specialty types of tomatoes relative to round, plum, and roma.[93]

## V.    INTERESTED PARTY COMMENTS

On September 27, 2024, Commerce issued its Draft Remand Redetermination and provided interested parties an opportunity to comment on it.[94]  Commerce received comments from FPAA,[95] FTE,[96] the Mexican Signatories,[97] and NatureSweet.[98]  These comments are addressed below.  After considering these four submissions, we made no changes to our conclusions in the Draft Remand Redetermination for these final results of redetermination.

**Comment 1:  NatureSweet is Entitled to an Opportunity for an Individual Rate**

The following is a verbatim executive summary of argument submitted by NatureSweet. For further details, *see* NatureSweet's Draft Remand Comments at 3-8 (internal citations omitted).

> On remand, the CIT instructed Commerce to reconsider its final determination, continuing the 1996 investigation and issued on October 2019, because it was not in accordance with law. Specifically, the CIT held that "Commerce's Final Determination must resume its investigation flowing from the affirmative preliminary determination issued on November 1, 1996, including focusing its analysis on the evidence submitted regarding the original period of investigation of

---

[93] *See* Appendices II and III.
[94] *See* Draft Results of Redetermination Pursuant to Court Remand, *Bioparques de Occidente, S.A. de C.V., et al. v. United States*, 698 F. Supp. 3d 1265 (CIT 2024), dated September 27, 2024 (Draft Results of Redetermination).
[95] *See* FPAA's Letter, "Comments on Draft Remand Redetermination," dated October 11, 2024 (FPAA Draft Remand Comments).
[96] *See* FTE's Letter, "Comments on Draft Remand Redetermination," dated October 11, 2024 (FTE Draft Remand Comments).
[97] *See* the Mexican Signatories' Letter, "Comments on the Department's Draft Remand Redetermination," dated October 11, 2024 (Mexican Signatories Draft Remand Comments).
[98] *See* NatureSweet's Letter, "Comments on the Draft Remand Redetermination," dated October 11, 2024 (NatureSweet Draft Remand Comments).

March 1, 1995 through February 29, 1996, and reviewing the original six mandatory respondents" to comply with "the statutory requirement." Although Commerce has technically complied with the CIT's Remand Order, Commerce is also required to determine fair and accurate dumping margins.

Commerce must also provide parties an opportunity to an individual, calculated dumping margin based on the current market. Because the current commercial and market conditions differ substantially from the commercial and market conditions in 1995-1996, including the tomatoes produced, exported from Mexico, and available to consumers, there is good cause for Commerce to conduct a changed circumstances review, at least with respect to certain companies. In particular, NatureSweet produces, exports, and imports tomatoes which did not exist during the initial investigation. In addition, NatureSweet did not exist during the initial investigation and, thus, could not be eligible for an individual rate and is now included as an "all other" company. Normally, NatureSweet would qualify as a new shipper and have an opportunity to obtain an individually calculated dumping margin. Commerce should provide such an opportunity here, or appropriate alternative such as a changed circumstances review.

**Commerce's Position:** For the final results of redetermination, we do not find it appropriate to initiate a new shipper review or a changed circumstances review for NatureSweet. NatureSweet asserts that there is good cause for Commerce to conduct a new shipper review or changed circumstance review to provide NatureSweet an opportunity to be assigned an individual, calculated dumping margin based on the current market. However, sections 751(a)(2)(B) and 751(b)(1)(A) of the Act require an antidumping duty order as a statutory prerequisite for Commerce to initiate and conduct a new shipper review or changed circumstances review, respectively.[99] Although we are continuing the investigation, as discussed above, but because this investigation is subject to a suspension agreement, an antidumping duty order has not been

---

[99] *See* section 751(a)(2)(B)(i) of the Act ("If the administering authority receives a request from an exporter or producer of the subject merchandise establishing that— (I) such exporter or producer did not export the merchandise that was the subject of an *antidumping duty … order* to the United States … during the period of investigation, …, the administering authority shall conduct a review under this subsection to establish an individual weighted average dumping margin … for such exporter or producer (emphasis added).") and section 751(b)(1)(A) of the Act ("Whenever the administering authority … receives information concerning, or a request from an interested party for a review of a final affirmative determination that resulted in an *antidumping duty order* under this title, which shows changed circumstances sufficient to warrant a review of such determination or agreement, the administering authority … shall conduct a review of the determination … after publishing notice of the review in the Federal Register (emphasis added).").

issued.[100]  Without an antidumping duty order in place, Commerce is unable to initiate and

conduct either a new shipper review under section 751(a)(2)(B) of the Act or a changed

circumstances review of a final affirmative determination that resulted in an antidumping duty

order under 751(b)(1)(A) of the Act within the context of these final results of redetermination or

otherwise.

