**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| BIOPARQUES DE OCCIDENTE, S.A. DE C.V.; AGRICOLA LA PRIMAVERA, S.A. DE C.V.; AND KALIROY FRESH LLC;<br>      *Plaintiffs*,<br><br>and<br><br>CONFEDERACION DE ASOCIACIONES AGRICOLAS DEL ESTADO DE SINALOA, A.C.; CONSEJO AGRICOLA DE BAJA CALIFORNIA, A.C.; ASOCIACION MEXICANA DE DE HORTICULTURA PROTEGIDA, A.C.; ASOCIACION DE PRODUCTORES DE HORTALIZAS DEL YAQUI Y MAYO; AND SISTEMA PRODUCTO TOMATE,<br>      *Consolidated Plaintiffs*,<br><br>v.<br><br>UNITED STATES,<br>      *Defendant*,<br><br>and<br><br>THE FLORIDA TOMATO EXCHANGE,<br>      *Defendant-Intervenor*. | Consol. Court No. 19-00204<br><br>**NON-CONFIDENTIAL VERSION**<br><br>Business Proprietary Information Subject to Protective Order is Removed from Brackets on Page 8. |

## DEFENDANT-INTERVENOR FTE'S COMMENTS SUPPORTING COMMERCE'S REMAND DETERMINATION

Robert C. Cassidy, Jr.
Charles S. Levy
James R. Cannon, Jr.
Mary Jane Alves
Jonathan M. Zielinski
Nicole Brunda
CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Avenue NW, Suite 300
Washington, D.C. 20037
*Counsel to The Florida Tomato Exchange*

January 7, 2025

**Table of Contents**

I.   No Party Challenges the Remand Results, so This Court Should Affirm Them ..................... 2

II.  NatureSweet's Request for an Individual Margin is Untimely and Improper ........................ 3

   A.   The Factual Background Provides a Backdrop for NatureSweet's Gamesmanship ........ 3

      1.   A Series of Suspension Agreements Failed to Provide Domestic Producers
           Relief ................................................................................................................... 3

      2.   Some Firms Appealed to Avoid Eventual Application of the 2019 Margins
           if an AD Order were Issued, but NatureSweet Did Not Do So ............................... 8

      3.   NatureSweet Again Did Not Challenge Commerce's 2019 Final
           Determination ...................................................................................................... 11

      4.   Commerce Complied with the Court's Remand Order ........................................... 11

      5.   NatureSweet was the Only Exporter That Submitted December 3
           Comments on the Remand Results ........................................................................ 13

   B.   This Court Should Reject NatureSweet's Request and Affirm the Remand Results as
        NatureSweet Provides No Legal Basis for the Relief it Now Seeks ............................. 15

III. Conclusion ..................................................................................................................... 17

## Table of Authorities

Page(s)

**Statute**

19 U.S.C. § 1516a(a)(2)(B)(i)................................................................................10

19 U.S.C. § 1516a(a)(2)(B)(iv)..............................................................................10

19 U.S.C. § 1673b(d).................................................................................................4

19 U.S.C. § 1673c(b)..............................................................................................10

19 U.S.C. § 1673c(c)....................................................................................4, 6, 10

19 U.S.C. § 1673c(c)(1).............................................................................................5

19 U.S.C. § 1673c(f)(3)(B).........................................................................................7

19 U.S.C. § 1673c(g).................................................................................................7

19 U.S.C. § 1673c(i)(1)(A)(ii)...................................................................................8

19 U.S.C. § 1673c(i)(1)(C)........................................................................................8

**Court Decisions**

*Bioparques de Occidente, S.A. de C.V. v. United States,*
698 F. Supp. 3d 1265 (Ct. Int'l Trade 2024)..............................2, 3, 11, 16

*Bioparques de Occidente, S.A. de C.V. v. United States*, 470 F. Supp. 3d
1366 (Ct. Int'l Trade 2020)...............................................................................10

*Bioparques de Occidente, S.A. de C.V. v. United States*, 31 F.4th 1336
(Fed. Cir. 2022)..............................................................................................10, 11

*Confederacion de Asociaciones Agricolas del Estado de Sinaloa, A.C. v.
United States*, 459 F. Supp. 3d 1354 (Ct. Int'l Trade 2020)........................10

*Confederacion de Asociaciones Agricolas Del. Estado de Sinaloa, A.C. v.
United States*, 32 F.4th 1130 (Fed. Cir. 2022)........................................10, 11

*Fla. Tomato Exch. v. United States*, 107 F. Supp. 3d 1342 (Ct. Int'l Trade
2015).................................................................................................................6

*Fla. Tomato Exch. v. United States*, 255 F. Supp. 3d 1362 (Ct. Int'l Trade
2017).................................................................................................................6

*Jem D Int'l Michigan Inc. USA v. United States*, 2022 U.S. App. LEXIS 10044\* (Fed. Cir. Apr. 14, 2022)..........................................................................11

*Laizhou Auto Brake Equip. Co. v. United States*, 477 F. Supp.2d 1298 (Ct. Int'l Trade 2007) ..............................................................................................16