Further, although section 751(b)(1)(B) of the Act provides that Commerce may initiate a

changed circumstances review of a <u>suspension agreement</u>,[101] this *Remand Order* is limited in

scope to the *Final Determination* in the continued investigation and that scope does not include

the suspension agreement.[102]  Thus, initiation of a changed circumstances review of the

suspension agreement as requested by NatureSweet is beyond the purview of the *Remand Order.*

Therefore, we are unable to initiate and conduct a changed circumstance review for NatureSweet

under section 751(b)(1)(B) of the Act in these final results of redetermination.

**Comment 2:  Support for Remand Redetermination**

The following is the entire argument submitted by FTE (internal citations omitted).

FTE's entire argument consists of fewer words than the maximum word count limit for a public

executive summary.  FTE did not submit a separate executive summary.

*FTE's Argument:*

Commerce has revised its *2019 Final Determination* "under respectful protest."
Thus, we understand that Commerce opposes the Court's determination to ignore

---

[100] *See 2019 Agreement.*

[101] *See* section 751(b)(1)(B) of the Act ("Whenever the administering authority or the Commission receives information concerning, or a request from an interested party for a review of a suspension agreement accepted under section 704 or 734, which shows changed circumstances sufficient to warrant a review of such determination or agreement, the administering authority … shall conduct a review of the determination or agreement after publishing notice of the review in the Federal Register.").  We note that no provisions of the Act allow for a new shipper review under a suspension agreement.

[102] In addition, section 751(b)(1) of the Act specifically requires that Commerce "shall conduct a {changed circumstances} review of the determination or agreement *after publishing notice of the review in the Federal Register* (emphasis added)."  To the extent that this statutory requirement for publication of an initiation notice is a statutory requirement that a changed circumstance review be initiated and conducted as a separate administrative proceeding, we are not able to do so in the context of these final results of redetermination, which are subject to judicial review in an ongoing litigation proceeding.

the *2019 Final Determination* and reissue a final determination based upon the data from the original period of investigation. We agree with Commerce's protest. Commerce's *2019 Final Determination* was supported by substantial evidence and was in accordance with law, and we reserve the right to further challenge the Court's decision in *Bioparques v. United States*.

Over one year ago, FTE requested that Commerce terminate the *2019 Suspension Agreement* and issue an antidumping duty order. Since then, FTE has continued to document the failures of the *2019 Suspension Agreement* and has many times reiterated its termination request so that the domestic industry could finally receive the remedy required under the statute. That remedy should be based upon the *2019 Final Determination*. However, to the extent Commerce continues to, under protest, not revert to the *2019 Final Determination* in its final remand redetermination, we support Commerce's *Draft Remand* so that Commerce can put this matter to bed and issue an antidumping duty order as quickly as possible.

The following is a verbatim executive summary of argument submitted by the Mexican Signatories. For further details, *see* the Mexican Signatories' Draft Remand Comments at 3-6 (internal citations omitted).

*The Mexican Signatories' Comments:*

In its Draft Remand Redetermination, {Commerce} "resume{d} its investigation flowing from the affirmative preliminary determination issued on November 1, 1996," consistent with the CIT's Opinion and Remand Order. In doing so, {Commerce} properly "focus{ed} its analysis on the evidence submitted regarding the original period of investigation … of March 1, 1995 through February 29, 1996, and review{ed} the original six mandatory respondents{.}"

The Mexican Signatories agree with several of {Commerce}'s decisions in the Draft Remand Redetermination. First, the Mexican Signatories agree with {Commerce} and the {FTE} that the Draft Remand Redetermination is not an appropriate setting to determine successors to the original mandatory respondents. Second, the Mexican Signatories agree with Commerce's decision not to apply its discontinued "zeroing" methodology. Finally, the Mexican Signatories agree with {Commerce}'s methodology for calculating the all-others rate. The Mexican Signatories urge {Commerce} to uphold these correct decisions in its final remand redetermination.