*Nat'l Ass'n of Mirror Mfrs. v. United States*, 670 F. Supp. 1013 (Ct. Int'l Trade 1987)...........................................................................................................16

*Red Sun Farms v. United States*, 469 F. Supp. 3d 1403 (Ct. Int'l Trade 2020) ....................................................................................................................10

*Torrington Co. v. United States*, 731 F. Supp. 1073 (Ct. Int'l Trade 1990) ...............................16

*Usinas Siderúrgicas de Minas Gerais S/A v. United States*, 201 F. Supp. 2d 1304 (Ct. Int'l Trade 2002)................................................................................10

*Vinson v. Wash. Gas Light Co.*, 321 U.S. 489 (1944) ...................................................16

**Administrative Determinations** (in ascending chronological order)

*Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Fresh Tomatoes from Mexico*, 61 Fed. Reg. 56608 (Nov. 1, 1996)........................................................................3, 4, 8

*Suspension of Antidumping Investigation: Fresh Tomatoes from Mexico*, 61 Fed. Reg. 56618 (Nov. 1, 1996)..............................................................................4

*Fresh Tomatoes from Mexico*, 67 Fed. Reg. 50858 (Aug. 6, 2002) ...............................5

*Suspension of Antidumping Investigation: Fresh Tomatoes from Mexico*, 67 Fed. Reg. 77044 (Dec. 16, 2002)...........................................................................5

*Fresh Tomatoes from Mexico*, 73 Fed. Reg. 2887 (Jan. 16, 2008)................................5

*Suspension of Antidumping Investigation: Fresh Tomatoes from Mexico*, 73 Fed. Reg. 4831 (Jan. 28, 2008)............................................................................5

*Fresh Tomatoes from Mexico: Notice of Preliminary Results of Changed Circumstances Review and Intent to Terminate the Suspended Antidumping Investigation*, 77 Fed. Reg. 60103 (Oct. 2, 2012).....................................6

*Fresh Tomatoes from Mexico: Termination of Suspension Agreement, Termination of Five-Year Sunset Review, and Resumption of Antidumping Investigation*, 78 Fed. Reg. 14771 (Mar. 7, 2013)...........................................................5

*Fresh Tomatoes from Mexico: Suspension of Antidumping Investigation*,
78 Fed. Reg. 14967 (Mar. 8, 2013)............................................................................5

*Fresh Tomatoes from Mexico: Termination of Suspension Agreement,
Rescission of Administrative Review, and Continuation of the Antidumping
Duty Investigation*, 84 Fed. Reg. 20858 (May 13, 2019) ............................................7

*Fresh Tomatoes from Mexico: Suspension of Antidumping Duty
Investigation*, 84 Fed. Reg. 49987 (Sept. 24, 2019) ...................................................7

*Fresh Tomatoes from Mexico: Final Determination of Sales at Less Than
Fair Value*, 84 Fed. Reg. 57401 (Oct. 25, 2019) ..................................................7, 8, 9

*Fresh Tomatoes from Mexico*, 84 Fed. Reg. 67958 (Dec. 12, 2019)............................8

**Other Administrative Materials** (in ascending chronological order)

Respondent Selection Memo (May 24, 2019) ................................................................8

Final Issues and Decision Memorandum for the Final Determination of
Sales at Less than Fair Value in *Fresh Tomatoes from Mexico*
(Oct. 21, 2019) .............................................................................................................6

NatureSweet Response to Request for Information (July 18, 2024) ...........................12

FTE Rebuttal Factual Information Comments (July 29, 2024) .............................5, 6, 9

NatureSweet's Comments on Draft Redetermination (Oct. 11, 2024) ........................13

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| BIOPARQUES DE OCCIDENTE, S.A. DE C.V.; AGRICOLA LA PRIMAVERA, S.A. DE C.V.; AND KALIROY FRESH LLC; <br><br> *Plaintiffs,* <br><br> and <br><br> CONFEDERACION DE ASOCIACIONES AGRICOLAS DEL ESTADO DE SINALOA, A.C.; CONSEJO AGRICOLA DE BAJA CALIFORNIA, A.C.; ASOCIACION MEXICANA DE DE HORTICULTURA PROTEGIDA, A.C.; ASOCIACION DE PRODUCTORES DE HORTALIZAS DEL YAQUI Y MAYO; AND SISTEMA PRODUCTO TOMATE, <br><br> *Consolidated Plaintiffs,* <br><br> v. <br><br> UNITED STATES, <br><br> *Defendant,* <br><br> and <br><br> THE FLORIDA TOMATO EXCHANGE, <br><br> *Defendant-Intervenor.* | Consol. Court No. 19-00204 <br><br> **NON-CONFIDENTIAL VERSION** <br><br> Business Proprietary Information Subject to Protective Order is Removed from Brackets on Page 8. |