**Commerce's Position:** As we state in these final results of redetermination, although the *Final Determination* was supported by substantial evidence and in accordance with law, we recalculated the final margins based on the 1995-1996 data under respectful protest to comply with the *Remand Order* in these final results of redetermination. Because no parties contest

34

Commerce's determination or methodologies, for these final results of redetermination, we continue to: (1) decline to determine successors to the original mandatory respondents; (2) decline to apply the discontinued "zeroing" methodology and apply the differential pricing methodology; and (3) continue with the same methodology for the calculation of the all-others rate.

**Comment 3: Need to Innovate and Improve Florida's Tomatoes Industry**

FPAA did not provide an executive summary of its comments. For further details, *see* FPAA's Draft Remand Comments.

**Commerce's Position:** As we stated in these final results of redetermination and FPAA noted, despite significant changes in the supply and demand conditions of the U.S. tomatoes market since the 1995-1996 period of investigation, we relied on the 1995-1996 data to recalculate the final margins in compliance with, and under respectful protest of, the *Remand Order*. Because we relied on the 1995-1996 data to recalculate the final margins, we did not consider current commercial reality in the U.S. tomatoes market, *e.g.*, FPAA's claim that Florida's current tomatoes business practices are outdated and need innovation and improvement, because considering them would not be consistent with the *Remand Order* that directed us to rely on the 1995-1996 data to recalculate the final margins. Business challenges that the Florida tomatoes industry is facing in the current U.S. tomatoes market are not relevant issues that need to be addressed to comply with the *Remand Order.*

**VII.    FINAL RESULTS OF REDETERMINATION**

Thus, under respectful protest, Commerce has complied with the CIT's *Remand Order* by evaluating the 1995-1996 data from the original seven respondents selected for individual examination during the investigation and determined dumping margins using the 1995-1996 data. Based on these changes, Commerce determines that the following estimated weighted-

average dumping margins exist for the period of investigation March 1, 1995, through February 29, 1996.

| Exporter/Manufacturer | Weighted-Average Dumping Margin (percent) |
|---|---|
| San Vicente Camalu | 2.81 |
| Ernesto Fernando Echavarria Salazar Grupo Solidario | 26.39 |
| Administradora Horticola Del Tamazula | 18.58 |
| Arturo Lomeli Villalobas S.A. de C.V. | 273.43 |
| Ranchos Los Pinos S. de R.L. de C.V. | 273.43 |
| Agricola Yory, S. de P.R. de R.I. | 273.43 |
| Eco-Cultivos S.A. de C.V. | 273.43 |
| All Others | 17.09 |

If Commerce's final results of redetermination are sustained by the Court, Commerce intends to publish a *Timken*[103] notice with the amended final determination in the *Federal Register* and issue appropriate customs instructions to U.S. Customs and Border Protection, consistent with the discussion above.

10/22/2024

X _Elouaradia_

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance

---

[103] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*); *see also Diamond Sawblades Manufacturers Coalition v. United States*, 626 F.3d 1374 (Fed. Cir. 2010).

**Appendix I – Details of Verification Failures**

Below is the description of Commerce's attempt to verify four mandatory respondents and their verification failures either because they were no longer operational and available for verification or because they agreed to verifications but were unable to present information requested during the verification.

1.    Yory

On October 7, 2002, through October 9, 2002, and on October 21-22, 2002, Commerce attempted to verify information submitted by Yory that relates to its home-market and U.S. sales.[104]  We found that Yory did not compile the necessary documentation nor did it prepare any information we requested in our September 26, 2002, verification outline.[105]  In our attempts to focus on the most critical parts of the verification agenda, we thoroughly explained the quantity and value section of the verification outline.  We explained what necessary reconciliations Yory needed to prepare and what type of source documentation we normally examine.  We then provided similar explanations with regard to various adjustments reported in Yory's home-market sales lists.  We also explained what source documentation we require to examine selected sales traces.  We provided nearly identical explanations to and requested similar information from Yory's U.S. distributor, Meyer Tomatoes.

With respect to Yory, we requested that it attempt to prepare all the necessary reconciliations in the quantity and value section of our outline and provide the appropriate source documentation on the second day of the verification.  We requested similar information with respect to any of the sales traces listed in our outline.  On the second day of verification the company officials stated that they were not able to perform these exercises.  With respect to Meyer Tomatoes, we asked company officials whether they would be able to provide all the information necessary to verify quantity and value of sales by the second day of the verification.  The company officials' response was negative.