## <u>DEFENDANT-INTERVENOR FTE'S COMMENTS SUPPORTING COMMERCE'S REMAND DETERMINATION</u>

Consistent with the Court's July 31, 2024 Amended Scheduling Order, ECF118,

defendant-intervenor The Florida Tomato Exchange ("FTE") respectfully submits these

comments supporting Commerce's October 22, 2024 Remand Determination, ECF121, and

responding to the request by NS Brands, Ltd. and Naturesweet Invernaderos S. de R.L. de C.V. /

NatureSweet Comercializadora, S. de R.L. de C.V. (collectively, "NatureSweet") for an order directing Commerce to calculate an individual margin for NatureSweet.  *See* NatureSweet's Comments in Opposition to Remand Determination, ECF130 (Dec. 3, 2025) ("NatureSweet's Comments").  Commerce issued its Remand Determination pursuant to this Court's order in *Bioparques de Occidente, S.A. de C.V. v. United States*, 698 F. Supp. 3d 1265 (Ct. Int'l Trade 2024).  As detailed below and in the separate brief filed by the United States, the Court should affirm Commerce's remand determination and reject NatureSweet's request.  No party contests the remand results.  Moreover, NatureSweet offers no legal basis for the relief it seeks – a remand to calculate an individual margin for NatureSweet.  Indeed, given the Court's finding that Commerce lacked the authority to take into consideration any recent developments to compute a margin for any firm, NatureSweet's request contradicts the Court's findings.  NatureSweet's request for a margin reflecting current market conditions also contradicts the relief sought by Plaintiff Bioparques.  Furthermore, to the extent that NatureSweet sought a changed circumstances review or new shipper review, Commerce lacked the authority to conduct such proceedings on remand.  Finally, it is not even clear how the remand determination prejudices NatureSweet, as NatureSweet retains the right to seek a new shipper review or changed circumstances review.

## I.      No Party Challenges the Remand Results, so This Court Should Affirm Them

This Court should affirm Commerce's remand results.  The original litigants challenging Commerce's 2019 Final Determination, Bioparques and CAADES, did not file any comments opposing the remand determination by the December 3, 2024 deadline.  The only party that filed comments on that date, NatureSweet, also does not actually oppose the remand determination.  Specifically, NatureSweet "does not object to Commerce's Remand Redetermination as it responds to the Court's holding that the statute requires Commerce to 'resume the investigation

as if its affirmative preliminary determination was made on the date of its determination –

November 1, 1996.'" NatureSweet's Comments, ECF130 at 2. Absent any timely legal

challenge, this Court should affirm the remand determination and terminate this litigation.

**II.    NatureSweet's Request for an Individual Margin is Untimely and Improper**

       As discussed above, no party—including NatureSweet—challenges the validity of

Commerce's remand results. Instead, NatureSweet asks the Court to issue a remand to force

Commerce to calculate an individual dumping margin for NatureSweet based on post-1996 data.

NatureSweet notably provides no legal basis for its request. Indeed, NatureSweet's request

directly contradicts the relief sought by Plaintiff Bioparques—which argued that in a resumed

proceeding Commerce only had the authority to consider data from the original 1996

investigation—and the relief granted by the Court in *Bioparques de Occidente, S.A. de C.V. v.*

*United States*, 698 F. Supp. 3d 1265 (Ct. Int'l Trade 2024). The Court should reject

NatureSweet's post-hoc attempts to enlarge the scope of the proceeding outright.

**A.    The Factual Background Provides a Backdrop for NatureSweet's**
**Gamesmanship**

              1.    *A Series of Suspension Agreements Failed to Provide Domestic*
                    *Producers Relief*

        In April 1996, the domestic industry petitioned for relief from imports of fresh tomatoes

from Mexico that were being sold at less than fair value in the United States and injuring the

domestic industry. Following an affirmative preliminary injury determination by the

International Trade Commission (the "Commission"), Commerce published its affirmative

preliminary dumping determination on November 1, 1996.[1] *Fresh Tomatoes from Mexico*,

---

[1] Commerce assigned the following weighted-average preliminary dumping margins:
Camalu (4.16 percent); Echavarria (11.89 percent); Lomeli (26.97 percent); Eco-Cultivos
(188.45 percent); RLP (10.26 percent); Tamazula (28.30 percent); Yory (11.95 percent); and all
others (17.56 percent).

61 Fed. Reg. 56608, 56615 (Nov. 1, 1996) (prelim. det.) ("1996 Preliminary Determination").

Ordinarily, Commerce would order the suspension of liquidation of all entries of fresh tomatoes

from Mexico and require importers to post a bond or pay a cash deposit on those imports while

Commerce and the Commission concluded their final investigations. *See* 19 U.S.C. § 1673b(d).

Instead of the default statutory route, Commerce entered into an agreement with Mexican tomato

producers/exporters under 19 U.S.C. § 1673c(c). Under the agreement, in addition to suspending

its investigation, Commerce instructed Customs and Border Protection ("CBP") not to collect

cash duty deposits. In turn, the Mexican signatories agreed, *inter alia*, to sell their merchandise

in the United States at or above a minimum "reference price." *Fresh Tomatoes from Mexico*, 61

Fed. Reg. 56618 (Nov. 1, 1996) (susp.) ("1996 Agreement").