On October 21, 2002, through October 24, 2002, Commerce attempted to verify the cost information submitted by Yory.[106]  We were unable to verify the completeness of the reported costs.  In order to assess the reasonableness of a respondent's cost-allocation methodology, the Department must ensure that the aggregate amount of the reported costs captures all costs incurred by the respondent in producing the subject merchandise during the period under examination.  This is done by performing a reconciliation of the respondent's submitted cost-of-production (COP) and constructed-value (CV) data to the company's audited financial statements.  Although the format of such reconciliation depends greatly on the nature of the accounting records maintained by the respondent, the reconciliation represents the starting point of a cost verification because it assures the Department that the respondent has accounted for all costs before allocating those costs to individual products.

---

[104] *See* Memorandum, "Home-Market and U.S. Sales Verification of Agricola Yory, S. de P.R. de R.I.," dated November 12, 2002.
[105] *See* Yory Verification Outline.
[106] *See* Memorandum, "Verification Report on the Cost of Production and Construction Value Data Submitted by Agricola Yory," dated November 12, 2002 (Yory Cost Verification Report).

Yory was unable to perform such a reconciliation.  The reconciliation that Yory presented at verification did not demonstrate that all costs were included or excluded appropriately.  Although Yory was able to reconcile the <u>total</u> cost of sales and net income from the fiscal year 1995 audited financial statements to its financial accounting system (*i.e.*, the trial balance), the company could not reconcile these amounts to the information it reported to Commerce.[107]

We made every attempt at verification to assist Yory in completing the requested reconciliations, including suggesting various ways to complete the task and identifying the typical reconciling items Yory would have to quantify.[108]  Yory did not provide the requested information.

2.    Los Pinos

We were not able to verify the total quantity of home-market sales reported in Los Pinos' questionnaire response.[109]  During verification, company officials explained that the company was not able to recover the inventory program from Los Pinos' accounting system.[110]  Consequently, Commerce could not verify completely the pre-sale warehouse expenses since the calculation for this expense was based on the quantity of sales.[111]

Furthermore, during the U.S. verification, we found that we could only verify U.S. quantity and value of sales reported by Los Pinos on a monthly basis.  We could not reconcile the total sales quantity and value amounts as reported for the entire period of investigation to Los Pinos's financial statements.[112]  Company officials explained during verification that the complexity of preparing such reconciliation data was due to the fact that Los Pinos had changed to a new accounting system between the time it prepared its original response and the time the verification took place.  Company officials informed Commerce at verification that they would need additional time to prepare the reconciliation data for additional months during the period of investigation.[113]

3.    Eco Cultivos

In its July 2 and July 9, 2002, letters CAADES informed Commerce that Eco Cultivos no longer does business and has shut down completely.[114]  CAADES also stated that this company no longer exists.  On August 12, 2002, Commerce issued a supplemental questionnaire addressed to members of CAADES.[115]  The objective of the supplemental was to receive more detailed information on the current state of business operations of certain producers of fresh tomatoes.

---

[107] *See* Yory Cost Verification Report.

[108] *Id.* at 2.

[109] *See* Memorandum, "Home-Market and U.S. Sales Verification of Ranchos Los Pinos, S. R.L. de C.V.," dated November 13, 2002 (Los Pinos Verification Report) at 9.

[110] *Id.* at 7.

[111] *Id.* at 14.

[112] *Id.* at 10-11.

[113] *Id.* at 8, 10, and 11.

[114] *See* CAADES' Letters, "CAADES Information re Eco Cultivos and Lomeli," dated July 2, 2002, and "CAADES Information re Eco Cultivos and Lomeli," dated July 9, 2002 (collectively, CAADES Letters).

[115] *See* Commerce's Letter, "Supplemental Questionnaire," dated August 12, 2002.