Over the subsequent years, Commerce would enter into a series of new suspension

agreements as **Figure 1** summarizes.



**Figure 1**: Milestones

In 2002, 2008, and 2013, producers/exporters accounting for a significant percentage of Mexican

tomato imports withdrew from the then-in-effect suspension agreement, necessitating that

Commerce terminate the suspension agreement that no longer met the 19 U.S.C. § 1673c(c)(1)

requirement to cover "substantially all" imports. After each termination, Commerce resumed its

final antidumping ("AD") investigation, ordered the suspension of liquidation of duties on

Mexican tomato imports, and required the posting of cash deposits or bonds on those imports. *See Fresh Tomatoes from Mexico*, 73 Fed. Reg. 2887 (Jan. 16, 2008) ("2008 Termination Notice") and *Fresh Tomatoes from Mexico*, 67 Fed. Reg. 50858 (Aug. 6, 2002) ("2002 Termination Notice"); *Fresh Tomatoes from Mexico*, 78 Fed. Reg. 14771 (Mar. 7, 2013) ("2013 Termination Notice"). After the investigation resumed in 2002, 2008, and 2013, Mexican producers/exporters then negotiated and concluded replacement suspension agreements with Commerce. Upon signing each new agreement, Commerce suspended the investigation, terminated the suspension of liquidation, and directed CBP to refund any duties paid. *Fresh Tomatoes from Mexico*, 67 Fed. Reg. 77044 (Dec. 16, 2002) (susp.) ("2002 Agreement"); *Fresh Tomatoes from Mexico*, 73 Fed. Reg. 4831 (Jan. 28, 2008) (susp.) ("2008 Agreement"); *Fresh Tomatoes from Mexico: Suspension of Antidumping Investigation*, 78 Fed. Reg. 14967 (Mar. 8, 2013) ("2013 Agreement").

The domestic industry grew increasingly frustrated with the various suspension agreements, which failed to provide adequate relief from unfairly traded Mexican tomato imports. Mexican respondents exited the suspension agreements every five years to renegotiate increasingly favorable terms without having to participate in sunset reviews, declined to comply with the requirements of the existing agreements, and otherwise avoided the default statutory requirement to pay AD duties on their dumped tomato imports. As a result, Mexican producers displaced the domestic industry and continued to increase their U.S. market share, as **Figure 2** shows. *See* FTE Rebuttal Factual Information Comments (Jul. 29, 2024) at Exhibit A, Figure 3.



Figure 2: Market Share Since 1994

Under 19 U.S.C. § 1673c(c), suspension agreements involve Mexican respondents and Commerce, and not the domestic industry, which is not a party to the agreements. Thus, in 2012, out of exasperation, FTE attempted to withdraw its original 1996 petition on the basis that the 2008 Agreement did not meet the statutory requirements to eliminate 85 percent of dumping and prevent injury to the domestic industry. *See generally Fla. Tomato Exch. v. United States*, 255 F. Supp. 3d 1362, 1377-78 (Ct. Int'l Trade 2017). Commerce initiated a changed circumstances review and preliminarily determined to terminate the investigation,[2] but instead of issuing a final changed circumstances determination,[3] Commerce eventually negotiated and entered into a new agreement, the 2013 Agreement.[4]

---

[2] *Fresh Tomatoes from Mexico*, 77 Fed. Reg. 60103, 60104 (Oct. 2, 2012) (prelim. results).
[3] *See* Final I&D Memo (Oct. 21, 2019) at 11-12 ("Commerce made no final determination with respect to the petitioners' June 2012 request to withdraw the petition and terminate of the investigation.").
[4] At that point, FTE appealed the 2013 Agreement, arguing that the 2013 Agreement did not meet the legal requirements of the statute. The Court remanded the 2013 Agreement twice. *Fla. Tomato Exch. v. United States*, 107 F. Supp. 3d 1342 (Ct. Int'l Trade 2015); *Fla. Tomato Exch.*, 255 F. Supp. 3d at 1380-81. Before the deadline for Commerce to file the results of the second remand determination, the Court stayed that appeal pending negotiations of the 2019 Agreement,

On November 14, 2018, FTE tried another approach to obtain relief by requesting that

Commerce withdraw from the 2013 Agreement and resume the suspended investigation, steps

that Commerce ultimately took after providing notice under section VI.B. of that agreement.

*Fresh Tomatoes from Mexico*, 84 Fed. Reg. 20858 (May 13, 2019) (termination) ("Termination

Notice").  Consistent with its past practice, Commerce resumed the suspended investigation at

the point where it originally stopped and announced its intention to complete the investigation

within 135 days pursuant to the extension previously requested by Mexican respondents – unless

Mexican tomato growers/exporters accounting for substantially all U.S. fresh tomato imports

signed a new suspension agreement.  *Id*., at 20860.  Mexican respondents did conclude a new

suspension agreement with Commerce, the 2019 Agreement.  84 Fed. Reg. 49987.