With respect to Eco Cultivos, Commerce did not receive a response to its supplemental questionnaire. On September 5, 2002, representatives of Desert Glory Ltd. (Desert Glory) met with Commerce officials and informed us that Desert Glory had acquired from Eco Cultivos certain assets that are used in the production of fresh tomatoes.[116] Commerce issued a supplemental questionnaire to Desert Glory requesting, among other things, information on the current status of Eco Cultivos's business operations. Commerce also made an inquiry into Desert Glory's access to Eco Cultivos's records in order to permit the intended verification of the information Eco Cultivos had submitted in the course of this investigation.[117] In its October 1, 2002, supplemental questionnaire response Desert Glory informed Commerce that it did not have access to any of Eco Cultivos's records and did not have knowledge of Eco Cultivos's current status of operations.[118]

We then contacted Eco Cultivos directly.[119] The company officials informed us that Eco Cultivos is inoperative and has not retained any records associated with the information submitted to Commerce in connection with the original investigation.[120] On October 17, 2002, we sent Eco Cultivos a supplemental questionnaire to inquire about its current state of operations and the existence of records that are necessary to conduct a verification.[121] On November 6, 2002, Eco Cultivos submitted a response to the supplemental questionnaire in which it explained that Eco Cultivos is an existing legal entity in an inoperative state.[122] Eco Cultivos did not provide an answer to whether documents existed that would make the verification of the submitted information possible.

4.     Lomeli

In its July 2 and July 9, 2002, letters CAADES informed Commerce that Lomeli no longer exports to the United States.[123] Specifically, CAADES advised us that Lomeli formerly exported as Lomeli Trade Center, Grupo Vista, and Grupo Exportador de Occidente, none of which currently exists. In addition, CAADES, in its August 30, 2002, supplemental questionnaire response, indicated that it was unable to locate Lomeli.[124]

5.     Echavarria

We were generally unable to verify or recreate transaction specific expenses reported by Echavarria for its U.S. and home market sales. These expenses were packing and "other" expenses reported in the home market sales list and freight and brokerage expenses incurred in Mexico, export fees, U.S. Customs duties, inspection fees, other U.S. expenses, packing and re

---

[116] See Memorandum, "Meeting with Representatives of Desert Glory on the Resumed Investigation of Fresh Tomatoes from Mexico," dated September 5, 2002.

[117] See Commerce's Letter to Desert Glory dated September 25, 2002.

[118] See Desert Glory's Letter, "Request for Information Concerning Eco Cultivos, S.A. de C.V.," dated October 1, 2002.

[119] See Memorandum, "Telephone Conversation; Antidumping Duty Investigation on Fresh Tomatoes from Mexico," dated October 14, 2002.

[120] Id.

[121] See Commerce's Letter to Eco Cultivos, dated October 17, 2002.

[122] See Eco Cultivos' Letter, "Request for Information Concerning Eco Cultivos, S.A. de C.V.," dated November 4, 2002.

[123] See CAADES' Letters dated July 2 and 9, 2002.

[124] See CAADES' Letter "CAADES Supplemental Response," dated September 3, 2002.

packing expenses reported in the U.S. sales list.  In addition, Echavarria was not able to provide supporting documentation for expenses reported on the growers' reports generated prior to October 1, 1995, because it had disposed of the invoices for the 1994/95 season two to three weeks prior to our U.S. sales verification.[125]  We were also unable to verify the home market price adjustments that Echavarria reported in the variable VALCRD2H.

6.    Tamazula

Commerce was unable to verify credit expenses, indirect selling expenses, and inventory carrying costs reported in the home-market sales list.  Company officials explained that this was because its counsel had performed the calculations that were necessary to derive and report theses expenses in the sales list, based on the relevant data submitted by Tamazula.  Tamazula could not produce documentation supporting the calculation of these expenses.

Commerce was unable to verify the inventory carrying costs reported in the U.S. sales list. Company officials could not provide supporting documentation demonstrating the calculation of this expense.[126]

[125] See Memorandum, "Verification of Ernesto Fernando Echavarria Salazar Grupo Solidario and Vizcaino Agricola, S. DE R.L. DE C.V.'s Home Market and U.S. Sales Data," dated November 12, 2002

[126] See Memorandum, "Verification of Home-Market and Export-Market Sales Questionnaire Responses Submitted by Administradora Horticola Del Tamazula, S. de R.L.," dated November 12, 2002.

**Appendix II – Tomato Types Entered between April 1, 2018 and March 13, 2019**

Source:  CBP Data
Business Proprietary Information in Its Entirety
Not susceptible to public summary

Business Proprietary Information Subject to APO

**Appendix III – Mandatory Respondents – Sales Quantity by Tomato Type**

Business Proprietary Information in Its Entirety
Not susceptible to public summary

Business Proprietary Information Subject to APO