In 2002, 2008, and 2013, the signing of a new suspension agreement resulted in a

separate suspension of Commerce's AD investigation.  As no party sought a continuation of the

final investigation within the 20-day deadline, in each of these instances the investigation

remained suspended.  In contrast, in 2019, for the first time ever, Commerce and the

Commission continued their investigations to completion at FTE's request pursuant to 19 U.S.C.

§ 1673c(g).  *See* 2019 Final Determination, 84 Fed. Reg. 57401, 57402 (Oct. 25, 2019).  The

statute allows for the continuation of suspended investigations to completion, but if the results of

the continued investigations are affirmative, "the agreement shall remain in force" and

Commerce "shall not issue an antidumping duty order," subject to certain conditions.  *See*

19 U.S.C. § 1673c(f)(3)(B).  Ultimately, both agencies reached affirmative final determinations

of dumping and injury, respectively.  2019 Final Determination, 84 Fed. Reg. at 57401-57403

(Commerce); *Fresh Tomatoes from Mexico*, 84 Fed. Reg. 67958 (Dec. 12, 2019) (Commission).

---

now in effect.  *Fresh Tomatoes from Mexico*, 84 Fed. Reg. 49987 (Sept. 24, 2019) (susp.) ("2019
Agreement").

For its 2019 Final Determination, Commerce based the analysis on recent data for the largest Mexican respondents due to the passage of time, the staleness of the 1996 data, and changes to the operations of Mexican producers/exporters of fresh tomatoes.  In 1996, the mandatory respondents and their affiliates accounted for "just under 40 percent of exports, by quantity," of fresh tomatoes to the United States, whereas by 2019, the top five Mexican growers/exporters involved different groupings of firms and accounted for [          ] percent of the total quantity of exports.  *Compare* 1996 Preliminary Determination, 61 Fed. Reg. at 56609 *with* Respondent Selection Memo (May 24, 2019) at Attachment 1.  In its 2019 Final Determination, Commerce assigned the following weighted-average dumping margins: Bioparques (30.48 percent); Cueta Produce (3.91 percent); Negocio Agricola San Enrique (17.02 percent); and all others (20.91 percent).  84 Fed. Reg. at 57401-57402.  Commerce did not select NatureSweet as a mandatory respondent in the 2019 resumed final AD investigation.

> **2.** *Some Firms Appealed to Avoid Eventual Application of the 2019 Margins if an AD Order were Issued, but NatureSweet Did Not Do So*

As a result of the affirmative final AD and injury determinations by Commerce and the Commission in the continued investigations, the domestic industry secured the right to immediate implementation of an AD order following termination of any suspension agreement on fresh tomatoes from Mexico along with the requirement for cash deposits on those entries equivalent to the AD margins Commerce calculated in the final determination pursuant to 19 U.S.C. §§ 1673c(i)(1)(A)(ii) and 1673c(i)(1)(C).  The statute allows the suspension agreement to remain "in force" under 19 U.S.C. § 1673c(f)(3)(B) and Commerce "shall not issue an antidumping duty order" on fresh tomato imports from Mexico only "so long as":

(1) "the 2019 Agreement remains in force,"
(2) "the 2019 agreement continues to meet the {relevant statutory} requirements," and

(3) "the parties to the 2019 Agreement carry out their obligations under the 2019 Agreement in accordance with its terms."

2019 Final Determination, 84 Fed. Reg. at 57403.[5]

Bioparques, CAADES, Jem D, and Red Sun filed appeals seeking to challenge (1) Commerce's termination of the 2013 Agreement and continuation of the investigation, (2) the 2019 Agreement, and/or (3) Commerce's 2019 Final Determination in the continued investigation.  At the time Bioparques and CAADES filed their 2019 complaints, NatureSweet knew that parties were arguing that Commerce had unlawfully failed to continue its 1996 proceedings, *see e.g.,* Bioparques Complaint, ECF No. 9 (Dec. 20, 2019) at 7, and thus that remand to continue those proceedings was a possibility.  NatureSweet also knew that neither Bioparques nor CAADES challenged Commerce's decisions not to conduct a changed circumstances review or to issue a separate rate for NatureSweet, even though NatureSweet requested such actions before Commerce during the challenged 2019 proceeding.  *See* Bioparques Complaint, CAADES Complaint, ECF No. 14 in Case No. 1:19-cv-203 (Dec. 20, 2019); *see also* NatureSweet's Motion to Intervene, ECF122 at Exhibit 6.  Yet, despite clear knowledge of the potential interests at stake, NatureSweet decided not to exercise its right to timely intervene then, let alone to file its own timely challenge to Commerce's 2019 Final Determination.

The United States moved to dismiss the various appeals filed by Bioparques, CAADES, Red Sun, and Jem D, and FTE supported those motions to dismiss.  This Court granted the

---

[5] Despite Commerce's best efforts, the 2019 Agreement, like its predecessors, proved unenforceable and inoperable, which is why on June 16, 2023, FTE formally petitioned Commerce to terminate the 2019 Agreement and issue an AD order.  Over a year later and following extensive comments from interested parties, no action has been taken on the June 16, 2023 termination request.  *See* FTE Rebuttal Factual Information Comments (Jul. 29, 2024) at Exhibit A.

motions and dismissed each of those appeals for mootness or lack of jurisdiction. *See Bioparques de Occidente, S.A. de C.V. v. United States*, 470 F. Supp. 3d 1366 (Ct. Int'l Trade 2020); *Confederacion de Asociaciones Agricolas del Estado de Sinaloa, A.C. v. United States*, 459 F. Supp. 3d 1354, 1362-65 (Ct. Int'l Trade 2020); *Jem D*, 470 F. Supp. 3d at 1374; *Red Sun Farms v. United States*, 469 F. Supp. 3d 1403 (Ct. Int'l Trade 2020). The Federal Circuit affirmed this Court's dismissal of those cases, except for claims regarding Commerce's final determination. *See Jem D Int'l Michigan Inc. USA v. United States*, 2022 U.S. App. LEXIS 10044*, *3-*4 (Fed. Cir. Apr. 14); *Bioparques de Occidente, S.A. de C.V. v. United States*, 31 F.4th 1336, 1339 (Fed. Cir. 2022); *Confederacion de Asociaciones Agricolas Del. Estado de Sinaloa, A.C. v. United States*, 32 F.4th 1130, 1143 (Fed. Cir. 2022). While a suspension agreement remains in effect, Commerce does not publish an AD order, which is ordinarily the 19 U.S.C. § 1516a(a)(2)(B)(i) triggering event for respondents to appeal Commerce's final antidumping duty determination.[6] *See Usinas Siderúrgicas de Minas Gerais S/A v. United States*, 201 F. Supp. 2d 1304, 1304-16 (Ct. Int'l Trade 2002). Here, however, even though Commerce has not yet published any AD order on fresh tomatoes from Mexico and a suspension agreement covers those imports, the Federal Circuit concluded that this Court has jurisdiction now to review Commerce's final determination in the continued investigation, because the case involves exports from a NAFTA/USMCA country. *Bioparques*, 31 F.4th at 1348; *see also CAADES*, 32 F.4th at 1135.

---

[6]  The basis for the 2019 Agreement involved Commerce's decision that the agreement would eliminate the "injurious effect" of the Mexican tomato imports pursuant to 19 U.S.C. § 1673c(c), and no party sought to appeal on the basis of how any changes in the margin calculations in the final determination would have impacted the agreement under 19 U.S.C. § 1516a(a)(2)(B)(iv), an appeal avenue available only for agreements to eliminate dumping completely pursuant to 19 U.S.C. § 1673c(b).

3. *NatureSweet Again Did Not Challenge Commerce's 2019 Final Determination*

After the Federal Circuit's decisions, this Court ordered the parties to file a joint status report and issued a scheduling order for briefing the remaining issues. *See* ECF54 (July 11, 2022); ECF50 (Mar. 30, 2023). Once again, NatureSweet did not seek to intervene in the litigation at this juncture let alone submit any arguments, whereas Bioparques filed a brief on the merits, and CAADES filed a brief largely echoing those arguments. *See* ECF83 (Dec. 20, 2022); ECF81 (Dec. 20, 2022). This Court remanded the 2019 Final Determination and required Commerce to "resume its investigation flowing from the affirmative preliminary determination issued on November 1, 1995, including focusing its analysis on the evidence submitted regarding the original period of investigation of March 1, 1995 through February 29, 1996, and reviewing the {original} mandatory respondents." *Bioparques*, 698 F. Supp. 3d at 1276.

4. *Commerce Complied with the Court's Remand Order*

On remand, and "under respectful protest," Commerce reconsidered respondent selection, and instead of using data for 2019, it "evaluated the 1995-1996 data from the seven respondents individually examined in 1996 and in 2002 during the investigation and determined dumping margins using the 1995-1996 data." Remand Determination, ECF120-1 at 2. As Commerce noted, the seven firms selected in the preliminary investigation represented the largest exporters of fresh tomatoes from Mexico at that time, but many of these firms were not among the largest exporters by 2019. Moreover, when the investigation resumed in 2002 following termination of the 1996 agreement, Commerce learned that two of the seven original respondents (Eco-Cultivos and Lomeli) ceased operation, and two other original mandatory respondents (Los Pinos and Yory) failed verification. *Id*. at 10-11.

11

During the remand proceeding, NatureSweet reported that its predecessor, Desert Glory, initially sold greenhouse technology to Eco-Cultivos, later entered into an arm's-length distribution agreement with Eco-Cultivos to help market their Mexican-grown cocktail tomatoes in the United States, and in 1999 purchased greenhouse facilities from Eco-Cultivos but did not purchase the right to use the brand of Eco-Cultivos, which exited the tomato business and has not exported fresh tomatoes to the United States since April 1999.  *See* NatureSweet Response to Request for Information (Jul. 18, 2024) at 4-5.  Commerce was unable to complete verification of Eco-Cultivos, which in 2002 "did not provide an answer to whether documents existed that would make the verification of the submitted information possible."  *See* Remand Determination, ECF120 at 17.  Due to its inability to verify information, in whole or in part, regarding Eco-Cultivos and other respondents, Commerce found it appropriate to apply facts otherwise available for several firms.  Indeed, because six firms failed to cooperate to the best of their ability to provide verifiable information, Commerce found it appropriate to use an adverse inference in selecting from among the facts otherwise available, assigning total adverse facts available margins to four firms (Eco-Cultivos, Lomeli, Los Pinos, and Yory) and applying adverse facts available for certain claimed adjustments by Echavarria and Tamazula.  *Id*. ECF120 at 19-20.  Commerce assigned the following weighted-average dumping margins on remand:  Camalu (2.81 percent); Echavarria (26.39 percent); Tamazula (18.58 percent); Lomeli (273.43 percent); Los Pinos (273.43 percent); Yory (273.43 percent); Eco-Cultivos (273.43 percent); and all others (17.09 percent).  *Id*., ECF120 at 36.

Bioparques did not file any comments with Commerce on the draft remand results, apparently pleased that its imports would no longer face a 30.48 percent AD duty and would instead be subject to an all others' rate of 17.09 percent.  Meanwhile, in its comments on the draft remand results, NatureSweet agreed that Commerce "technically complied with the CIT's

Remand Order," by calculating margins for the original mandatory respondents based on data for the original investigation.  At the same time, NatureSweet asked Commerce to conduct a new shipper review or changed circumstances review and calculate an individual margin for NatureSweet due to substantial changes in commercial and market conditions since the 1995-1996 period.  *See* NatureSweet's Comments on Draft Remand Redetermination (Oct. 11, 2024).  NatureSweet's submissions to Commerce in the remand proceeding largely repeated arguments that NatureSweet made to Commerce—but chose not to appeal—in 2019.  In particular, in submissions to Commerce in the 2019 proceeding, NatureSweet argued that it produced specialty tomatoes that "do not belong" in the restarted investigation and that Commerce should calculate an individual rate for NatureSweet or conduct a "changed circumstances" review.  *See* NatureSweet's Motion to Intervene, ECF122 at Exhibit 6.  NatureSweet's October 2024 submissions to Commerce in the remand proceeding unsurprisingly reiterate these same arguments.  *See id*. at Exhibit 5.  During the remand proceeding, Commerce rejected NatureSweet's request.  Remand Determination, ECF120 at 32-33.  Bioparques and CAADES had not argued for a new shipper or changed circumstances review, so the Court had no jurisdiction over such a claim.  Moreover, the Court's Remand Order limited the scope of the remand proceeding to the 2019 Final Determination, precluding Commerce from initiating a changed circumstances review of the suspension agreement as part of the remand proceeding. Remand Determination, ECF120 at 33.

> ### 5.    *NatureSweet was the Only Exporter That Submitted December 3 Comments on the Remand Results*

On October 25, 2024, NatureSweet submitted a motion to intervene in this litigation, claiming that it did not intervene or appeal the 2019 Final Determination four and a half years earlier because it could not have foreseen Commerce's reopening of the record in the remand

proceeding and because, at the time, it believed "NatureSweet's interests could be represented by the arguing parties." NatureSweet's Motion at 4. Due to NatureSweet's failure to file the motion to intervene on time, its failure to file an administrative brief during the remand proceedings, and NatureSweet's inability to demonstrate good cause for the delay in its filing, the United States and FTE objected to NatureSweet's intervention. *See* ECF127, ECF128. The Court granted its motion to intervene. ECF129 (Nov. 25, 2024).

On December 3, 2024, the deadline for parties to file comments opposing Commerce's remand determination, Bioparques and CAADES did not file any comments. Only NatureSweet filed comments, in which it "does not object to Commerce's Remand Redetermination as it responds to the Court's holding that the statute requires Commerce to 'resume the investigation as if its affirmative preliminary determination was made on the date of its determination – November 1, 1996.'" NatureSweet's Comments, ECF130 at 2. Instead, NatureSweet claims "prejudice to companies now in existence which did not exist during the preliminary phase of Commerce's investigation in 1996." *Id*. NatureSweet admits that it is "connected to an original respondent" but claims that it "is not a successor." *Id*. at 5. According to NatureSweet, in the "event that the statute does not allow for investigation of companies like NatureSweet as part of the remand proceeding, Commerce has an obligation to 'establish an individual weighted-average dumping margin' for companies with *bona fide* sales, even those subject to suspension agreements." *Id*. at 4-5. According to NatureSweet, the all-others' rate does not reflect NatureSweet's exports of "almost exclusively specialty, snacking tomatoes," especially because NatureSweet "did not even exist in 1995." NatureSweet's Comments, ECF130 at 6. Thus, NatureSweet requests that this Court order Commerce to "fulfill its statutory obligation to calculate accurate margins for companies which were not in existence during the initial investigation," such as a changed circumstances review. *Id*. at 6-7.

14

**B.    This Court Should Reject NatureSweet's Request and Affirm the Remand Results as NatureSweet Provides No Legal Basis for the Relief it Now Seeks**

NatureSweet fails to provide a legal basis for this Court to provide the relief it seeks. Specifically, NatureSweet claims "prejudice to companies now in existence which did not exist during the preliminary phase of Commerce's investigation in 1996." NatureSweet's Comments, ECF130 at 2. NatureSweet admits that it is "connected to an original respondent" but claims that it "is not a successor." *Id*. at 5. According to NatureSweet, in the "event that the statute does not allow for investigation of companies like NatureSweet as part of the remand proceeding, Commerce has an obligation to 'establish an individual weighted-average dumping margin' for companies with *bona fide* sales, even those subject to suspension agreements." *Id*. at 4-5. According to NatureSweet, the all-others' rate does not reflect NatureSweet's exports of "almost exclusively specialty, snacking tomatoes," especially because NatureSweet "did not even exist in 1995." *Id*. at 7. As such, NatureSweet requests that this Court order Commerce to "fulfill its statutory obligation to calculate accurate margins for companies which were not in existence during the initial investigation," such as a changed circumstances review. *Id*. at 6-7. This Court should reject NatureSweet's request for several reasons.

First, this Court rejected Commerce's reliance on more recent information of the type requested by NatureSweet to compute antidumping duty margins for its Final Determination. *Bioparques*, 698 F. Supp. 3d 1265. The Court found that Commerce lacked the authority to take into consideration any recent developments to compute a margin for any firm.

Second, by arguing that Commerce calculate a "representative" margin for NatureSweet based on changes in market conditions in the intervening time, NatureSweet seeks relief that directly contradicts the position taken by Bioparques in this appeal, which argued in favor of using the 1995-1996 data. NatureSweet offers no explanation how it, as a Plaintiff-Intervenor,

15

has the legal right to seek the opposite relief that Plaintiff Bioparques obtained through this litigation. Indeed, the Courts have repeatedly held that intervenors in court proceedings are limited to the claims brought by the original parties and may not use intervention to broaden the scope of a proceeding, much less take a position opposite the one articulated by the party on whose side intervention was granted. *See, e.g.*, *Vinson v. Wash. Gas Light Co.*, 321 U.S. 489, 498 (1944); *Laizhou Auto Brake Equip. Co. v. United States*, 477 F. Supp.2d 1298, 1299–1301 (Ct. Int'l Trade 2007); *Torrington Co. v. United States*, 731 F. Supp. 1073, 1076 (Ct. Int'l Trade 1990); and *Nat'l Ass'n of Mirror Mfrs. v. United States*, 670 F. Supp. 1013, 1015 (Ct. Int'l Trade 1987).

Third, as Commerce explained, to the extent that NatureSweet sought a changed circumstances review or new shipper review, Commerce lacked the authority to conduct such proceedings on remand. Bioparques and CAADES had not argued for a new shipper or changed circumstances review, so the Court had no jurisdiction over such a claim. Moreover, the Court's Remand Order limited the scope of the remand proceeding to the 2019 Final Determination, precluding Commerce from initiating a changed circumstances review of the suspension agreement as part of the remand proceeding. Remand Determination, ECF120 at 32-33. NatureSweet does not argue otherwise, essentially affirming the correctness of Commerce's conclusion and instead suggesting what it wants in the "event that the statute does not allow for investigation of companies like NatureSweet as part of the remand proceeding … ." *Id*. at 4-5.

Finally, it is not even clear how the remand determination prejudices NatureSweet. Currently, the imposition of AD duties is suspended by the existence of the 2019 Agreement. NatureSweet retains the right to seek a new shipper or changed circumstances review, and Commerce will have the legal authority to take a closer look at the pertinent facts at that time.

16

This Court should not allow NatureSweet to circumvent the path provided by the statute and seek to achieve that result now by means of this litigation.

## III.    Conclusion

Absent any challenges to the remand results, this Court should affirm them.  For the reasons discussed above, the Court also should reject NatureSweet's request for a remand and otherwise dismiss this litigation

<div style="margin-left:40%">

Respectfully submitted,

/s/ Robert C. Cassidy, Jr.

Robert C. Cassidy, Jr.
Charles S. Levy
James R. Cannon, Jr.
Mary Jane Alves
Jonathan M. Zielinski
Nicole Brunda
**CASSIDY LEVY KENT (USA) LLP**
2112 Pennsylvania Avenue NW, Suite 300
Washington, DC 20037
202-567-2302
rcassidy@cassidylevy.com

*Counsel to The Florida Tomato Exchange*

</div>

January 7, 2025

**Certificate of Compliance**

Pursuant to the Court's Standard Chamber Procedure 2(B)(1)(b), the undersigned certifies that Defendant-Intervenor FTE's Comments Supporting Commerce's Remand Determination filed on January 7, 2025 complies with the word-limitation requirement of no more than 10,000 words. The word count for this submission as computed using MSWord and the limitations described in the Court's Standard Chamber Procedure 2(B)(1)(c) totals 4,970 words, including the two figures.

/s/ Mary Jane Alves
Mary Jane Alves